IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN BADII, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. 3:12-CV-04541 |
| RICK'S CABARET INTERNATIONAL | § | |
| INC, XTC CABARET (DALLAS), INC., | § | |
| XTC CABARET, INC., AND XTC | § | |
| CABARET, | § | |
| | § | |
| *Defendants.* | § | |

## APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Monte K. Hurst
State Bar No. 00796802
monte.hurst@hsblaw.com

Adam Reed
State Bar No. 24002811
adam.reed@hsblaw.com

HERMES SARGENT BATES, LLP
901 Main Street, Suite 5200
Dallas, Texas  75202
214.749.6000
(f) 214.749.6100

*Counsel for Rick's Cabaret International Inc., XTC Cabaret (Dallas), Inc., XTC Cabaret, Inc. and XTC Cabaret*

## TABLE OF CONTENTS

| EXHIBIT | DOCUMENT | PAGES |
|---|---|---|
| **A** | Original Complaint (November 13, 2012) | APP 1 – 17 |
| **B** | Defendants' Original Answer (December 10, 2012) | APP 18 – 42 |
| **C** | Oral and Videotaped Deposition of Ryan J. Badii, September 12, 2013 | APP 43 – 133 |
| **D** | Affidavit of Josh Stern (November 15, 2013) | APP 134 – 142 |
| **E** | Affidavit of Jennifer Andis (November 13, 2013) | APP 143 – 148 |
| **F** | Affidavit of Amy Crenshaw (November 15, 2013) | APP 149 – 152 |
| **G** | Affidavit of Ed Anakar (November 15, 2013) | APP 153 – 155 |
| **H** | Certified copy of administrative EEOC file in *Ryan J. Badii v. Rick's Cabaret International, Inc. d/b/a XTC Cabaret,* Charge No. 450-2012-03750 | APP 156 – 191 |

Respectfully submitted,

HERMES SARGENT BATES, LLP
901 Main Street, Suite 5200
Dallas, Texas 75202
214.749.6000


By:     *Monte K. Hurst*

Monte K. Hurst
State Bar No. 00796802
monte.hurst@hsblaw.com

Adam Reed
State Bar No. 24002811
adam.reed@hsblaw.com

*Counsel for Rick's Cabaret International Inc., XTC Cabaret (Dallas), Inc., XTC Cabaret, Inc. and XTC Cabaret*


## CERTIFICATE OF SERVICE

On November 15, 2013, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served Plaintiff's counsel as follows electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Mr. Vishal Chander
THE CHANDER LAW FIRM
3102 Maple Avenue, Suite 450
Dallas, Texas  75201


*Monte K. Hurst*

Monte K. Hurst



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RYAN BADII              *
     PLAINTIFF,     *
                     *
VS.              * NO. 3:12-CV-04541
                    *
RICK'S CABARET          *
INTERNATIONAL INC., XTC  *
CABARET (DALLAS), INC.,  *
XTC CABARET, INC., AND   *
XTC CABARET              *
     DEFENDANTS.    *

--------------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
RYAN J. BADII
SEPTEMBER 12, 2013
--------------------------------------

    ANSWERS AND DEPOSITION of RYAN J. BADII, a witness produced on behalf of the Defendants, taken in the above styled and numbered cause on the 12th day of September, 2013, from 9:34 a.m. to 4:38 p.m. before Kathy Bradford, a Certified Court Reporter in and for the State of Texas, taken in the offices of The Chander Law Firm, 3102 Maple Avenue, Suite 450, City of Dallas, County of Dallas, State of Texas, in accordance with the Federal Rules.

**Page 2**

1          A P P E A R A N C E S
2 FOR THE PLAINTIFF:
3   Mr. Vishal Chander
    THE CHANDER LAW FIRM
4   3102 Maple Avenue, Suite 450
    Dallas, Texas 75201
5   Phone: (214) 677-4990
    vchander@chanderlaw.com
6
  FOR THE DEFENDANTS:
7
    Mr. Monte K. Hurst
8   HERMES SARGENT BATES, L.L.P.
    901 Main Street, Suite 5200
9   Dallas, Texas 75202
    Phone: (214) 749-6500
10   monte.hurst@hsblaw.com
11 ALSO PRESENT:
12   Ms. Deborah Smith, Videographer
    ELITE VIDEO PRODUCTIONS
13   3018 Commerce Street
    Dallas, Texas 75226
14   Phone: (214) 747-1952
15   Mr. Scott Sherman, General Counsel
    RICK'S CABARET INTERNATIONAL, INC.
16
17
18
19
20
21
22
23         REPORTER'S NOTE
    Quotation marks are used for clarity and do not
24     necessarily reflect a direct quote.
25

**Page 3**

1         I N D E X
2 EXHIBIT               PAGE
  NUMBER   DESCRIPTION        IDENTIFIED
3
  1     Twitter Printout        272
4
  2     E-mail dated 10/7/12 from Puya Badii  286
5     to jobs@veelounge.com
6
7 VIDEOTAPE INDEX
8    TAPE  PAGE
9     1    4
     2    97
10     3   204
11
12
13
14
15
16
17
18
19
20
21
22
23 EXAMINATION            PAGE
24   BY MR. HURST          4
25

**Page 4**

1       P R O C E E D I N G S
2     COURT REPORTER: Do you want the federal
3 introductory clause read or waive the reading?
4     MR. CHANDER: We can waive it.
5     MR. HURST: We can waive it.
6     VIDEOGRAPHER: We're now on record.
7 Time is 9:34.
8         RYAN J. BADII,
9 having been first duly sworn, testified as follows:
10       EXAMINATION
11 BY MR. HURST:
12   Q. Can you please state your full name for the
13 record?
14   **A. Yes. My name is Ryan James Badii.**
15   Q. And how do you spell your last name?
16   **A. B-a-d-i-i.**
17   Q. Sir, you and I just met. My name is Monte
18 Hurst, and I represent Rick's Cabaret International
19 and XTC Cabaret Dallas in this lawsuit. Do you
20 understand that?
21   **A. Yes, sir.**
22   Q. Okay. And I understand that you've had your
23 deposition taken before. And we'll talk about that in
24 just a moment; but before we proceed with this one,
25 I'd like to go over some ground rules with you that I

Page 5

1  think will make it easier for both of us.
2      No. 1, will you please do the best you
3  can to answer each of my questions and let me finish
4  that question before you start in on your answer?
5  **A. Sure.**
6      Q. I'll do the best I can to let you finish your
7  answer before I go to my next question.
8  **A. Thank you.**
9      Q. No. 2, if you don't understand one of my
10 questions, will you please just let me know, ask me to
11 rephrase it?  And I'll do the best I can to rephrase
12 it.
13 **A. Okay.**
14     Q. No. 3 -- you're doing a very good job of this
15 already -- will you please answer verbally with yes's,
16 no's, or explanations using words as opposed to the
17 huh-uhs or the uh-huhs that the court reporter can't
18 necessarily reflect in her record?
19 **A. Yes.**
20     Q. Thank you.  Are you on any medication today?
21 **A. No, I'm not.**
22     Q. I know you've had your deposition taken
23 before.  How many times?
24 **A. Twice.**
25     Q. Okay.  What was the most recent time you've

Page 6

1  had your deposition taken?
2  **A. In the case -- I believe it was regarding a**
3  **cab driver that was killed outside of XTC.**
4      Q. Okay.  Do you know the name of that lawsuit?
5  **A. I don't quite remember, no.**
6      Q. Do you recall when that incident was?
7  **A. Yes.  It was April ni -- I believe on/or**
8  **around April 19, 2010.**
9      Q. Were you working that night?
10 **A. No, I wasn't.**
11     Q. And do you recall when your deposition with
12 regard to that case was?
13 **A. It was last month.**
14     Q. As in August 2013?
15 **A. Yes.**
16     Q. And what was the other time you've had your
17 deposition taken?
18 **A. It was in July of this year.**
19     Q. And it was in reference to what?
20 **A. I believe some minors that were injured or**
21 **died leaving the club.**
22     Q. XTC Dallas?
23 **A. Yes.**
24     Q. What's your understanding of how those minors
25 died?

Page 7

1  **A. I -- all I know is what I was told, that they**
2  **died leaving the club.**
3      Q. In a car accident?
4  **A. I believe so.**
5      Q. Were you working that night?
6  **A. I don't think so.**
7      Q. Okay.  Do you recall the night of the
8  incident?
9  **A. No, I don't.**
10     Q. Do you recall what year it purportedly
11 happened?
12 **A. No.  I don't have any firsthand knowledge.**
13     Q. What's your date of birth?
14 **A. April 17, 1978.**
15     Q. Where were you born?
16 **A. In Lewisville, Texas.**
17     Q. What's your social security number?
18 **A. 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.**
19     Q. Do you have a Texas driver's license?
20 **A. I do, yes.**
21     Q. What's that number?
22 **A. I -- I'm not sure.  I have it with me.**
23     Q. If you don't mind checking --
24 **A. Sure.  It is 24072731.**
25     Q. Any restrictions on that license?

Page 8

1  **A. Yes, vision.**
2      Q. You're required to wear corrective --
3  **A. Lenses, yes.**
4      Q. Any other restrictions or limitations?
5  **A. No, sir.**
6      Q. Have you ever had your license suspended or
7  revoked?
8  **A. Yes, I have.**
9      Q. Which one and when?
10 **A. I had it suspended for six months in 2008.**
11     Q. Why?
12 **A. Because of a misdemeanor charge that I had**
13 **received at the time.**
14     Q. What was the misdemeanor?
15 **A. It was possession of less than an ounce of**
16 **marijuana and unlawful carry of a weapon.**
17     Q. Is this the only time you've had your license
18 suspended or revoked?
19 **A. I believe so.**
20     Q. And as you recall, that was in 2008.  And you
21 got your license back sometime in 2009?
22 **A. I believe so, yes.**
23     Q. What type of weapon did you have on you,
24 allegedly?
25 **A. It was actually in my girlfriend's car at the**

Page 9

1  time.
2      Q. You were driving your girlfriend's car?
3      A. Yes.
4      Q. And what weapon do the police say they found
5  in the car?
6      A. I -- I believe she had a small caliber gun.
7  I don't know exactly what type.
8      Q. Did it belong to your girlfriend at the time?
9      A. Yes.
10     Q. Was that the only weapon the police found?
11     A. Yes.
12     Q. What is the name of this woman who was or is
13  your girlfriend?
14     A. She was, and I'd prefer not to disclose that.
15     Q. Okay. I'm going to allow your attorney to
16  let you know that you have to answer my questions.
17  And we can do this easily, or we can go to court and
18  do it. This is not privileged information. She's not
19  in any trouble because you're identifying who the
20  person is, but she may have knowledge of facts
21  relevant to this case. And we're certainly entitled
22  to ask that question.
23     A. Okay. I'm going to just insist on my answer
24  and leave it as it is.
25     Q. I want to get this straight. You're refusing

Page 10

1  to provide the name of your former girlfriend from
2  2008?
3      A. Yes, because she's a lawyer. And what
4  occurred at that time might impact her negatively.
5      MR. HURST: Vishal, do you want to
6  counsel your client to make a better choice with
7  regard to his testimony? Or do we need to go in front
8  of a magistrate.
9      MR. CHANDER: Ryan, the matter is not
10  privileged. Perhaps you guys could make an assurance
11  that you would not be bringing any type of dis --
12  disciplinary proceedings before the bar, and he would
13  feel more secure in -- in -- in providing that answer.
14     Q. (BY MR. HURST) I have no intention of outing
15  your former girlfriend, if that's the point. I hope
16  you understand that she is someone who may have
17  knowledge of relevant facts with regard to this
18  lawsuit you've initiated, though.
19         And I can assure you that a federal
20  magistrate is going to be extremely angry that Vishal
21  and I would even have to call him or her to resolve
22  this silly discovery issue.
23     A. Okay. Her name was Sheena Shaghaghi.
24     Q. How do you spell her first name?
25     A. S-h-e-e-n-a.

Page 11

1      Q. How do you spell her last name?
2      A. S-h-a-g-a-g-i [sic], I believe.
3      Q. Have you had a driver's license with any
4  other number than the one you just gave to me?
5      A. In Texas, no.
6      Q. Okay. How about in any other state?
7      A. I lived in Oregon for several years.
8      Q. Did you have a driver's license there?
9      A. Yes.
10     Q. And when did you live in Oregon?
11     A. Between 1984 and 2008.
12     Q. Do you recall the driver's license number of
13  your Oregon driver's license?
14     A. No, I don't.
15     Q. Was that driver's license ever suspended or
16  revoked?
17     A. I don't remember.
18     Q. Do you recall that there may have been an
19  instance in which it was?
20     A. I -- I don't -- I don't recall.
21     Q. Any other driver's license besides the one in
22  Texas that you gave to me and the one in Oregon that
23  you identified?
24     A. No.
25     Q. What's your current cell phone number?

Page 12

1      A. 214/414-6045.
2      Q. How long have you had this one?
3      A. For about four years.
4      Q. Who is your provider right now?
5      A. It's T-Mobile.
6      Q. Has it been T-Mobile the entire four years?
7      A. No, it hasn't.
8      Q. Okay. When did you switch over to T-Mobile?
9      A. I believe about a year ago.
10     Q. Who was the provider of your cell phone
11  service prior to your switching over to T-Mobile last
12  year?
13     A. MetroPCS.
14     Q. And how long was MetroPCS the provider of
15  this particular phone number for you?
16     A. For about three years.
17     Q. So '09 to 2012, approximately?
18     A. Yes.
19     Q. Over the last approximately four years, have
20  you had a cell phone number other than the cell phone
21  number you just gave to me?
22     A. No.
23     Q. Over the last four years, have you had a cell
24  phone provider other than T-Mobile and MetroPCS?
25     A. No.

Page 13

1 Q. What was your cell phone number, if you had
2 one, prior to the cell phone number you just gave to
3 me?
4 **A. I -- I don't remember.**
5 Q. Do you remember the -- who the provider was?
6 **A. No, I don't.**
7 Q. Was it someone different than MetroPCS?
8 **A. I believe so.**
9 Q. Do you recall why you switched over to
10 MetroPCS in 2009?
11 **A. Moving to the Dallas area, it was a good**
12 **option.**
13 Q. So this is the cell -- first cell phone
14 number that you obtained when you moved to the
15 Dallas/Fort Worth area after being in Oregon?
16 **A. Yes.**
17 Q. Do you recall any of your cell phone numbers
18 prior to the one you have now?
19 **A. No, I don't.**
20 Q. What's your current e-mail address or
21 addresses?
22 **A. My last name, badii.ryan@gmail.**
23 Q. How long have you had this one?
24 **A. A few years.**
25 Q. Since, what, 2010, 2011?

Page 14

1 **A. Maybe or maybe before that.**
2 Q. Since 2009?
3 **A. Possibly, yes.**
4 Q. Do you currently use or have access to any
5 other e-mail address, let's say, since 2009, up until
6 now?
7 **A. Yes, there is one other one.**
8 Q. Okay. What is that?
9 **A. It's ryanbadii@icloud.**
10 Q. And that's the last name spelled correctly,
11 as well?
12 **A. Yes.**
13 Q. Is that icloud.com?
14 **A. Yes, sir.**
15 Q. How long have you had that e-mail address?
16 **A. Approximately a year.**
17 Q. Over the last year or so, have you had access
18 to or used any e-mail address other than the two that
19 you just gave to me?
20 **A. No.**
21 Q. Over the last four to five years, have you
22 had access to and/or used an e-mail address other than
23 the two you just gave to me?
24 **A. No.**
25 Q. Did you use or have access to any e-mail

Page 15

1 address other than the two you just identified for me
2 while you were employed for XTC Cabaret Dallas?
3 **A. Yes, I -- I had a corporate e-mail.**
4 Q. Okay. And what was that?
5 **A. Ryanb@rickscabaret or ricks -- just ricks, I**
6 **believe, .com.**
7 Q. And that was just while you were employed at
8 XTC?
9 **A. Yes.**
10 Q. How about prior to becoming employed at XTC
11 Cabaret Dallas? Do you recall what e-mail address you
12 used or were using?
13 **A. No, I don't.**
14 Q. Okay. Have you had a Gmail account other
15 than badii.ryan?
16 **A. No.**
17 Q. As we sit here today, do you recall any other
18 e-mail address that you've used or to which you've had
19 access over, say, the last ten years besides the three
20 you've identified?
21 **A. I believe those are the two main e-mails that**
22 **I use -- or those are the two e-mails that I use.**
23 Q. I understand what your answer is. My
24 question to you, sir, was, do you recall any other
25 e-mail addresses you have used or have had access to

Page 16

1 over the last ten years besides the three you've
2 identified for me?
3 **A. I'm sure there was others. I don't recall**
4 **right now what they are.**
5 Q. Okay. And do you recall anything with regard
6 to those other e-mail addresses including who actually
7 hosted the e-mail address?
8 **A. No, those are the -- that's all I remember as**
9 **of right now.**
10 Q. Did you ever have an MSN account?
11 **A. No, I didn't.**
12 Q. Did you ever have a Yahoo! account?
13 **A. I believe so, yes.**
14 Q. What would that Yahoo! account name have
15 been, if you recall?
16 **A. I don't remember. I haven't used it in**
17 **years.**
18 Q. When you --
19 **A. I think it's ryan -- ryanb@yahoo.**
20 Q. When you were working for XTC Cabaret, did
21 you mainly use your ricks.com e-mail address? Or were
22 you using your Gmail account?
23 **A. For business-related matters, I used the**
24 **company e-mail.**
25 Q. And for personal matters, you would use the

Page 17

1  Gmail account?
2  **A. Yes.**
3  Q. And how would you access that Gmail account?
4  **A. From a computer.**
5  Q. Would it be your home computer?  Would it be
6  your iPhone, your other PDA device?
7  **A. It was my home computer.**
8  Q. Is that the only place where you would access
9  your Gmail account?
10  **A. I may have had it linked to a cell phone.**
11  **I'm not -- I don't quite remember.**
12  Q. Well, do you have it linked to a cell phone
13  now?
14  **A. Now I do, yes.**
15  Q. But you don't recall whether you actually had
16  it linked to a cell phone or another portable device
17  while you were employed at XTC Cabaret Dallas?
18  **A. Well, at the time, I didn't have a PDA**
19  **device.  I don't -- I believe what I had was a more**
20  **simple phone, so I don't remember if it had the**
21  **capability.**
22  Q. Do you still have a home computer?
23  **A. Yes, I do.**
24  Q. Okay.  Is it the same home computer that you
25  had when you were accessing your e-mail account while

Page 18

1  you worked for XTC Cabaret Dallas?
2  **A. I have a new computer now.**
3  Q. What happened to that old one?
4  **A. It was a laptop that broke.**
5  Q. Okay.  So when did the laptop break?
6  **A. I don't remember -- sometime over the past**
7  **few years.**
8  Q. Was it before or after you separated with XTC
9  Cabaret Dallas?
10  **A. It was during.**
11  Q. What did you do with that computer?
12  **A. I just scrapped it.**
13  Q. Does that mean throw it away?
14  **A. I believe I may have it still.  I'm not sure.**
15  Q. What kind of laptop is it?
16  **A. It's a Toshiba, a P.C.**
17  Q. Okay.  I'm instructing you at this point with
18  your attorney present to not destroy that laptop
19  computer and actually preserve it.  You replaced that
20  Toshiba with a laptop that you have now?
21  **A. A desktop, yeah.**
22  Q. Okay.  What kind of desktop is it?
23  **A. It's a Mac.**
24  Q. Do you recall when you purchased it?
25  **A. It was sometime last year.**

Page 19

1  Q. And I think you testified sometime while you
2  were still employed for XTC Dallas?
3  **A. No, it -- it was after.**
4  Q. Okay.  I thought you had testified that your
5  Toshiba laptop broke sometime while you were still
6  employed for XTC Dallas.
7  **A. It did, yes.**
8  Q. And you didn't replace it or get a new
9  computer until after you separated?
10  **A. No, I did.  The current computer I have is a**
11  **newer one.  However, at the time when that laptop**
12  **broke, I had purchased a second laptop which also**
13  **broke.**
14  Q. And you believe you still may have that
15  second laptop?
16  **A. I -- I have to check.**
17  Q. Is that a Toshiba laptop, as well?
18  **A. No, it's not.  It's a -- I forget the brand.**
19  **Yeah, I don't remember the brand right now.**
20  Q. Okay.  So as was the case with the Toshiba
21  laptop, I'm instructing you with your attorney present
22  to preserve that other laptop, the brand of which you
23  can't remember, and the Mac desktop, which it sounds
24  like you're using.  That means not destroying any
25  e-mails or e-mail addresses or scrubbing it of any

Page 20

1  sort.
2  **A. Okay.**
3  Q. Have you ever had any computer, including a
4  laptop or a desktop of yours, imaged by a third-party
5  service?
6  **A. No, I haven't.**
7  Q. Do you know what I mean by "imaged"?
8  **A. As in a forensic specialist?**
9  Q. Sure.  Copied.
10  **A. No, I haven't.**
11  Q. Examined.  Anything like that?
12  **A. No.**
13  Q. What social media memberships, screen names,
14  user ID's do you have including Facebook, Twitter,
15  LinkedIn?
16  **A. I have a LinkedIn account.**
17  Q. Under what name?
18  **A. I believe it's my name.  I'm not sure.**
19  Q. Would it be under another name?
20  **A. No, I just -- I don't remember right now**
21  **exactly what name it's under.  I think it's my name.**
22  Q. Okay.  Twitter?
23  **A. Facebook.**
24  Q. I'm sorry.  Go ahead.
25  **A. Sure.  Facebook, RyanDallas.**

Page 21

1    Q. One word?
2    **A. Yes.**
3    Q. Okay.
4    **A. Twitter, I do also have one. It's under my**
5    **own name.**
6    Q. Okay. Ryan Badii?
7    **A. Yes. I think the -- the I is actually a --**
8    **the number 1.**
9    Q. One of the I's or --
10   **A. Yes.**
11   Q. So it's B-a-d-i-1?
12   **A. I -- I -- I believe so. I haven't used my**
13   **Twitter account in a while -- I think in over a year**
14   **and a half so -- but I believe it's -- it's B-a-d just**
15   **1, no I.**
16   Q. Was there already a Ryan Badii spelled the
17   way you spell it?
18   **A. I don't -- I don't know.**
19   Q. I mean, do you recall why it is that you
20   wouldn't include your last name?
21   **A. I don't remember why.**
22   Q. Is that something common for you? Or was
23   that a one time deal, if you recall?
24   **A. It's -- I believe it's the only time that I**
25   **did that. Typically, I use my name, if I can.**

Page 22

1    Q. Can you think of any other social media
2    membership screen names or user ID's that you've had,
3    say, over the last ten years?
4    **A. No, I think that's it.**
5    Q. When did you get your Facebook account or
6    membership?
7    **A. 2009, I believe.**
8    Q. How about your Twitter account?
9    **A. 2010 or '11.**
10   Q. How about your LinkedIn account?
11   **A. 2012.**
12   Q. Are they all active?
13   **A. I don't think the Twitter account is, and the**
14   **Facebook account is not.**
15   Q. And just so we're together on what I mean by
16   "not active," you can still access it and post
17   whatever you want. You just have chosen not to do so
18   for a while; is that right?
19   **A. Is -- I'm sorry?**
20   Q. The account hasn't closed when you say it's
21   not active?
22   **A. I have closed the Facebook account, yes.**
23   Q. Okay. Why did you close it?
24   **A. I didn't have any need to talk to the people**
25   **that were -- I was friends with on there anymore.**

Page 23

1    Q. Did you have a falling out with one or two or
2    anybody in particular?
3    **A. No.**
4    Q. Was there an incident that prompted you to
5    close it?
6    **A. No.**
7    Q. So you just one day decided to close your
8    Facebook account?
9    **A. Yeah. I -- I didn't use it very much, and I**
10   **just didn't see the need for it.**
11   Q. Okay. What about your Twitter account? Did
12   you close it, as well?
13   **A. I think it's still active. I'm not sure. I**
14   **think it is still active, but I don't use it.**
15   Q. And your LinkedIn account, do you use?
16   **A. Yes.**
17   Q. Are you married?
18   **A. No, I'm not.**
19   Q. Have you ever been married?
20   **A. No.**
21   Q. Do you have any children?
22   **A. No.**
23   Q. Where do you live right now?
24   **A. I live on 3907 Gilbert Avenue, Apartment 7,**
25   **Dallas, Texas 75219.**

Page 24

1    Q. 219?
2    **A. Yes.**
3    Q. And do you have a home telephone number
4    there?
5    **A. I use my cell phone.**
6    Q. Okay. But do you have a home telephone
7    number there?
8    **A. No.**
9    Q. Have you ever had a home telephone number
10   there?
11   **A. No.**
12   Q. Who do you live with?
13   **A. Nobody -- with my dog.**
14   Q. How long have you lived there?
15   **A. Since February.**
16   Q. February 2013?
17   **A. Yes.**
18   Q. Prior to February 2013, where did you live?
19   **A. At -- on Reagan Street. It was 2525 Reagan**
20   **Street.**
21   Q. How do you spell Reagan?
22   **A. R-e-a-g-a-n.**
23   Q. Is that in Dallas?
24   **A. It is, yes. Dallas, Texas, same zip code,**
25   **75219.**

Page 25

1    Q. And how long did you live on Reagan Street?
2    **A. For two years.**
3    Q. So 2011 to 2013?
4    **A. Yes.**
5    Q. Who did you live with?
6    **A. No one.**
7    Q. Was there a home telephone number there?
8    **A. No, sir.**
9    Q. Do you recall ever having a home telephone
10   number?
11   **A. Yes.**
12   Q. When did you have a home telephone number?
13   **A. In Portland, Oregon.**
14   Q. Since you have resided in Texas, have you
15   ever had a home telephone number?
16   **A. No.**
17   Q. Where did you live prior to Reagan?
18   **A. It was on Southwestern Boulevard. I -- I**
19   **think it's -- I know it's the 8000 block of**
20   **Southwestern Boulevard. It's also in Dallas.**
21   Q. Do you recall the zip?
22   **A. No, I don't.**
23   Q. How long did you live there?
24   **A. From 2009 to 2010.**
25   Q. To 2010?

Page 26

1    **A. Yes.**
2    Q. Did you live anywhere between the place on
3    Southwestern and the place on Reagan?
4    **A. No.**
5    Q. So did you move into the place on Reagan
6    sometime in 2010?
7    **A. 2010, 2011, 2012, I believe so, yes.**
8    Q. And you didn't have a home telephone number
9    at the place on Southwestern?
10   **A. No, I didn't.**
11   Q. Who did you live there with?
12   **A. I lived there with Sheena.**
13   Q. Was it a house?
14   **A. No, it was an apartment.**
15   Q. How about the place on Reagan? House or
16   apartment?
17   **A. Apartment.**
18   Q. Have you ever lived in a house in Texas?
19   **A. I -- I stayed with my folks in Austin for a**
20   **couple of months in Buda when I first moved here.**
21   Q. When was that?
22   **A. It was in two thousand -- excuse me -- 2008.**
23   Q. Okay. So prior to the apartment on
24   Southwestern, where did you live?
25   **A. I lived in Oregon.**

Page 27

1    Q. Okay. So --
2    **A. Oh, excuse me. Prior to the apartment, I**
3    **lived in Buda.**
4    Q. Okay. Do you recall your parents' address?
5    **A. It -- I believe it was 6043 Steiner.**
6    Q. S-t-i-e-n-e-r?
7    **A. S-t-e-i-n-e-r. And actually, it was in Kyle,**
8    **which is neighboring to Buda.**
9    Q. Kyle, Texas?
10   **A. Yes.**
11   Q. And you lived there with your parents. Any
12   siblings?
13   **A. I do have siblings, yes.**
14   Q. Were they living there, as well?
15   **A. No.**
16   Q. Do your parents still reside there?
17   **A. No, they don't.**
18   Q. Did they move?
19   **A. Yes.**
20   Q. Where did they move?
21   **A. To a new house.**
22   Q. In Kyle?
23   **A. No, in Buda.**
24   Q. How do you spell Buda?
25   **A. B-u-d-a.**

Page 28

1    Q. Have you given me all the addresses that you
2    recall residing in since you moved from Oregon to
3    Texas?
4    **A. Yes.**
5    Q. What brought you to Oregon?
6    **A. I was five years old when I went to Oregon.**
7    **My -- my parents moved there, so I just tagged along.**
8    Q. Which is understandable at five years old.
9    Then did your parents move back to Texas before you
10   did?
11   **A. They did, yes.**
12   Q. Who were you living with when your parents
13   moved back to Texas?
14   **A. I was living by myself.**
15   Q. Are you currently employed?
16   **A. Independently, yes.**
17   Q. What --
18   **A. I'm self-employed.**
19   Q. Do you have a company?
20   **A. No.**
21   Q. What do you do as someone self-employed?
22   **A. I'm a bookkeeper.**
23   Q. What does that mean?
24   **A. I prepare income statements for my clients.**
25   **I also prepare balance sheets, cash flow statements,**

Page 29

1  quarterly reports, sales and use tax reports.  And
2  I -- and I do business consultations for them.
3      Q.  Like, tax advice?
4      A.  I do give tax advice, but I typically -- what
5  I mean by "business consultation" is I help them grow
6  their business in terms of sales and operations.
7      Q.  And you're not incorporated?  You don't have
8  a company?
9      A.  I -- I don't, no.  I work under a family
10  member's company name right now, but I'm self-employed
11  so --
12      Q.  Okay.  So I don't understand the
13  relationship, then.
14      A.  So --
15      Q.  Who is your family member that you're talking
16  about?
17      A.  It's my -- my father.
18      Q.  Okay.  And your father does what for a
19  living?
20      A.  He is a tax consultant.
21      Q.  Okay.
22      A.  So I -- I consult him on tax matters; but for
23  my clients' bookkeeping services, I'm self -- I do it
24  for myself.
25      Q.  Okay.  So your father is a tax consultant.

Page 30

1  Where does he work?
2      A.  He owns his own company.  It's called
3  Paycentra.
4      Q.  Is that one word?
5      A.  Yes.
6      Q.  Paycentra.  And that's in Buda?
7      A.  It's out of Austin.
8      Q.  Is there just one location?
9      A.  Yes.
10      Q.  And that's tax consultation?
11      A.  Yes.
12      Q.  A smaller version of H&R Block?
13      A.  No, it's -- it's more versatile than that.
14  And it's -- he doesn't just prepare taxes.  He's --
15  typically what he does is he does tax resolution.
16      Q.  Okay.  And your father is a CPA?
17      A.  No, he's not.
18      Q.  But he's a tax professional?
19      A.  Yes.  He -- he is registered with the IRS,
20  and he has a PTIN number.
21      Q.  He has a what?
22      A.  A PTIN.
23      Q.  What is that?
24      A.  It's a -- it's -- basically, he's registered
25  with the IRS.  And he has an official number to make

Page 31

1  contact with them through or by.
2      Q.  It allows your father to represent parties
3  against the IRS?
4      A.  He has -- yes.  You have to get
5  certifications in order to -- you have to get
6  certified every year and recertified every year in
7  order to be allowed to do that.
8      Q.  Okay.  And do you work for your father?
9      A.  No, I don't.
10      Q.  Does he pay you?
11      A.  No, he does not.
12      Q.  Okay.  So I'm trying to understand the
13  relationship between you and your father.  And you
14  said that you currently work under his company?
15      A.  I can clarify.
16      Q.  Please.
17      A.  So for the bookkeeping and -- and business
18  consultations, I do it independently.  For tax
19  purposes, I seek his advice and I use his guidance
20  because he's well-versed in the tax matters.  So I
21  would -- I will contact him for tax purposes; but for
22  the bookkeeping service and for the business
23  consultations, I do that independently.
24      Q.  You consult with him?
25      A.  Right.

Page 32

1      Q.  But do people or companies pay you for tax
2  guidance?
3      A.  I -- I do prepare taxes, yes.
4      Q.  And do you get --
5      A.  I have.
6      Q.  -- paid for it?
7      A.  Yes, I do.
8      Q.  By your client or your customer?
9      A.  Yes, sir.
10      Q.  Okay.  So what are you telling me, that
11  sometimes an issue will come up that you'll ask your
12  father about?
13      A.  Typically -- and then what I will do is
14  I'll -- for -- just for the tax purposes, what I'll do
15  is I'll send him the tax documents that I prepared.
16  He'll overlook [sic] it.  And then once he believes
17  that it's correct, he will send it in under his name
18  because I don't have the certifications to send it in
19  myself.
20      Q.  So --
21      A.  And I don't have a physical address outside
22  of my home address.  I work out of -- out of my home.
23  So it's basically to stay legal.
24      Q.  Because it wouldn't be legal for you to
25  submit it?

Page 33

1    A. It -- it -- it wouldn't be, no, because I
2  don't have my own physical address so --
3    Q. You think it's a matter of having a physical
4  address that makes it legal for you?
5    A. Well, not just that. Also, the
6  certifications matter so --
7    Q. Okay. So are companies paying you for tax
8  consultation?
9    A. Not as much -- I -- the majority of what I do
10 is bookkeeping.
11   Q. Okay. And bookkeeping means you go to a
12 company and you help them organize their costs,
13 profits, paperwork?
14   A. I reconcile their bank statements, their
15 check registers, and any other accounts that they use
16 for expenses and -- and -- and profits or revenues.
17 And I will prepare statements based on those numbers.
18   Q. Okay.
19   A. And I also will help them with their
20 quarterly reports and et cetera.
21   Q. How do you bill them?
22   A. I bill them through their bank accounts.
23 I -- I typically wire the money the first of the
24 month.
25   Q. You wire the money, or your clients wire the

Page 34

1  money to you?
2    A. I draft their accounts.
3    Q. They obviously give you authorization to do
4  so?
5    A. Yes, sir.
6    Q. So you charge them by the month?
7    A. Yes, sir.
8    Q. When did you start doing this?
9    A. February or March of 2013.
10   Q. Do you send your clients invoices?
11   A. No, I don't.
12   Q. How do you -- strike that. How do you know
13 how much to charge them? Or is it just a flat fee
14 each month?
15   A. It's a flat fee based on --
16   Q. So --
17   A. -- based on an agreement that we sign.
18   Q. Okay. So you have paper agreements with
19 these people?
20   A. Yes.
21   Q. And it probably says something about if
22 either party wants to cancel, then there's a notice
23 period; but either party is more than welcome to
24 cancel the agreement at any time?
25   A. Yeah, within 30 days.

Page 35

1    Q. So how many customers do you have right now
2  that you are doing work for?
3    A. Three or four.
4    Q. And how much are you charging each of those
5  three to four customers?
6    A. About 500 a month.
7    Q. So since February or March of 2013 when you
8  started this business, where else have you received
9  money, income, loans, any type of financial benefit?
10   A. Nowhere.
11   Q. Not getting any money from your parents?
12   A. No.
13   Q. Any family members?
14   A. No.
15   Q. And the only thing that has come in to you in
16 any form of income, money benefits has been the $500 a
17 month from three to four customers?
18   A. Well, I -- that's true in terms of income,
19 yes. I did have a lot of assets saved from working at
20 XTC. I was making, you know, 80,000-plus a year. And
21 so I had second cars. I had -- I had savings,
22 et cetera.
23   Q. Okay. So you believe that annualized, that
24 you were making $80,000 a year at XTC Dallas?
25   A. Yes.

Page 36

1    Q. And you saved a lot of that?
2    A. I did. I -- well, I typically bought a lot
3  of gold coins with my money, American Eagles. I
4  bought a second vehicle. And I kept a lot of the
5  cash.
6    Q. Okay. Well, how much cash did you have in
7  the bank when you separated from XTC Dallas?
8    A. I don't recall how much I had in the bank. I
9  typically didn't deposit cash tips into the bank.
10   Q. So you actually kept cash in your house or in
11 your apartment?
12   A. In a safe, yes.
13   Q. You have a safe in your apartment, and that's
14 where you would keep the cash?
15   A. Yes.
16   Q. And as we sit here today, you do not know how
17 much cash you had in that safe or on your person or
18 somewhere where you had access to at the time that you
19 separated from XTC Dallas?
20   A. I think I maybe had 20, $25,000 or so. And I
21 also had gold coins.
22   Q. And those gold coins, did you purchase each
23 and every single one of them while you were employed
24 at XTC Cabaret Dallas?
25   A. I had -- I had purchased some of them from

Page 37

1 before that; but the majority of them was while I was
2 working for XTC, yes.
3 Q. When did you purchase these?
4 A. At gold coin shops and on the Internet.
5 Q. Do you have receipts for each one?
6 A. I'm sure I have receipts for some of them,
7 not for all of them, no.
8 Q. Okay. What made you want to purchase gold
9 coins?
10 A. It was just a way to save money.
11 Q. Is it --
12 A. They're -- they're --
13 Q. -- your understanding that was a good
14 investment?
15 A. It was okay. I made some money off -- off of
16 some of them.
17 Q. Okay. How many gold coins do you think you
18 had at the time you separated from XTC Cabaret?
19 A. Maybe 15 to 20.
20 Q. Was that in a safe, also?
21 A. Yes.
22 Q. And educate me. How much are these gold
23 coins worth? Or does it vary depending on the coin?
24 A. It varies depending on the weight of the
25 coin. So there -- there -- the smallest size would be

Page 38

1 a tenth of an ounce, and then they go up to a full
2 ounce.
3 Q. Okay. And so --
4 A. And there's intermediate sizes, as well.
5 There's -- there's quarter ounces, half ounces.
6 Q. Give me the range of the amounts of money you
7 paid for these 15 to 20 gold coins that you had at the
8 time you separated from XTC Cabaret.
9 A. They were between -- the tenth of an ounce is
10 about $200. The quarter ounces are about $500. The
11 half ounces were about $1,000. And the full ounces
12 were 1,800 to two grand.
13 Q. So at the time you separated from XTC
14 Cabaret, you had 15 to 20 gold coins, each of which
15 was worth somewhere between 200 and $2,000; is that
16 right?
17 A. They -- they -- I had one that was a full
18 ounce. The rest of them were all tenths, quarters,
19 and I believe I had, like, two half ounces.
20 Q. But did I get the range correct?
21 A. The range is correct.
22 Q. Okay. Have you sold any of those gold coins?
23 A. I sold all of them.
24 Q. When did you sell all of them?
25 A. Why?

Page 39

1 Q. No, when.
2 A. After I couldn't find work after being fired
3 from XTC.
4 MR. HURST: Okay. I'm going to object
5 as nonresponsive.
6 Q. (BY MR. HURST) You'll be able to tell your
7 story, so you don't have to try to get any jabs of
8 whether you were terminated or whether you voluntarily
9 resigned. My question to you was, when would you have
10 sold them and at what point? Was it between jobs?
11 A. After two thousand -- February of 2012.
12 Q. Is when you sold all of them?
13 A. I sold all of them, yes.
14 Q. Okay. Was there a particular month in which
15 you sold all of them? Was it in February of two --
16 A. It was ov -- it was over an extended period
17 of time.
18 Q. Over a one year period?
19 A. About, yes.
20 Q. Okay. Who bought them?
21 A. Different people.
22 Q. Yeah? How did you find these people?
23 A. I know a lot of people in -- in Texas.
24 Q. You know a lot of people in Texas who buy
25 gold coins?

Page 40

1 A. Well, they're not easy to liquidate; but I
2 mean I have a lot of friends in Texas, especially
3 after working at XTC for so long.
4 Q. So you made friends at XTC?
5 A. I -- I -- I had associates, yes.
6 Q. Did someone you met at XTC Cabaret Dallas
7 purchase any of your gold coins?
8 A. A few. I sold a few of them to some people
9 that I had met through XTC, but I sold some of them to
10 family members. I sold some of them on eBay.
11 Q. Okay. I'll tell you what. Why don't you
12 identify each person to whom you sold a gold coin?
13 A. I sold -- I sold several to anonymous people
14 on eBay.
15 Q. All right.
16 A. I sold --
17 Q. And you'll have records of that, right?
18 A. Yeah, on eBay.
19 Q. Okay.
20 A. I sold some to my -- I sold a good portion of
21 them to my family.
22 Q. Does that mean your mom and dad?
23 A. Yes.
24 Q. Okay. Do you recall how much they paid?
25 A. No.

Page 41

1   Q. Do you recall how many you sold?
2   **A. To my family?**
3   Q. Yes, sir.
4   **A. Maybe 10 -- 10 or 12 of them went to them.**
5   Q. Okay. Is it fair to say that was the
6   majority of your coins?
7   **A. Yes, definitely.**
8   Q. Okay. But you cannot recall how much they
9   paid you?
10  **A. It was different amounts different times.**
11  **One -- one -- one occasion I remember, I gave them two**
12  **or three different coins -- four different coins at**
13  **the same time. And they gave me, I believe, 1,000 or**
14  **$1,500.**
15  Q. Did your parents when they paid you write it
16  in a check?
17  **A. No, they didn't. They just gave me cash.**
18  Q. Each time?
19  **A. Yes.**
20  Q. Okay. Who else bought your coins besides
21  your mom and dad purchasing the majority of them and
22  your selling how ever many on eBay?
23  **A. I think that's the majority of it.**
24  Q. Can you recall selling a gold coin to anyone
25  other than on eBay or to your mom and dad?

Page 42

1   **A. I may have. I just -- I don't remember right**
2   **now.**
3   Q. When was the last time you recall receiving
4   money from your mom and dad for your gold coins?
5   **A. I think in December of this last year -- or**
6   **January of 2013.**
7   Q. Okay. Is that the last time you sold a gold
8   coin at all?
9   **A. Yeah.**
10  Q. Is that right?
11  **A. Yes.**
12  Q. Okay. Do you keep, like, a record -- you're
13  in the recordkeeping business. Do you keep a record
14  of how much money your parents have paid to you or
15  given to you over the last five years?
16  **A. No. They haven't -- they haven't really**
17  **given me much, if anything at all, except for what**
18  **I've given them in terms of gold coins.**
19  Q. Or --
20  **A. And --**
21  Q. -- sold to them in gold coins?
22  **A. Right.**
23  Q. But you don't have a record of how much your
24  parents have given to you?
25  **A. No. I just started the recordkeeping**

Page 43

1   **business this year so --**
2   Q. But you recognize the value of keeping
3   records?
4   **A. More -- more so now that I've -- that I've**
5   **started --**
6   Q. Do you --
7   **A. -- bookkeeping, yes.**
8   Q. Do you have a bank account?
9   **A. I do.**
10  Q. Where is that?
11  **A. BBVA Compass.**
12  Q. How long have you had a bank account there?
13  **A. About a year or less.**
14  Q. Is it a checking account?
15  **A. Checking and savings, yes.**
16  Q. One of each?
17  **A. Yes.**
18  Q. Do you have any other accounts there?
19  **A. No, I don't.**
20  Q. Do you have any bank accounts anywhere other
21  than BBVA Compass?
22  **A. No.**
23  Q. Okay. Did you have a bank account prior to
24  this last year?
25  **A. I did, yes.**

Page 44

1   Q. Where?
2   **A. At -- I don't recall the name of the bank.**
3   **It's -- I think it's First National.**
4   Q. How long were you at First National?
5   **A. For about three years.**
6   Q. Why did you switch from First National to
7   BBVA Compass?
8   **A. Free checking and free savings. I was paying**
9   **a fee at First National.**
10  Q. Okay. And you had a checking and savings
11  there, as well?
12  **A. I may have just had a checking there.**
13  Q. Okay. Now, when your parents would pay you
14  money for these gold coins, did you just put the cash
15  in your safe where you had other cash?
16  **A. Well, at that point, I was -- I was pretty --**
17  **my money had substantially gone down. So I believe I**
18  **just put the money by itself in the safe or I could**
19  **have kept it in my wallet.**
20  Q. There wasn't any other cash that it would be
21  joining. Is that what you're saying?
22  **A. Right, not to speak of at that time.**
23  Q. Okay. Is there cash in there now?
24  **A. In my safe? No.**
25  Q. So when did you run out of money in your

Page 45

1  safe?
2  **A. Sometime this year.**
3  Q. So when you would receive money from your
4  parents or from the eBay buyers --
5  **A. Uh-huh.**
6  Q. -- you wouldn't deposit any of that money in
7  a bank account?
8  **A. Well, eBay buyers would send the money to**
9  **PayPal. And that money would be transferred by wire**
10 **to my bank account, so that money did go into my bank**
11 **account.**
12 Q. Okay. Is it still in your bank account?
13 **A. That money?**
14 Q. Yes.
15 **A. Probably not.**
16 Q. Okay. What -- what money is in your bank
17 account, then?
18 **A. The money that I have received from my**
19 **clients, mainly.**
20 Q. And that gets wired to your checking account?
21 **A. Right.**
22 Q. Then how do you pay for rent?
23 **A. With that money.**
24 Q. In your checking account?
25 **A. Right.**

Page 46

1  Q. Okay. How much do you pay for rent?
2  **A. Seven ninety-five.**
3  Q. What other monthly expenses do you have?
4  **A. Car insurance.**
5  Q. Well, do you have a car?
6  **A. I do, yes.**
7  Q. Do you have a payment on the car?
8  **A. I do, yes.**
9  Q. How much is that?
10 **A. It's 500.**
11 Q. What kind of car do you drive?
12 **A. A Toyota Tundra.**
13 Q. How much do you pay for insurance on that
14 Tundra?
15 **A. A hundred and twenty-seven dollars.**
16 Q. Who do you have it with?
17 **A. My insurance?**
18 Q. Yes, sir.
19 **A. Through GEICO.**
20 Q. Do you have renters insurance?
21 **A. No, I don't.**
22 Q. What other monthly expenses do you have? How
23 much is your electricity usually?
24 **A. It ranges from $50 to 100.**
25 Q. Okay. Do you have cable or dish?

Page 47

1  **A. I have cable, $60 a month. And I have a cell**
2  **phone. It's $50 a month.**
3  Q. How much do you spend on groceries a month?
4  **A. Maybe 150 -- 150, 175.**
5  Q. What other expenses do you have?
6  **A. That's it.**
7  Q. Do you go out?
8  **A. No.**
9  Q. Do you go out on dates?
10 **A. No.**
11 Q. When was the last time you were out on a
12 date?
13 **A. I don't remember.**
14 Q. Do you work out?
15 **A. I do, yes.**
16 Q. Do you go to a gym?
17 **A. I do.**
18 Q. What gym?
19 **A. 24 Hour Fitness.**
20 Q. How much is that?
21 **A. I -- it's paid. I prepaid it for two years.**
22 Q. Okay. How much did you pay for it?
23 **A. I believe it was 300 bucks or $350, something**
24 **like that.**
25 Q. Okay. Do you buy clothes?

Page 48

1  **A. No, I don't.**
2  Q. Are you trying to grow your company?
3  **A. I am, yes.**
4  Q. Okay. Do you have marketing materials?
5  **A. No.**
6  Q. Do you have a web site?
7  **A. No.**
8  Q. Are you working on a web site?
9  **A. No.**
10 Q. How are you trying to grow your company?
11 **A. Through networking, mainly.**
12 Q. And you've been in business since February or
13 March of 2013?
14 **A. Yes.**
15 Q. And that's what you've been doing full time?
16 **A. That's what I've been doing, but I've -- I've**
17 **also been looking for work meanwhile.**
18 Q. Well, how much of the day are you spending
19 looking for work; and how much of the day are you
20 spending doing this bookkeeping business?
21 **A. It varies.**
22 Q. Well, why don't you tell me as best you can.
23 **A. I spend the majority of my time working on my**
24 **bookkeeping. And I'll dedicate some time during the**
25 **week to applying for work and looking for work.**

Page 49

1    Q. And you say you're trying to grow it by
2  marketing. So what are you doing to market?
3    **A. Networking.**
4    Q. Sorry.
5    **A. That's okay.**
6    Q. How are you marketing?
7    **A. I contact people that I know or I'll go to**
8  **places where they might be.**
9    Q. Okay.
10    **A. And I'll just rub elbows and try to get**
11  **accounts from people that are -- that have their own**
12  **businesses.**
13    Q. So how -- where have you networked? How have
14  you networked?
15    **A. Different -- different little events that my**
16  **friends hold or social events that they go to.**
17    Q. Okay. What are those?
18    **A. They might be football-watching parties.**
19  **They might be poker games. They might be different --**
20  **different intramural sporting events like soccer**
21  **matches and basketball games, et cetera.**
22    Q. Do you have business cards?
23    **A. No, I don't.**
24    Q. Don't you think that would help you network?
25    **A. Yes, I do.**

Page 50

1    Q. Have you looked into making business cards
2  for yourself over the last six months?
3    **A. I have, yes.**
4    Q. And you've decided not to up to this point?
5    **A. That's correct.**
6    Q. Is it because of the expense of it?
7    **A. No.**
8    Q. Why have you not made business cards?
9    **A. No reason.**
10    Q. How would someone reach you if you met them
11  at a party or at a function and maybe they were
12  interested in your bookkeeping services?
13    **A. We would exchange phone numbers.**
14    Q. And that's the only thing you're doing to
15  network?
16    **A. That's correct.**
17    Q. You have no marketing materials? You're not
18  sending out e-mails?
19    **A. No. It's good advice, though.**
20    Q. I wasn't giving it. I just want to make sure
21  I understand what you're saying. Why is it that you
22  decided to become self-employed as a bookkeeping
23  professional?
24    **A. I had a difficult time finding a job. I**
25  **applied to over 100 places, and I didn't get very much**

Page 51

1  of a response. So it was an effort to make a living.
2    Q. I will tell you, in your discovery responses,
3  you do not identify over 100 places to which you've
4  applied. You understand?
5    **A. Yes, I do understand.**
6    Q. Okay. Why is it that you didn't identify all
7  the places that you have supposedly applied to?
8    **A. I don't -- I never counted how many were in**
9  **there, but I couldn't find everything. I couldn't**
10  **find every place that I applied to.**
11    Q. Do you understand you're required under the
12  Federal Rules of Civil Procedure to supplement your
13  answer and provide counsel, your attorney in this
14  case, everything that would be responsive to that
15  request?
16    **A. If I had it, I would have. I -- it's all I**
17  **could find.**
18    Q. When you say "all I could find," like
19  materials?
20    **A. Right. All the different locations that I**
21  **had a record of or I could find a record of applying**
22  **to.**
23    Q. So --
24    **A. At the time that I was applying, I didn't**
25  **know that I would need to come up with a discovery**

Page 52

1  request.
2    Q. But certainly, you recognize you're
3  responsible for identifying companies to which you
4  applied, as well, even if you don't find any materials
5  that you submitted?
6    **A. I understand that.**
7    Q. Okay. So what was your last job prior to
8  becoming self-employed?
9    **A. XTC.**
10    Q. That's XTC Cabaret Dallas, correct?
11    **A. XTC Cabaret, Rick's Cabaret International.**
12    Q. Are you using those names interchangeably, or
13  is your -- are you trying to make the point that
14  they're one and the same?
15    **A. I'm just identifying the company I worked**
16  **for.**
17    Q. Okay. So say the name of the company you
18  worked for.
19    **A. RCI is the name of the company.**
20    Q. Okay. Is that what it said on your
21  paychecks?
22    **A. No, it didn't. On my paychecks, it said XTC**
23  **Cabaret.**
24    Q. XTC Cabaret Dallas, Inc., correct?
25    **A. That's correct.**

Page 53

1    Q.  And what dates were you at XTC Cabaret?
2    A.  March of 2009 through February of 2012.
3    Q.  And prior to XTC Cabaret Dallas, where were
4    you employed?
5    A.  Prior to XTC, I was employed at Kalga.
6    Q.  How do you spell that?
7    A.  K-a-l-g-a.
8    Q.  And when were you employed there?
9    A.  From November of two -- or December of 2005
10   through November of 2007.
11   Q.  What kind of company is Kalga?
12   A.  It's a restaurant.
13   Q.  Is it in Oregon?
14   A.  Yes, it is.
15   Q.  What did you do there?
16   A.  I was a manager.
17   Q.  Kalga Cafe?
18   A.  Yes.
19   Q.  What kind of food is that?
20   A.  It was regional food.  It was Indian, Middle
21   Eastern, et cetera.  It had some vegan and American
22   influences like burritos and vegan pizza and stuff,
23   too.
24   Q.  Do you have the address?
25   A.  Yeah.  It was on Division Street.  I think it

Page 54

1    was the 4000 block, 4745 or something like that.
2    Q.  And that's in what city?
3    A.  It's in Portland.
4    Q.  Is it still there?
5    A.  No.
6    Q.  When did it go under or close?
7    A.  It was -- I believe it was sometime like
8    eight or nine months after I left.
9    Q.  What did you do there?
10   A.  I was a manager.
11   Q.  What does that mean?  I mean, did you manage
12   the cooks?  Did you manage a wait staff?  Did you --
13   A.  I --
14   Q.  -- manage the entire operation?
15   A.  I was more front of the house, so I was
16   working with the waitresses and the customers.
17   Q.  How many employees did it have?
18   A.  Less than 20 -- less than 15.
19   Q.  Who was your supervisor?
20   A.  Mr. Singh.
21   Q.  How do you spell that?
22   A.  S-i-n-g-h.
23   Q.  Is that the owner, also?
24   A.  Yeah.  Suk -- Sukhdeep was his name.
25   Q.  Is Sukhdeep his first name?

Page 55

1    A.  Sukhdeep (pronunciation), yeah.
2    Q.  What -- how do you spell that?
3    A.  S-u-k-h -- S-u-k-h-d-e-e-p, I think.
4    Q.  'd-e-e-p?
5    A.  Yeah.
6    Q.  How much were you making at Kalga Restaurant?
7    A.  About 3,200 a month.
8    Q.  Were you on salary?
9    A.  I was, yeah.
10   Q.  Okay.  Why did you leave Kalga?
11   A.  At the time that I left, the business had
12   really died down.  So I had decided to move to Texas.
13   Q.  You moved to Texas because Kalga Restaurant
14   had died down?
15   A.  No, I -- I -- I had intended to be closer to
16   my family because my folks had relocated down out
17   here.  My -- that had my sister at the time.  She was
18   going to school in San Marcos.
19   Q.  So you left the restaurant because you wanted
20   to move to Texas?
21   A.  That's correct.
22   Q.  Were you fired, or did you leave voluntarily?
23   A.  No, I left voluntarily.
24   Q.  Is it your testimony that the only income for
25   your labor that you've received since moving to Texas

Page 56

1    has been at XTC Cabaret Dallas and for your
2    self-employment?
3    A.  No, I -- I had a -- a -- a job before XTC.  I
4    was working at a co -- a commercial collections
5    company.
6    Q.  Okay.  What was the name of the company?
7    A.  I don't remember.  It was in Plano.
8    Q.  You can't remember the name of it?
9    A.  No, I can't.  I only worked there for a week
10   or two.
11   Q.  Okay.  Sometime --
12   A.  In 2008 when I first moved here.
13   Q.  Do you recall how much money you earned
14   there?
15   A.  It was $100 a day plus commission.
16   Q.  Why did you leave?
17   A.  I -- I didn't like the work.
18   Q.  Based on your one to two weeks there?
19   A.  That's correct.
20   Q.  So did you have a job at the time you quit?
21   A.  No.  I -- after that, I worked at PayDP,
22   which was a payroll company.
23   Q.  PayDP?
24   A.  Uh-huh, PayDP.
25   Q.  How long did you work for PayDP?

Page 57

1    A. Just a -- a couple of months.
2    Q. In 2008?
3    A. Yes.
4    Q. Okay.  Where is that?
5    A. It's in Austin.
6    Q. And the commercial collections company, you
7  said was where?
8    A. It was in Plano.
9    Q. So was PayDP the first employer you had --
10   A. It was.
11   Q. -- when you moved to Texas?
12   A. It was, yes.
13   Q. Okay.  How much did you make at PayDP?
14   A. I don't recall.  I think it was a hundred
15 and -- 100, $120 a day, something around there.  It
16 came with commissions, also.
17   Q. Did you leave voluntarily?
18   A. I did, yes.
19   Q. And why did you leave?
20   A. I -- I just didn't like the work.
21   Q. Okay.  What -- what were you actually doing
22 there?
23   A. I was contacting companies to enlist them
24 in -- in payroll services.
25   Q. And you decided after some short time period,

Page 58

1  that you didn't like the work and you wanted to move
2  to the Dallas area?
3    A. I didn't like the work because it was a lot
4  of cold calling.
5    Q. What made you move to Dallas or in the Dallas
6  area?
7    A. Nothing in particular.  I was just -- I was
8  born close to Dallas, so I decided to come back to
9  where I was born.
10   Q. Were you by yourself when you moved?
11   A. I was, yeah.
12   Q. Just made the decision?
13   A. Uh-huh.
14   Q. Were you interviewing for jobs prior to
15 actually moving?
16   A. No, I wasn't.
17   Q. So how were you going to support yourself if
18 you didn't have a job and you made this decision to
19 move?
20   A. I just took a risk.
21   Q. Did you have any money at the time?
22   A. I -- I had a little bit, yeah.
23   Q. How did you have money?
24   A. Just from money that I had earned.
25   Q. Working at the restaurant in Oregon?

Page 59

1    A. No, I think it was money that I had earned
2  working at the payroll place.
3    Q. You just told me you worked there for a
4  limited time, right?
5    A. I did, yes.
6    Q. What did you say?  Two to three months?
7    A. Something like that, yeah.
8    Q. So that's the money with which you moved to
9  Dallas?
10   A. Right.  I didn't have a lot when I moved
11 here.
12   Q. Did you have enough to put a security deposit
13 down on an apartment?
14   A. I did, yes.
15   Q. Okay.  How much was that?
16   A. Just a few hundred dollars.
17   Q. Okay.  And you had that few hundred dollars?
18   A. Yes.
19   Q. And then you also had enough money to commit
20 to paying that apartment?
21   A. I -- I -- I took a risk so --
22   Q. You signed a one year lease, right?
23   A. It was a one year lease, yes.
24   Q. And you didn't have enough money at the time
25 then to pay the entire year if you didn't find a job,

Page 60

1  right?
2    A. No, I didn't.  I -- I -- I think at the time
3  I moved here, I only had a few months of expenses with
4  me.
5    Q. And that was from money that you got from
6  PayDP, you believe?
7    A. I don't know where I got the money from.
8    Q. And even though you knew you needed money and
9  after taking this job for a commercial collections
10 company, the name of which you can't even remember at
11 this time, you thought "I'm going to go ahead and
12 leave that work, too, because I didn't particularly
13 care for the job"?
14   A. Yes.  I believe when I left that job, that I
15 had -- that I had already spoken to XTC.  I may not
16 have.  I don't quite remember, but I think I had some
17 leads on -- on -- on another job at the time.
18   Q. Okay.  Do you know where you would have
19 worked if you didn't get hired at XTC Cabaret Dallas?
20   A. No, I don't.
21   Q. So XTC Cabaret Dallas kind of saved you from
22 not being able to afford living in that apartment that
23 you had already committed to, right?
24   A. I was -- I was desperate for any kind of
25 work, yeah.  So I did -- I was happy to hear from XTC.

Page 61

1    Q. What made you even apply to XTC Cabaret
2  Dallas?
3    A. I applied to a variety of jobs in a variety
4  of industries from sales to management to -- I mean to
5  basically anything I could find.
6    Q. What would make you think of an establishment
7  like XTC Cabaret Dallas?
8    A. It was the only one of its kind that I
9  applied to. I was -- I was -- when I moved here, I
10  was desperate for any kind of work, and I do have a
11  background in management.
12   Q. From your restaurant experience?
13   A. And previous to that, I worked at Nationwide
14  Staffing as a branch manager --
15   Q. Okay.
16   A. -- in Oakland, California, and also a sales
17  manager in Portland, Oregon. And I studied management
18  in college, HR management and general management. So
19  I felt --
20   Q. I'm glad you mentioned Nationwide Staffing.
21  Nationwide Staffing is telling the records service
22  that you were never employed there.
23   A. That's interesting. They had several names.
24   Q. Okay. So what was the name when you worked
25  there?

Page 62

1    A. Labor Temp.
2    Q. That would have been helpful when we were
3  getting our records for us to identify the name. Is
4  it different than --
5    A. Na --
6    Q. -- Nation --
7    A. Nationwide Staffing is the name of the
8  company. If the records service couldn't find it,
9  I -- I really don't know what to tell you.
10   Q. So --
11   A. Labor Temp, Office Med.
12   Q. Labor Temp and -- what was the other one?
13   A. Staff Med. They had -- they had several
14  names.
15   Q. Is Nationwide Staffing still around?
16   A. No, it's not. It's bankrupt.
17   Q. Same with Labor Temp?
18   A. Yes. It -- it's all --
19   Q. It's all --
20   A. It's all -- it's all one company.
21   Q. When did they go bankrupt?
22   A. I don't recall.
23   Q. And you don't know what's happened with the
24  name since the bankruptcy of the company for which you
25  worked?

Page 63

1    A. It happened after I left the company.
2    Q. So is it possible then that the records
3  company is actually contacting a company different
4  than the one for which you worked? Is that --
5    A. I don't know. I don't know who they're
6  contacting.
7    Q. Okay. So you worked for this Nationwide
8  Staffing in two different locations?
9    A. I did, yes.
10   Q. Okay. Where?
11   A. In Portland, Oregon, off of Martin Luther
12  King Boulevard.
13   Q. Okay.
14   A. And then I also worked off of
15  International -- East International in Oakland,
16  California.
17   Q. Did you live out in Oakland for a while?
18   A. I lived in Alameda County.
19   Q. For how long?
20   A. For about two years.
21   Q. What did you do at Nationwide Staffing or
22  Labor Temp or Staff Med?
23   A. I had a variety of jobs, but the most recent
24  position I held was a branch manager.
25   Q. Were you a temporary staffer placed at

Page 64

1  someone else's facility?
2    A. No, I wasn't. I was a permanent staff in the
3  core -- in the core activity of the company.
4    Q. What does the company do?
5    A. They provide headhunting services. They also
6  provide temporary labor.
7    Q. But you were actually employed for the
8  company?
9    A. That's correct.
10   Q. And who did you manage?
11   A. I managed some account managers, salespeople.
12  I had a dispatcher, and I had an administrative
13  assistant.
14   Q. How much were you making there?
15   A. I had -- I -- I believe it was something
16  around 40,000 a year. I had a rent stipend of $1,000
17  for relocating.
18   Q. When you relocated to Oakland?
19   A. That's correct.
20   Q. Why did you leave there?
21   A. Oakland is -- is a -- kind of a tough
22  neighborhood. I had no idea what it was like before I
23  accepted the position, so the quality of life was
24  significantly diminished in Oakland. I decided to go
25  back to Portland and finish college.

Page 65

1  Q. So how long were you actually employed for
2  Nationwide Staffing?
3  A. Several years on and off. I was attending
4  school simultaneously while I was working there.
5  Q. So what years?
6  A. It was about four or five years.
7  Q. And from 2004 to 2008?
8  A. No, it was '97, '98-ish to 2002, I believe,
9  maybe 2003.
10  Q. So you testified earlier that you think your
11  annualized income while you were working for XTC
12  Cabaret Dallas was around $80,000?
13  A. Yes.
14  Q. Okay. So you were making $125 a shift,
15  right?
16  A. That's correct.
17  Q. Okay. Then you were getting some money from
18  entertainer tipouts?
19  A. That's correct, $5 per entertainer.
20  Q. Okay. Well, so how much do you claim you
21  were getting a night?
22  A. From the entertainers?
23  Q. Yeah, the entertainer tipout.
24  A. When -- at the height of our entertainer
25  count, we were making over $400 a night in entertainer

Page 66

1  tipout alone.
2  Q. You -- when you say "we," you personally were
3  getting about 400 a night?
4  A. It was evenly divided between the managers on
5  duty.
6  Q. Okay. How many managers would there be?
7  A. Anywhere from one to four a night.
8  Q. Okay. So let me ask you again. How much
9  were you personally getting off the entertainer tipout
10  part of the evening?
11  A. It varied depending on how many girls and how
12  many managers were working.
13  Q. I'm sure it varied. But just as sure as
14  you're able to estimate $80,000 of an annualized
15  income, how -- what was the range where it varied?
16  A. On a Sunday night, some -- one time, I had 15
17  entertainers. I made $250. And then on a Friday
18  night, we had four managers. We made over 400 -- $450
19  bucks, so I think $100 apiece.
20  Q. So you claim that out of entertainer tipout,
21  you made anywhere from 100 to $250 each shift?
22  A. That's correct. Sometimes it was less,
23  especially if the entertainer count was low.
24  Q. Okay. You say you also made money in table
25  commissions?

Page 67

1  A. Yes.
2  Q. What's that?
3  A. We were allotted a certain number of tables
4  to sell by the corporate office. Typically, it was
5  about 12 tables. It was around the stage and in the
6  corner near the door that led to the back.
7  Those tables, we sold for $200 a table.
8  And we were allowed to take half of the money we
9  received for table sales and divide it evenly among
10  the managers.
11  Q. Okay. So just as you gave me a range for how
12  much you claim to have made each night in entertainer
13  tipout, how much were you making in table commissions
14  each night?
15  A. We --
16  Q. And I'm sure it varied, as well.
17  A. It did. We made anywhere from 1,000, $1,200
18  a night. And that money would be divided between us.
19  So typically, it was around 250 to $300 on a Friday
20  and Saturday.
21  Q. So you made anywhere from 250 to $300 each
22  shift out of table commissions alone?
23  A. That's correct, on Fridays and Saturdays.
24  Q. Well, but I asked you a range for each shift.
25  So would it be less during the week?

Page 68

1  A. It would be less during the week.
2  Q. So $100 or $50?
3  A. During the week, it might be zero or it might
4  be up to $500.
5  Q. Okay. Would you agree that there was not a
6  lot of table commissions that you earned during the
7  week?
8  A. Yes, that's true.
9  Q. In fact, there were many nights, perhaps a
10  majority of the nights that you were working during
11  the week where you didn't have any table commissions?
12  A. That's correct; but during the weekend, we
13  always made that money.
14  Q. Up to $300?
15  A. Each.
16  Q. That's what I'm asking you.
17  A. Yes, sir.
18  Q. Each. Okay. And then there were tips. Now,
19  when would someone tip a manager like yourself?
20  A. We would get tipped for a range of things,
21  for providing good service, just plain networking.
22  Q. For networking?
23  A. That's right.
24  Q. Like someone was so glad to meet you that he
25  would give you a 20?

Page 69

1   A. Well, if you get to know people and you take
2   care of them when they're in the club, use their name,
3   especially people that are wealthy, they would give
4   you more than a 20.
5   Q. So that sounds like good service, then?
6   A. Right.
7   Q. Which is the first reason you gave me, right?
8   A. There were other reasons, as well, for -- to
9   fulfill requests such as to take -- to -- to have
10  entertainers brought over, to let waitresses not work
11  for a shift.
12  Q. And you, the manager, would get the tip
13  because --
14  A. The G --
15  Q. -- the waitress wasn't working?
16  A. That's correct. The GM would basically have
17  to sign off on it; but he would get the money, and
18  then he would divide it among us.
19  Q. Okay. So how much do you claim to have made
20  in tips?
21  A. I consider all those -- everything besides a
22  shift pay a tip but --
23  Q. Wait. I don't know what you just said.
24  A. I cons --
25  Q. We -- we --

Page 70

1   A. I considered all tips for purposes of -- of
2   my tax returns.
3   Q. You considered what all tips?
4   A. The -- the commissions, the -- the
5   entertainer tipout.
6   Q. Okay. But we're talking about each
7   specifically because you specified them in your
8   interrogatory answers.
9   A. Okay.
10  Q. So I'm trying to get an understanding of how
11  you got to $80,000 a year annualized. And I'm
12  splitting it up. And you told me what you think you
13  made on average in entertainer tipout.
14  A. Uh-huh.
15  Q. You told me what you think you made --
16  A. I see.
17  Q. -- on average in table commissions. Now I'm
18  asking you what you believe you made on average in
19  tips other than entertainer tipout and table
20  commissions or maybe --
21  A. It's -- it's -- it varies widely.
22  Q. Many times, there wasn't one?
23  A. No, there was always tips.
24  Q. You were always tipped every shift you
25  worked?

Page 71

1   A. Always tipped, yes.
2   Q. Okay.
3   A. I was tipped more than the rest of the
4   managers. When I -- when we went to our tipout, our
5   share at the end of the night, I always had the most
6   money.
7   Q. Okay.
8   A. Tip --
9   Q. So why don't you give me the range.
10  A. On Fridays and Saturdays, I would probably
11  provide anywhere from $400 up to 1,000.
12  Q. You would provide it?
13  A. To the tipout pool for the managers to
14  divide. We divided all of our tips.
15  Q. Okay. Once again, I'm asking you how much
16  you believe you made in tips other than table
17  commissions and entertainer tipout each night.
18  A. Anywhere from $100, $200 up to 500, $600 a
19  night.
20  Q. Okay. And was it more often the $100 than
21  the $600?
22  A. No.
23  Q. More often, it was the 600?
24  A. It was -- no, it was somewhere in the middle.
25  Typically, if I was working night shifts, it would be

Page 72

1   somewhere in the middle; but if they had me on day
2   shifts, then I would make the $100 figure or less.
3   Q. Okay. Have we talked about each and every
4   way that you got to your $80,000 a --
5   A. Yes.
6   Q. -- year annualized?
7   A. Yes.
8   Q. And by the way, is $80,000 how much you
9   reported to the IRS that you were making at XTC
10  Cabaret Dallas?
11  A. Yes, it is.
12  Q. And that will be in your tax records?
13  A. That's correct.
14  Q. Where are we on that, by the way?
15  A. I called them on Monday to find out when
16  they -- if they were processed or posted. They said
17  they hadn't been posted yet; but within two weeks,
18  they should be posted.
19  Q. What does "posted" mean?
20  A. "Posted" means recorded as received. And
21  then they would be actually analyzed in a total of six
22  weeks from the day that they received them.
23  Q. But do you not have your complete tax records
24  especially since that's the business you're in now?
25  A. Tax -- what tax records are we talking about?

Page 73

1  Q. Your income tax records. We received records
2  from you.
3  A. Uh-huh.
4  Q. And some of the pages are missing. Are you
5  aware of that?
6  A. Pages of -- I -- can you --
7  Q. Your tax --
8  A. -- be --
9  Q. -- returns.
10  A. -- more specific?
11  Q. Sure. Your tax returns --
12  A. Uh-huh.
13  Q. -- are you aware that what we received, there
14  are pages missing from your tax returns?
15  A. No, I'm not aware.
16  Q. Okay. Did you give to your attorney
17  everything that you had with regard to your tax
18  returns?
19  A. I did, yes.
20  Q. Are your tax returns usually two pages a
21  year?
22  A. I don't -- I don't know. I -- I didn't
23  prepare them, so I don't know.
24  Q. You don't prepare your own taxes?
25  A. No, I don't.

Page 74

1  Q. Do you prepare taxes for anyone else?
2  A. I -- I have, yes.
3  Q. Okay. Are those tax returns usually just two
4  pages?
5  A. Well, they're corporate tax returns. They're
6  different. They're much longer. They could be up to
7  20 pages.
8  Q. You have to provide supporting documentation
9  including W-2's, right?
10  A. That's correct.
11  Q. Did you fill out a tax return for 2012?
12  A. I did, yes.
13  Q. 2011?
14  A. Yes.
15  Q. 2010?
16  A. Yes.
17  Q. 2009?
18  A. Yes.
19  Q. 2008?
20  A. No.
21  Q. 2007?
22  A. No.
23  Q. 2006?
24  A. No.
25  Q. Okay. You told me about your -- strike that.

Page 75

1  Have you told me about each and every one of your jobs
2  since you moved to Texas?
3  A. Yes.
4  Q. Have you told me about each and every source
5  of income you've had since you moved to Texas?
6  A. Yes.
7  Q. And I'm not including any government benefits
8  at this time.
9  A. Okay.
10  Q. So who was doing your taxes?
11  A. Faris & Associates.
12  Q. F-e-r-r-i-s?
13  A. That's correct [sic].
14  Q. Are they in Dallas?
15  A. No, it's in Austin.
16  Q. And they did it for this past year, 2012?
17  A. They did, yes.
18  Q. Who in particular at Faris & Associates?
19  A. It was my father, Faris Badii.
20  Q. Is that your father's name?
21  A. It is, yes.
22  Q. But certainly, your dad would have your
23  complete tax records, right?
24  A. I -- I believe so.
25  Q. He's the one who is submitting them to the

Page 76

1  IRS?
2  A. I sent him a summary.
3  Q. He's filing the tax records on your behalf?
4  A. That's correct.
5  Q. You've authorized him to do so?
6  A. He sub -- he requested the W-2 information,
7  et cetera, from the IRS directly. And I provided him
8  with the rest of the information he needed.
9  Q. And he filled out your tax return?
10  A. That's correct.
11  Q. Have you tried to get your tax returns from
12  your father?
13  A. Yes.
14  Q. And what happened?
15  A. I received them.
16  Q. And is that what was given to us?
17  A. That's correct.
18  Q. Were you aware that the W-2's were missing
19  from these years?
20  A. No, I wasn't.
21  Q. What's your education background?
22  A. I went to college.
23  Q. Where?
24  A. At Portland State University.
25  Q. When did you graduate?

Page 77

1    A. March 2013.
2    Q. Did you finish on-line?
3    A. I finished the last class on-line that I had.
4    Q. How many hours were you taking since you
5  moved to Texas?
6    A. I've taken a total of four hours.
7    Q. What's your degree in?
8    A. General management and human resources
9  management, bachelor of science.
10   Q. What do you want to do with your degree?
11   A. I want to go to graduate school --
12   Q. Okay.
13   A. -- if I get the opportunity.
14   Q. Are you applying?
15   A. No, not yet.
16   Q. What kind of graduate school do you want to
17  go to?
18   A. I'm not quite sure.
19   Q. When are you going to decide?
20   A. Hopefully soon.
21   Q. Okay. All right. So you're trying to grow
22  your small business?
23   A. Uh-huh.
24   Q. And you're considering graduate school?
25   A. Yes.

Page 78

1    Q. And when you're not doing either one of
2  those, you're applying for work elsewhere?
3    A. That's correct.
4    Q. When did you start college?
5    A. In 1997.
6    Q. So why did it take you 16 years to graduate?
7    A. I was working the entire time and paying my
8  own tuition and I just -- unfortunately, I just wasn't
9  able to finish because of income and needing to work,
10  other reasons.
11   Q. What were the other reasons?
12   A. I was offered the job in Oakland, for
13  example. And I felt like it was an opportunity that I
14  should take, so I took a break.
15   Q. Okay. So was that the first time you took a
16  break from school?
17   A. I -- I'm -- I don't remember.
18   Q. But you only kept that job for a little while
19  after you moved to Oakland, right?
20   A. Yes. I was only in Oakland for two years.
21   Q. And then did you go back to school?
22   A. I did, yes.
23   Q. And so how many classes were you taking when
24  you went back to school?
25   A. I was taking a -- a -- a lighter course load.

Page 79

1    Q. So you could work?
2    A. That's correct.
3    Q. Did you start college at Portland State
4  University?
5    A. I did.
6    Q. Have you taken college courses at anywhere
7  other than Portland State University?
8    A. In my senior year in high school, I was part
9  of an upward bound program where I got college credits
10  and high school credits simultaneously.
11   Q. Where did you go to high school?
12   A. My freshman year, I went to Valley Catholic.
13  And my sophomore and junior years, I went to Jesuit
14  High School and my --
15   Q. Por -- in Portland?
16   A. Yes.
17   Q. Sorry. Senior year?
18   A. Senior year, I went to PCC.
19   Q. What does that stand for?
20   A. Portland Community College.
21   Q. Why is it that you didn't do your senior year
22  at Jesuit High School in Portland?
23   A. Because of the upward bound program.
24   Q. So you didn't even actually attend high
25  school at Jesuit High School in Portland your senior

Page 80

1  year?
2    A. No, I didn't.
3    Q. When you -- did you graduate from high
4  school?
5    A. I did, yes.
6    Q. Did you receive a diploma that said Jesuit
7  High School?
8    A. No.
9    Q. Were you expelled from Jesuit High School in
10  Portland?
11   A. No, I wasn't.
12   Q. Were you asked to leave?
13   A. No.
14   Q. Did Jesuit High School support your upward
15  bound program?
16   A. They had no knowledge of it.
17   Q. So what does your high school diploma say?
18   A. Portland Community College.
19   Q. What did your parents think about that
20  decision?
21   A. They thought it was a good idea.
22   Q. Did you think it was a good idea?
23   A. I did, yes.
24   Q. Did you play sports at Jesuit?
25   A. No, I didn't.

Page 81

1    Q. And what year did you graduate from PCC as a
2  high schooler?
3    **A. In 1996.**
4    Q. And you didn't start college for another
5  year?
6    **A. Yes.**
7    Q. Why is that?
8    **A. There was no break, if that's what you're**
9  **implying.**
10   Q. I'm not implying anything. You told me that
11 you started college in '97; yet, you graduated from
12 high school in '96.
13   **A. '96-'97, that calendar year, academic year.**
14   Q. Okay. Any other formal education or
15 schooling that you haven't told me about?
16   **A. No.**
17   Q. Ever filed a workers' compensation claim?
18   **A. No, I have not.**
19   Q. You filed a charge of discrimination with the
20 EEOC against XTC Cabaret Dallas; is that correct?
21   **A. Yes.**
22   Q. Have you ever filed any other employment
23 discrimination claim or charge of discrimination with
24 the EEOC, Texas Workforce Commission, on any other
25 state or federal agency?

Page 82

1    **A. In Oregon, I did, yes.**
2    Q. Okay. Against whom did you file?
3    **A. CEC Corporation.**
4    Q. When did you work for CEC Corporation?
5    **A. In 2003 or 2004.**
6    Q. What did you do for CEC Corporation?
7    **A. I was in admissions.**
8    Q. What is CEC Corporation?
9    **A. It is a higher education company.**
10   Q. What does that mean?
11   **A. They provide educational services to students**
12 **who wish to pursue specific careers.**
13   Q. Is it like Stanley Kaplan?
14   **A. I don't -- I'm not familiar with Stanley**
15 **Kaplan.**
16   Q. Princeton Review?
17   **A. I'm not familiar with them either.**
18   Q. Is it a testing company?
19   **A. No, it's not. It's an actual college. They**
20 **provide associate's degrees.**
21   Q. Okay. And you were in admissions like in
22 determining who was going to be accepted into CEC?
23   **A. That's correct.**
24   Q. Okay. What was the official title of your
25 job?

Page 83

1    **A. Admissions.**
2    Q. And when -- you started there in what year?
3    **A. I don't remember exactly. I believe it was**
4  **2003.**
5    Q. Were you fired?
6    **A. No, I quit.**
7    Q. Why did you quit?
8    **A. Because I was being sexually harassed.**
9    Q. By whom were you being sexually harassed?
10   **A. My superior.**
11   Q. What was his or her name?
12   **A. Laura -- I don't remember her last name.**
13   Q. What was her position?
14   **A. Director of admissions.**
15   Q. What did she do to sexually harass you,
16 allegedly?
17   **A. I signed a confidentiality agreement. So I**
18 **don't know if I'm able to even speak about this.**
19   Q. Was there a settlement?
20   **A. I --**
21       MR. CHANDER: Objection as priv --
22 that's privileged.
23       MR. HURST: If there's a settlement, it
24 shouldn't be privileged, the fact that there is a
25 settlement.

Page 84

1    **A. There was a confidentiality agreement that I**
2  **signed --**
3    Q. (BY MR. HURST) I understand that.
4    **A. -- regarding --**
5    Q. Is that in connection with a settlement
6  between you and CEC Corporation?
7    **A. I don't know if I'm even allowed to answer**
8  **these questions. I'd have to -- I'd have to -- I'd**
9  **have to confer with my attorney.**
10   Q. Confer with your attorney who undoubtedly
11 should know these things. And I'm not asking you the
12 terms of a settlement at this point. And I don't know
13 that that would be privileged anyway; but the fact of
14 a settlement, I doubt would be privileged.
15       Are you telling me that it's your
16 understanding that whether or not there was a
17 settlement between you and CEC is privileged?
18   **A. I think the whole matter is.**
19   Q. So you filed an EEOC charge against CEC, and
20 then something was resolved. And now you can't talk
21 about it?
22   **A. That's correct.**
23   Q. Is that the only other EEOC charge you've
24 filed?
25   **A. That's correct.**

Page 85

1    Q.  Have you filed a claim for unemployment
2  compensation?
3    A.  Yes.
4    Q.  How many times?
5    A.  I believe two times.
6    Q.  Okay.  Most recent time was after you
7  separated from XTC Cabaret Dallas?
8    A.  That's correct.
9    Q.  What was the time before that?  Was it in
10  Oregon?
11    A.  I believe so.
12    Q.  Do you remember what year?
13    A.  I don't.
14    Q.  Was it in the last ten years?
15    A.  It may have been.
16    Q.  So do you recall what the TWC found with
17  regard to your claim for unemployment benefits?
18    A.  I was approved.
19    Q.  And how much money did you start receiving
20  and when?
21    A.  About -- about $1,400 a month.  And I started
22  receiving it, I believe, in March of 2012.
23    Q.  And how long did you receive the $1,400 a
24  month?
25    A.  I think it was about ten months.

Page 86

1    Q.  So it ended sometime at the end of 2012 or
2  beginning of this year?
3    A.  Yes.
4    Q.  Which one?
5    A.  The end of 2012.
6    Q.  Have you received money, income, benefits
7  from any entity other than the Texas Workforce
8  Commission over the last two, three years?
9    A.  No.
10    Q.  And you haven't received any money from your
11  parents other than their purchase of some of the --
12  the majority of your gold coins?
13    A.  That's correct.
14    Q.  Have you received money benefits from any
15  other family member or friend over the last three
16  years?
17    A.  No.
18    Q.  Have you sold anything or participated in any
19  type of transaction or sale or commission that brought
20  money to you other than the sale of your gold coins
21  over the last three years?
22    A.  Just the car.
23    Q.  The Tundra?
24    A.  No, I sold an Acura.
25    Q.  Gotcha.  What kind of Acura?

Page 87

1    A.  TSX.
2    Q.  And then you used that money for a down
3  payment on your Tundra?
4    A.  No, I had already purchased the Tundra.
5    Q.  You had two cars at one time?
6    A.  Yes.
7    Q.  What was the reasoning there?
8    A.  One is a truck, and one is a car.
9    Q.  Okay.  Does everyone need a truck?
10    A.  I don't think so.
11    Q.  Does everyone need two cars?
12    A.  No.
13    Q.  So why did you have two cars?  Did you need
14  it for a job?
15    A.  I purchased the Tundra because I wanted to
16  help XTC out and -- ori -- originally.  And I used the
17  truck for certain things such as hauling spotlights,
18  et cetera.  That was the only purpose I had for
19  getting a truck.  The car was just to save money on
20  mileage.
21    Q.  But you still have the truck?
22    A.  I still have the truck.
23    Q.  You could sell the truck at any time and get
24  a car if you wanted?
25    A.  That's true.

Page 88

1    Q.  Do you prefer a truck?
2    A.  The reason that I sold the car was because I
3  had the title in hand; whereas, the truck is financed.
4  So I was able to make the transaction quicker.
5    Q.  The car was already paid off?
6    A.  That's correct.
7    Q.  But you have equity in your truck?
8    A.  I mean at the time, I don't know how much I
9  had when I sold the Acura.  I don't know how much
10  equity was there.
11    Q.  You have equity in your truck right now?
12    A.  I do, yes, now.
13    Q.  You don't have to drive a truck if you don't
14  want to?
15    A.  That's true.
16    Q.  Okay.  Have you been a party to any lawsuit
17  other than this lawsuit that we're here about today?
18    A.  No.
19    Q.  You told me earlier about an instance in
20  which you were arrested.  Do you recall that?
21    A.  Yes.
22    Q.  I think that was in or around 2008.  Is that
23  right?
24    A.  Yes, that's correct.
25    Q.  And by the way, where were you arrested?

Page 89

1  What county?
2  **A. In Denton.**
3  Q. Have you been arrested any other time?
4  **A. Yes.**
5  Q. How many other times?
6  **A. I -- I was arrested twice.**
7  Q. 2008 in Denton?
8  **A. That's correct.**
9  Q. And by the way, what's the final disposition
10  on that particular crime or alleged crime?
11  **A. I -- I believe it was a plea in bar.**
12  Q. Okay. You pled to a lesser crime?
13  **A. Yes.**
14  Q. And did you pay a fine?
15  **A. Yes.**
16  Q. Did you serve any jail time?
17  **A. One day.**
18  Q. In Denton?
19  **A. That's correct.**
20  Q. What was the other time you were arrested?
21  **A. I was arrested in 2012 for a prohibited**
22  **weapon charge.**
23  Q. Was it found in your car?
24  **A. Yes.**
25  Q. Were you pulled over for something else?

Page 90

1  **A. I wasn't charged with anything else.**
2  Q. I'm sorry?
3  **A. I was not charged with anything else.**
4  Q. I didn't ask you that.
5  **A. I don't know what I was pulled over for.**
6  Q. Did you ask the officer why he pulled you
7  over or she pulled you over?
8  **A. I did.**
9  Q. And what was the response?
10  **A. They said something about a lane change.**
11  Q. Okay. So how was it that the officer began
12  to check your -- the contents of your car?
13  **A. They just started to check the vehicle.**
14  Q. And you had a prohibited weapon somewhere in
15  the vehicle?
16  **A. Yes. I had a can of mace.**
17  Q. Where was it?
18  **A. It was in the back -- back -- back cup**
19  **holder.**
20  Q. And when in 2012 was this?
21  **A. I believe it was September.**
22  Q. Why were you carrying around or driving
23  around with a can of mace?
24  **A. I had -- I had been provided it by Robert**
25  **Bonilla when I first started XTC. He said that it was**

Page 91

1  **a dangerous work environment and to have this can of**
2  **mace just in case. After my termination, I just never**
3  **removed it from the car.**
4  Q. Drove it around with you?
5  **A. That's -- that's correct.**
6  Q. Is mace illegal?
7  **A. I believe that can is, yes.**
8  Q. Why is that can illegal?
9  **A. Because I guess it was larger than the size**
10  **allowed by law.**
11  Q. What does the law allow -- allow to -- strike
12  that. What are you allowed to do under the law, per
13  your understanding?
14  **A. I don't know exactly what the size**
15  **limitations are.**
16  Q. Okay. And were you taken to jail?
17  **A. I was, yes.**
18  Q. Did you serve time in jail?
19  **A. I -- just until I bonded out.**
20  Q. And what was the final disposition?
21  **A. Probation, deferred adjudication.**
22  Q. Did you plead guilty or entered into an
23  agreement where your -- where you would get deferred
24  adjudication?
25  **A. I -- I got deferred adjudication. That's**

Page 92

1  **correct.**
2  Q. So was there a no contest plea?
3  **A. I don't know what the plea was.**
4  Q. Any other instances in which you've been
5  arrested besides those two?
6  **A. I was arrested in April, I believe, of 2012.**
7  Q. What was that for?
8  **A. It was for aggravated assault on a public**
9  **servant with a deadly weapon.**
10  Q. What were the circumstances in that case?
11  **A. I was arrested and told that I had an**
12  **outstanding warrant from ten months previous. After I**
13  **went through the -- started the court proceedings,**
14  **district attorney informed me that they had found the**
15  **police officer to be lying regarding their claim. And**
16  **they dismissed the case.**
17  Q. So how did you get arrested for aggravated
18  assault of public servant? That's what was on your
19  record that shouldn't have been?
20  **A. I don't -- I don't know what you mean by**
21  **my -- what was on my record. I just know that this is**
22  **the charge that they pursued in the beginning, and**
23  **then they dismissed the charge based on the**
24  **information that the D.A. gathered. They specifically**
25  **said the police officer had been lying about their**

Page 93

1 claim.
2    Q. Were you pulled over in April 2012?
3    **A. I was.**
4    Q. Okay. And so did the police officer tell you
5 why he or she pulled you over?
6    **A. I was not driving. I was in a friend's car.**
7 **He got pulled over for a traffic violation, and then**
8 **they asked me for my driver's license.**
9    Q. Okay. Then the police officer -- officers
10 come back to the car and say "you over there,"
11 pointing to you, "you have a warrant out for your
12 arrest for aggravated assault on a public servant"?
13    **A. That's correct.**
14    Q. And certainly, you said "I do not"?
15    **A. That's absolutely what I said.**
16    Q. And he said, "well, come with me. It's on
17 your record"?
18    **A. That's right.**
19    Q. Probably wasn't that civil of a conversation.
20 But at some point, you got in the back of the cop car?
21    **A. Yes, I had -- I didn't have much of a choice**
22 **at that point.**
23    Q. Okay. And so did you go to jail?
24    **A. I did. I went to jail, and I was bonded out.**
25    Q. When did you learn that the police officer

Page 94

1 was lying?
2    **A. When the District Attorney informed me and my**
3 **attorney in the courthouse.**
4    Q. How much after your arrest was that?
5    **A. A long while after. It was several months.**
6    Q. So there was never anything on your record
7 for aggravated assault on a public servant?
8    **A. No. The case was dismissed by the State.**
9    Q. Was there an instance where you were ever
10 accused of aggravated assault on a public servant
11 besides the cop pulling you out of the car saying it
12 was on your record?
13    **A. No.**
14    Q. Have you ever had a warrant out for your
15 arrest besides what you understand this was in April
16 of 2012 and by mistake?
17    **A. No, I have not.**
18    Q. Have you been arrested on any other instance
19 besides the three that you and I just visited about?
20    **A. No.**
21    Q. Once in 2008 and two in 2012?
22    **A. Yes.**
23    Q. Have you ever considered the possibility that
24 your criminal record may be turning employers off or
25 prospective employers off from hiring you?

Page 95

1    **A. I applied for many jobs before these -- these**
2 **different charges went on my record.**
3        MR. HURST: Objection. Nonresponsive.
4    Q. (BY MR. HURST) Have you ever considered that
5 employers turning you down were getting turned off by
6 your criminal record, may be a reason --
7        MR. CHANDER: Objection.
8    Q. (BY MR. HURST) -- keeping you --
9        MR. CHANDER: Leading.
10        MR. HURST: Well, I'm allowed to lead.
11 This is a deposition that I'm taking.
12    Q. (BY MR. HURST) Let me start again. Have you
13 ever considered the possibility that your criminal
14 record is keeping you from getting hired anywhere?
15    **A. No, I haven't.**
16    Q. Have you ever typed in on-line or gone down
17 to the courthouse to see what comes up when someone
18 does a background search on you?
19    **A. No, I have not.**
20    Q. Is that something you think you may want to
21 do?
22    **A. Not particularly.**
23    Q. You don't want to do it because you won't
24 like what you find?
25    **A. I mean a can of mace? I don't think that's**

Page 96

1 that serious.
2    Q. So you presume that that arrest and/or that
3 conviction comes up?
4    **A. I -- I assume it does, yes.**
5    Q. And you don't think it's a big deal. That's
6 what you're saying to me right now?
7    **A. Yes, because it was just a can of mace.**
8    Q. But my question to you was, do you know
9 whether prospective employers are considering this to
10 be bad news or a red flag when they're looking to hire
11 you?
12    **A. I -- I -- I'm sure some might.**
13    Q. And you've thought about that, haven't you?
14    **A. No, not really, I haven't.**
15    Q. Are you discouraged by your not being hired
16 by a company that -- after you said you've applied to
17 over 100?
18    **A. Am I dis -- I'm somewhat discouraged, but I**
19 **still keep on applying so --**
20    Q. Okay. But certainly, you're asking yourself
21 "why can't I find a job," right?
22    **A. To some degree, yes.**
23    Q. I mean, you want to make sure that you're
24 presenting as the best candidate you can, right?
25    **A. Yes.**

Page 97

1    Q. You want to make sure that they know that
2 you're going to be a hard worker and you're going to
3 be responsible?
4    **A. That's correct.**
5    Q. And certainly, you've contemplated "what is
6 it about my application, my resume, my whole package
7 that is not getting in the door with some of these
8 employers," right?
9    **A. I have, yes.**
10    Q. And you have not once in that process
11 considered that maybe your criminal record has
12 something to do with it?
13    **A. Not really, no.**
14    Q. What is your race?
15    **A. I'm an Iranian.**
16    Q. And that's what you consider to be your race?
17    **A. Yes.**
18    MR. HURST:  Now, let's go off the record
19 for a moment.
20    VIDEOGRAPHER:  Going off the record.
21 Time is 11:24.  This is the end of Tape 1.
22    (Lunch Recess.)
23    VIDEOGRAPHER:  We're back on the record.
24 Time is 12:34, beginning of Tape 2.
25    Q. (BY MR. HURST)  We were visiting before break

Page 98

1 about the instances in which you were arrested.  And I
2 forgot to ask you, did you have an attorney in each
3 one of those three instances in which you claim to
4 have been arrested?
5    **A. I did, yes.**
6    Q. Who was your attorney for each one?
7    **A. Steven Miller.**
8    Q. For which?  All three?
9    **A. No, for the last two.  And the -- the case in**
10 **Denton County, I -- I don't recall his name.**
11    Q. Was it an attorney in Denton County?
12    **A. It was.**
13    Q. What were you doing in Denton County?
14    **A. We were driving to Oklahoma for a small**
15 **vacation.  We were going to go there overnight.**
16    Q. How is it that you met Sheena?
17    **A. We --**
18    Q. She was a student at the time, correct?
19    **A. Yes.**
20    Q. Was she also a dancer?
21    **A. No.**
22    Q. Where did you meet her?
23    **A. I met her at just some New Year's parties, I**
24 **believe, was where I met her.**
25    Q. Is Steven Miller in Dallas?

Page 99

1    **A. He's in Plano.**
2    Q. Is he a criminal defense attorney?
3    **A. Yes.**
4    Q. Did you have an attorney representing you in
5 the EEOC proceeding in Oregon?
6    **A. I did, yes.**
7    Q. Who was that?
8    **A. I don't recall.**
9    Q. An attorney in Portland --
10    **A. Yes.**
11    Q. -- who did plaintiff's employment work?
12    **A. Yes.**
13    Q. Man or a woman?
14    **A. It was a woman.**
15    Q. Do you remember her first name?
16    **A. I do not.**
17    Q. I asked you before break what your race was,
18 and you said Iranian; is that right?
19    **A. Yes.**
20    Q. Okay.  And so I'm going to ask you a question
21 that I think will probably get me to the same answer.
22 Do you know what your national origin is?
23    **A. American.**
24    Q. So you were born in America, and that's what
25 you understand your national origin to be?

Page 100

1    **A. Yes.**
2    Q. You're not from Iran or anywhere in the
3 Middle East, right?
4    **A. No.  I was born in Dallas.**
5    Q. So you're not from Iran or any other country
6 in the Middle East, correct?
7    **A. No.**
8    Q. Is either one of your parents?
9    **A. They both are, yes.**
10    Q. Do you ever recall visiting with anyone at
11 XTC Cabaret Dallas about your family being from Iran
12 or your having considered yourself of Iranian race?
13    **A. Yes, I was asked what my race was.**
14    Q. Who asked you that?
15    **A. Both Erin Frye and Josh Stern asked me that.**
16    Q. Okay.  Erin Frye, what was her position?
17    **A. General manager.**
18    Q. When you came to work at XTC?
19    **A. Yes.**
20    Q. In fact, Erin Frye is the one who hired you,
21 right?
22    **A. She forwarded me to Ian Crissman who hired**
23 **me.**
24    Q. And when did Erin Frye supposedly ask you
25 what your -- how did she say it?

Page 101

1    A. She asked me where I'm from or what I am,
2  what's my race.
3    Q. Was this after you came to work there?
4    A. Yes.
5    Q. Okay. Did you think that was strange, that
6  she asked that?
7    A. Not particularly, no.
8    Q. Just making conversation?
9    A. I thought so.
10   Q. Did you take offense to it?
11   A. No, not when she asked me.
12   Q. You thought that it was just a good-natured,
13  "hey, let's get to know each other"?
14   A. I wasn't quite sure what to think.
15   Q. Did you ask her where she was from?
16   A. No.
17   Q. So she says "what are you"?
18   A. She asked me what race I was.
19   Q. Did she actually use the word "race"?
20   A. Yes.
21   Q. And you responded how?
22   A. I said that I'm Iranian-American.
23   Q. And did you ever visit with Erin Frye again
24  about your being Iranian-American?
25   A. Well, no, after I told her I was

Page 102

1  Iranian-American, though, she did say, "oh, my God
2  you're a Muslim terrorist." She's sort of boisterous.
3  She -- she said it in a -- sort of a loud manner in --
4    Q. Was --
5    A. -- front of staff.
6    Q. Was it just the two of you?
7    A. No, there was other people there.
8    Q. Do you recall when this was?
9    A. It was the first week of my hire.
10   Q. So when was that?
11   A. Sometime in the beginning of March 2009.
12   Q. So obviously, if Erin said that, then she
13  would know that she said that. Did anyone witness her
14  supposedly saying, "oh, my God, you're a Muslim
15  terrorist"?
16   A. I believe there was a few employees there. I
17  know Marty Ray Carl was there.
18   Q. Okay. How do you spell his name?
19   A. Marty, M-a-r-t-y, Ray, R-a-y, Carl, C-a-r-l.
20  And he, in fact, repeated it often after that.
21   Q. Okay. Anyone else you believe heard it?
22   A. Christine Goodgion.
23   Q. Okay. How do you spell her name?
24   A. C-h-r-i-s-t-i-n-e.
25   Q. Uh-huh.

Page 103

1    A. Goodgion, G-o-o-d -- I believe it's g-i-o-n.
2    Q. What was her position?
3    A. She was the house mom.
4    Q. And did she ever say anything to you about
5  it?
6    A. Everybody started to refer to me as Muslim
7  terrorist. You know, just after -- after that
8  incident, it just continued.
9    Q. Okay. Right now, we're talking about
10  Christine Goodgion.
11   A. Yes.
12   Q. Did she ever call you a Muslim terrorist --
13   A. Yes.
14   Q. -- after this incident?
15   A. Yes, frequently.
16   Q. Okay. Do you believe anyone other than Marty
17  Ray Carl and Christine Goodgion heard Erin Frye
18  supposedly say to you, "oh, my gosh, you're a Muslim
19  terrorist"?
20   A. I -- I don't recall.
21   Q. Okay. And how did you respond to Erin Frye
22  supposedly saying this?
23   A. I was a new hire, so I sort of just ignored
24  it. I was hoping that it was just a one-time thing
25  and that it would go away.

Page 104

1    Q. And she only said this to you once, and that
2  was your first week there?
3    A. No, she -- she continued to say things along
4  those lines.
5    Q. Throughout the entire time y'all worked
6  together?
7    A. Yes.
8    Q. Okay. So did you ignore it the first time,
9  or you ignored it every time?
10   A. I ignored it the first time. And after that,
11  it sort of just continued to where it was happening
12  frequently.
13   Q. And did you say anything to her like --
14   A. I --
15   Q. -- "I don't like being called" --
16   A. I told her --
17   Q. -- "that"?
18   A. I told her I didn't think it was funny.
19   Q. Okay. How many times did you tell her that?
20   A. Just once.
21   Q. Do you remember when you told her that?
22   A. It was a couple of months into my employment
23  there.
24   Q. And how did she respond?
25   A. She -- she said something along the lines of

Page 105

1  "oh, God, relax."
2      Q.  And that was a couple of months into your
3  employment?
4      A.  Yeah, it was just a few months in.
5      Q.  Then did she continue to refer to you as a
6  Muslim terrorist even after you said you didn't like
7  that?
8      A.  Yeah, she -- she referred to me in derogatory
9  ways based on my race.
10     Q.  Right now, we're talking about the supposed
11  quote of your being a Muslim terrorist.
12     A.  It's -- it's a fact.  She did say that.
13         MR. HURST:  Objection.  Nonresponsive.
14     Q.  (BY MR. HURST)  My question to you is, did
15  she refer to you as a Muslim terrorist after you told
16  her that you didn't think it was funny?
17     A.  Yes, she did.
18     Q.  Okay.  In those other instances in which she
19  referred to you as a Muslim terrorist, did she do it
20  in front of anyone?  Or was it just the two of you?
21     A.  She did it in front of staff sometimes.
22  Other times, she did it in front of myself alone.
23     Q.  What staff did she supposedly do this in
24  front of?
25     A.  As -- as I can recall, Christine and Marty as

Page 106

1  of right now.  There may have been others that also
2  witnessed it.
3      Q.  So you identified Christine and Marty as
4  being there the first time she said it, right?
5      A.  They were there frequently.
6      Q.  Hold on.  You've identified them as being
7  there the first time she supposedly said it, correct?
8      A.  Yes.
9      Q.  And you're also saying that they were there
10  on other instances in which Erin Frye referred to you
11  as a Muslim terrorist?
12     A.  Yes.
13     Q.  You said Josh Stern and you had a discussion
14  about your race or your being Iranian-American or
15  considering yourself an Iranian-American?
16     A.  Yes.
17     Q.  Is that right?
18     A.  Yes.
19     Q.  Okay.  What was the situation there?
20     A.  When I first got hired by Erin, we worked
21  together for about a year.  When Josh Stern came on,
22  it was about three weeks or so that he started to ask
23  me more questions about where I was from and what my
24  national origin is and my ethnicity.
25     Q.  Did that bother you?

Page 107

1      A.  No, it didn't bother me until I heard his
2  response.  I told him where I was from, that I was
3  Persian or Iranian, and he started immediately making
4  jokes --
5      Q.  What did he say?
6      A.  -- both racist and religiously-based.  He
7  asked me questions like where is my bomb, where do --
8  where do I hide my bomb; is Osama bin Laden my cousin.
9  He asked me if my girlfriend covers her body, if I
10  allowed my girlfriend out of the house.  He called me
11  all kinds of names like Muslim, Arab, terrorist,
12  Al-Qaeda.  He called me a Jihadist.  He called me even
13  Italian mafia.  He referred to me as a wetback, as a
14  spick.  And he did so regularly with customers, as
15  well, and other staff members.
16     Q.  Okay.  Now, in any of these instances, did
17  you say "I don't like that"?
18     A.  Yes, I did, on more than one occasion.
19     Q.  Okay.  Do you specifically remember an
20  occasion where you told him that?
21     A.  Yeah.  About a month into my employment
22  there -- a month into my employment with Josh -- so
23  probably, it was May 2010 -- when he made the jokes
24  about my girlfriend covering her body in veils,
25  et cetera, I told him that I thought what he was

Page 108

1  saying was offensive.  And I asked him to be more
2  professional.
3      Q.  And do you recall when that was?
4      A.  It was in May of 2010.
5      Q.  I mean, more specific than that?
6      A.  It was during that time.  It was about three
7  to four weeks into my employment.  It was about three
8  with Josh.
9      Q.  How did he respond to your telling him you
10  wanted him to be more professional?
11     A.  He said that he was only joking.
12     Q.  And did it continue after that?
13     A.  It did, yes.
14     Q.  So you've identified two individuals with
15  whom you had discussions about your race or your
16  considering yourself an Iranian-American, correct?
17     A.  Yes.
18     Q.  Can you think of any other discussions?
19     A.  Yes.  Marty Ray Carl, who was also a manager
20  at XTC, was a self-proclaimed KKK member.  And he
21  basically said that the first cloth that ever touched
22  his body was a KKK robe.
23         And he almost on a daily basis referred
24  to me in ways such as Persian fuck -- excuse my
25  language -- Arab, raghead, suicide bomber.  I mean

Page 109

1 just it was relentless with Marty. He did it
2 publicly, and he did it in front of everyone.
3    Q. Now, who would attest to him calling you
4 these types of things? Who was there who would have
5 heard it?
6    A. All the floor hosts. Pretty much the entire
7 floor host staff could attest to that.
8    Q. Okay. So who are we talking about?
9    A. I don't remember exactly who was there at the
10 time on our -- because our floor host staff had some
11 turnover, but anybody that was on the staff could
12 attest to it.
13    Q. Okay. But you can't identify any
14 particular --
15    A. Cesar -- Cesar Corolla, Jason West, Breon
16 Russell --
17    Q. Who --
18    A. -- Billy -- Billy Jackson --
19    Q. How do you spell Breon?
20    A. B-r-e-o-n -- Chewy or Jesus Esparza. I don't
21 remember exactly who worked with us at the same --
22 during that first year besides those people. I know
23 there were others.
24    Q. It's your testimony that these five persons
25 who you just identified heard Marty make these types

Page 110

1 of offensive jokes to you?
2    A. Yes, they did.
3    Q. Are -- are you assuming they did because they
4 were floor hosts, or do you specifically recall that
5 they heard this?
6    A. I specifically remember those people being in
7 meetings or being in gatherings after work where Marty
8 would use that sort of language against me.
9    Q. Okay. So now you've identified three people
10 who you recall had discussions with you regarding your
11 race or your -- regarding yourself as
12 Iranian-American; is that right?
13    A. Yes.
14    Q. Okay. And you've also identified all the
15 persons who, as we sit here today, you can recall
16 heard Erin, Josh, and/or Marty referring to you as a
17 raghead, Muslim terrorist, wetback, spick?
18    A. Nigger, Arab.
19    Q. Saying "where is your bomb," those types of
20 things?
21    A. Yes, so far.
22    Q. When you say "so far" --
23    A. There are more.
24    Q. So what I'm --
25    A. There are more instances. I'm -- I'm

Page 111

1 referring to instances.
2    Q. Oh.
3    A. Not the people.
4    Q. Okay. So we've just identified the people,
5 though?
6    A. Yes.
7    Q. Any other persons with whom you had
8 discussions about your race or your regarding yourself
9 as Iranian-American?
10    A. Yes. When we had a regional meeting for
11 Rick's Cabaret, it was for managers.
12    Q. Do you remember when this was?
13    A. It was on/or around December 13, 2011. There
14 was an instance where I had experienced some
15 discrimination during the meeting. I complained about
16 this discrimination.
17        And as a result, I was at work during
18 shift a few days after the meeting when Robert
19 Bonilla, who is an appointee for Rick's out of Houston
20 who was working at XTC Cabaret, brought over a very
21 large 350 pound man named John Henry over to me during
22 my shift and basically said that -- asked me "do you
23 know what discrimination is?" And he was yelling at
24 me. And he said your people, Arab Muslims, have been
25 persecuting black people for thousands of years before

Page 112

1 9/11.
2        He said -- he continued basically by
3 poking me and shoving me and screaming in my face that
4 Arab Muslims like me call him Abdi, which means slave,
5 and have -- have oppressed his people. And he -- he
6 continued in a very threatening manner.
7    Q. Who are we talking about? John Henry?
8    A. John Henry. He continued in a very
9 threatening manner until, without me even asking my
10 security to come over, they came over out of fear of
11 my safety. And --
12    Q. Was John Henry an employee?
13    A. John Henry is an employee for Rick's in the
14 Onyx Club in Houston.
15    Q. So what was he doing there?
16    A. He -- well, the situation basically got to
17 the point where my security came over. And I
18 explained to him that I wasn't an Arab, that I was not
19 a Muslim. I -- I -- as calmly as I could.
20        I -- I -- I did fear for my safety
21 because he's such a large man and there was so much
22 illegality in the club in terms of assault and
23 et cetera.
24        And I told him that I was a Bahai, that
25 I was actually Persian-Iran, not Arabic, and that my

APP 71

Page 113

1 Persian Bahais had also been persecuted by Arab
2 Muslims and executed and imprisoned over the last
3 couple of hundred years.
4          And finally, I was able to defuse the
5 situation and get away from him; but just a couple of
6 days before this, I had complained to Josh Stern
7 because during the regional meeting at Rick's, we had
8 stopped at Cabaret North.  It was myself and several
9 general managers and a regional manager named Wayne
10 Fenlon.  And it was about closing time.  There were no
11 patrons left in the club.  And we were in a circle,
12 just a small circle.  And we were asked to introduce
13 ourselves, and we were -- we were --
14     Q.  Can I -- can I stop you for a minute?  I want
15 you to go with me on my questions because I -- I think
16 you're getting away from what we're --
17     A.  Well, I'm --
18     Q.  -- talking about.
19     A.  -- trying to ex --
20     Q.  I --
21     A.  I'm --
22     Q.  I -- I --
23     A.  I'm trying to finish what I was saying, if
24 that -- if --
25     Q.  Well, I --

Page 114

1     A.  -- that -- that's okay.
2     Q.  Well, it -- actually, it's not because I only
3 have a limited time to take your deposition.  And when
4 I hear you going off the beaten path --
5     A.  Well, it's -- I'm not.  It's actually --
6     Q.  I --
7     A.  -- all --
8     Q.  I mean --
9     A.  -- related.
10     Q.  I know --
11     A.  It's all related.
12     Q.  I know you think that you're being responsive
13 or you're trying to be or at least to tell your story.
14 I'm letting you know this is my deposition, and you're
15 not answering the question that I'm asking you.
16     A.  Okay.
17     Q.  I can assure you, you will have an
18 opportunity to respond to provide whatever you recall
19 happened and what your allegations are in this
20 lawsuit; but what I'm not going to allow is my
21 perception of your going all over the place just to
22 try to get allegations in even if it's not answering
23 the question.  I have to be more responsible with our
24 time together, and I'm trying to be.
25          So what we were talking about was

Page 115

1 instances in which you had discussions about your
2 recognition or your characterization of yourself as
3 Iranian-American, anything about your race,
4 discussions with coworkers.  You initially named two
5 people, Erin Frye and Josh Stern.
6     A.  Yes.
7     Q.  We talked about those instances.
8     A.  Uh-huh.
9     Q.  Then you went on and -- and mentioned Marty,
10 who was not only, you believe, a witness to some of
11 the discussions or insults launched at you by Erin
12 and/or Josh, but you also recall that he himself made
13 similar comments to you.  Is that correct so far?
14     A.  Yes.
15     Q.  Okay.  Then we talked about people who
16 specifically recall heard Marty make those types of
17 comments to you?
18     A.  Okay.
19     Q.  And you identified five people who -- all of
20 whom I presume were floor hosts at the time.  Is that
21 correct?
22     A.  Yes.
23     Q.  Okay.  Then I think we got off the beaten
24 path because I'm still wanting to know just
25 conversations where you said "this is my race" or

Page 116

1 "this is what I consider my race to be."
2          I'm not asking you who called you names.
3 I'm not asking you who said bad things to you yet or
4 who made fun of you or who called you an Arab
5 terrorist; although, you kind of got there with some
6 of these discussions.  I'm asking you who you recall
7 had discussions with you regarding your race or what
8 you consider to be your race.
9     A.  Okay.
10     Q.  Do you understand the difference?
11     A.  I -- I think so.
12     Q.  Okay.  Tell -- telling me about a 350
13 pound --
14     A.  Well, he was --
15     Q.  -- African --
16     A.  We --
17     Q.  -- American man --
18     A.  Yes.
19     Q.  -- who's threatening you and you had to talk
20 your way out of it, is what you want us to believe, is
21 not exactly a discussion as to what you believe you
22 are.
23     A.  Well, I -- I guess our understandings are
24 different --
25     Q.  Okay.

Page 117

1    A. -- because when a coworker that works for
2 Rick's approaches me at work and we have a
3 conversation about the fact that I am an Iranian
4 Bahai, I believe that that's in answer -- or in
5 response to your question. And I --
6    Q. It -- it didn't sound like there was a
7 conversation there. It sounds like you were being
8 threatened or at least that's your testimony.
9    A. I mean I -- it was threatening; but the
10 content of the conversation included the fact that I
11 was being called an Arab Muslim and I was trying to
12 explain to this gentleman that I was not an Arab
13 Muslim, that I was an Iranian Bahai. And so if --
14 if -- if I didn't answer your question, then maybe you
15 could clarify or specify further. And we can --
16    Q. Okay.
17    A. We can --
18    Q. And I'm doing --
19    A. -- go from there.
20    Q. Fair enough. I'm doing the best I can. I
21 want to go through your recollection of each
22 conversation you had of people with regard to how you
23 saw your race, what you regarded your race because I
24 am getting at the idea that your race or how you
25 regarded yourself was not a secret at XTC Cabaret

Page 118

1 Dallas. In fact, you had discussions with people
2 about it.
3        I understand you have allegations that
4 people said what they said or that they made racial
5 epithets and so forth, but you did indeed have
6 conversations with people in which you were stating in
7 the conversation "here's how I regard myself." That's
8 what I'm trying to get at.
9    A. Yes, in -- in response to the questions. I
10 never offered up any information. It was in response
11 to questions from my superiors and other coworkers.
12    Q. Okay. So you never made small-talk with
13 anyone about where they were from?
14    A. No, I didn't.
15    Q. Okay.
16    A. I didn't think that was appropriate.
17    Q. It's not appropriate to ask someone where
18 they're from?
19    A. I -- I don't think so. I think when you're
20 in a professional capacity, that there is no -- there
21 is no reason to ask people where they're from. We're
22 all from this -- we're all from the same carbon-based
23 life form. So what -- what difference does it make?
24    Q. Well, that's a strange answer, isn't it?
25    A. I don't think so.

Page 119

1    Q. Is that how you would --
2        MR. CHANDER: Objection. Argumentative.
3    Q. (BY MR. HURST) Is that how you would
4 actually respond to someone if they asked you where
5 you were from? You'd say --
6    A. The way --
7    Q. -- "it doesn't matter because we're all from
8 the same carbon-based life form"?
9    A. The way that I --
10        MR. CHANDER: Objection.
11    A. -- see things --
12        MR. CHANDER: Argumentative.
13    A. As a Bahai, the way that I see things is that
14 we are all equal. And because of the different sorts
15 of ongoing and continuous discrimination, both race --
16 racially motivated and religiously motivated that I
17 experienced at XTC for three years, I did not welcome
18 those questions.
19        MR. HURST: Objection. Nonresponsive.
20    Q. (BY MR. HURST) We're not even talking about
21 that. We're talking about the beginning of your
22 employment at XTC Cabaret Dallas. Do you recall
23 discussing your first conversation with Erin Frye
24 where she may have asked you where you were from?
25    A. Yes, I do recall.

Page 120

1    Q. Okay. And you were not offended at the time,
2 were you?
3    A. I was offended when she called me a Muslim
4 terrorist in --
5        MR. HURST: Objection.
6    A. -- response --
7        MR. HURST: Nonresponsive.
8    Q. (BY MR. HURST) Do you understand my
9 question?
10    A. I guess not.
11    Q. When you talked to Erin Frye with -- I think
12 you said within the first week of your hire and she
13 supposedly asked you what race you were -- do you
14 recall testifying to that ten minutes ago?
15    A. Yes.
16    Q. Okay. You were not offended by that, were
17 you?
18    A. By the question, no.
19    Q. You -- okay. And you told her you considered
20 yourself Iranian-American, correct?
21    A. Yes.
22    Q. Okay. And you proceeded to tell me how that
23 conversation went. Those are the conversations that
24 I'm asking you about that you had, if you had, with
25 any other coworker. Do you understand my

APP 73

Page 121

1    **A. Yes.**
2    Q. Okay. You told me about your conversation
3  with Josh Stern which you said, I believe, was in the
4  first two to three months of your working with him.
5  Do you remember that?
6    **A. Yes.**
7    Q. Okay. Did you have any conversations with
8  anyone other than Erin Frye or Josh Stern where you
9  told them you considered yourself to be
10  Iranian-American as your race?
11    **A. Yes.**
12    Q. Okay. What other ones?
13    **A. With Marty, with Tim St. Onge.**
14    Q. And you've already told me about the one with
15  Marty?
16    **A. I think we've already talked -- discussed**
17  **Marty, yes.**
18    Q. Okay. What about with Tim St. Onge? And
19  that's O-n-g-e?
20    **A. Yes, I think so.**
21    Q. Okay. Do you recall when this conversation
22  was?
23    **A. Tim St. Onge and Josh used to --**
24    Q. Do you recall when your conversation was with
25  Tim St. Onge that you're about to tell me?

Page 122

1    **A. It was ongoing.**
2    Q. An ongoing conversation where you say that
3  you think you're Iranian-American?
4    **A. Oh, well, when I identified myself with --**
5  **being Iranian-American with Tim, I believe it happened**
6  **through the staff. I think at that point, there was**
7  **enough derogatory comments to where he just picked up**
8  **on the fact that I was Iranian-American; but we -- I**
9  **think we did have some conversations about it. I**
10  **don't -- I don't remember.**
11    Q. Okay. So as we sit here today, you don't
12  actually recall a specific conversation with Tim
13  St. Onge in which you told him you thought you were
14  Iranian-American?
15    **A. No.**
16    Q. Anyone else?
17    **A. John Henry.**
18    Q. Anyone else?
19    MR. CHANDER: Monte?
20    MR. HURST: Yes.
21    MR. CHANDER: May I just -- I'm not
22  going to coach or anything. Just answer the question
23  that's being asked here. And, Monte, if you can
24  restate it so that he understands precisely what
25  you're asking, you know, in terms of the conversation

Page 123

1  so that he's able to address your question so we can
2  move on to -- to other things.
3    Q. (BY MR. HURST) I can have the court reporter
4  read it back if you'd like.
5    **A. Okay.**
6    MR. CHANDER: Well, maybe you can
7  rephrase --
8    MR. HURST: I -- I --
9    MR. CHANDER: -- it in a way that he'll
10  be able to under -- answer the question that you're
11  asking.
12    Q. (BY MR. HURST) I'm doing the best I can to
13  identify a conversation in which you told a coworker
14  your belief that you were Iranian-American --
15    **A. Okay.**
16    Q. -- or here's what you thought your race was.
17    **A. Okay. That's all.**
18    Q. Have you -- have you told me about each and
19  every one of those conversations that you recall as we
20  sit here today?
21    **A. Yes.**
22    Q. Just so we're clear, that's a conversation
23  with Erin Frye within the first week of your being
24  there. That's a conversation with Josh Stern within
25  the first two to three months that you spoke with him.

Page 124

1  That's a conversation with Marty and a conversation
2  with John Henry; although, you and I went back and
3  forth on whether that was even a conversation or
4  discussion and more of your responding to his threats.
5  Is that correct?
6    **A. Okay. Yes.**
7    Q. Is that -- okay. Those are all the
8  conversations in which you were asked about your race
9  or you discussed with someone your belief that you
10  were Iranian-American?
11    **A. Yes.**
12    Q. What is your religion?
13    **A. Bahai.**
14    Q. And how long have you practiced this
15  particular religion?
16    **A. Since I was 15.**
17    Q. Is that the same religion of your parents?
18    **A. It is.**
19    Q. What happens at 15? Why would you not have
20  been practicing it prior to then?
21    **A. We are -- as Bahais, we are required to**
22  **independently investigate our faiths. So we are not**
23  **allowed to declare ourselves a member of the religion**
24  **until we're 15.**
25    Q. And do you still practice this religion?

Page 125

1   A. Yes.
2   Q. Now, did you have discussions with coworkers
3   about your religion?
4   A. Yes.
5   Q. Okay. With whom and when?
6   A. I -- I told Erin that I was a Bahai.
7   Q. Okay. Why did you tell her that?
8   A. Because she was calling me a Muslim.
9   Q. Okay. Do you recall when this was?
10  A. It was -- it was in the first few months of
11  working there.
12  Q. Anyone else?
13  A. I told Josh I was a Bahai.
14  Q. And what was that in reference to?
15  A. Just to try and stop the -- the Muslim
16  comments.
17  Q. Anyone else you told that to?
18  A. No.
19  Q. Was there a time where you were actually
20  explaining to Erin, Josh, or anybody else at XTC
21  Cabaret Dallas what it meant to you to be a Bahai?
22  A. No.
23  Q. Did you ever discuss with a coworker that you
24  hated extremists in your country?
25  A. Yes.

Page 126

1   Q. What country are you referring to?
2   A. Okay. So maybe I answered the question
3   incorrectly. It's not my country, but the country of
4   my ancestry.
5   Q. Okay.
6   A. And, yes, I did discuss that I did not like
7   the extremists.
8   Q. Are you talking about in Iran?
9   A. Yes.
10  Q. Do you recall when any such discussion took
11  place?
12  A. I explained to Josh when we had the
13  conversation about me being Bahai what had happened
14  with the people in my religion and how they've been
15  executed and imprisoned, not allowed to go to school,
16  et cetera.
17  Q. In Iran?
18  A. In Iran.
19  Q. Is that the only instance in which you recall
20  discussing that you didn't like extremists in -- in
21  Iran?
22  A. I talked to Christine about it, Christine
23  Goodgion.
24  Q. Okay. Same thing?
25  A. Same thing.

Page 127

1   Q. When was your discussion with Christine?
2   A. It was somewhere near the beginning of my
3   employment there.
4   Q. Anyone else with whom you discussed that you
5   didn't like extremists in Iran?
6   A. I don't know.
7   Q. What type of company is XTC Cabaret Dallas?
8   A. It is a cabaret, a club.
9   Q. What goes on there?
10  A. Customers come to drink and be entertained by
11  a group of entertainers.
12  Q. What kind of entertainment?
13  A. A gentlemen's club.
14  Q. Can you be more specific?
15  A. Topless dancers.
16  Q. Gentlemen come to drink and be entertained by
17  topless dancers?
18  A. Yes.
19  Q. Okay. You knew what kind of establishment it
20  was when you applied there, right?
21  A. Yes.
22  Q. Had you ever been to one before that?
23  A. Yes, I have.
24  Q. Okay. Which ones had you been to?
25  A. A long time ago when I was younger in

Page 128

1   Portland, Oregon.
2   Q. Do you remember the name of it?
3   A. No, I don't.
4   Q. How many times had you gone?
5   A. I think just a couple of times for bachelor
6   parties or something along those lines.
7   Q. And I had asked you before what circumstance
8   was it that led you to apply for a position at XTC
9   Cabaret Dallas, and you said you were applying to a
10  lot of places and this was the only strip club or
11  gentlemen's club or topless dancer club that you even
12  applied to. Is that right?
13  A. Yes.
14  Q. Was there something more attractive or more
15  enticing about XTC Cabaret than other types of those
16  clubs?
17  A. Other types of what?
18  Q. Than other clubs that did the same thing.
19  Was there something better in your mind about XTC
20  Cabaret?
21  A. No.
22  Q. Why is it that that was the only gentlemen's
23  establishment to which you applied when you were
24  looking for a job in Dallas?
25  A. Oh, I applied to a variety of jobs that I

Page 129

1 found on Craigslist.
2     Q. Okay.
3     A. And XTC just happened to be one of the job
4 postings that was available.
5     Q. Was it the only gentlemen's club that was
6 available at the time?
7     A. I'm not sure.
8     Q. You didn't have a particular relationship
9 with XTC or there wasn't anything jumping out at you
10 that XTC was the best gentlemen's club in Dallas? It
11 just happened to have a posting on Craigslist?
12     A. That's right.
13     Q. Would it be fair to say that if there was
14 another posting, a similar posting, from a competitor
15 of XTC that was also a gentlemen's club, you probably
16 would have applied there, as well?
17     A. Yes.
18     Q. You were looking for a job?
19     A. Yes, that's correct.
20     Q. And Craigslist was one of those places that
21 you were looking for a job?
22     A. Yes.
23     Q. And what was the posting on Craigslist for
24 XTC?
25     A. It was for a manager.

Page 130

1     Q. And you thought that would be good because
2 you had already had management experience; is that
3 right?
4     A. Right.
5     Q. Did it say anything about a college degree?
6     A. No.
7     Q. Did it any -- say anything about the money?
8     A. No.
9     Q. And just so we're clear, you're not someone
10 who looks down on strip clubs, are you?
11     A. I don't frequent them.
12     Q. I didn't ask you that.
13     A. Do I look down on them?
14     Q. Yeah. Do you look down on people who
15 frequent strip clubs or gentlemen's establishments?
16     A. I don't -- I don't look down on anyone.
17     Q. Okay. So -- and that would include people
18 who go to gentlemen's establishments?
19     A. Sure, yes.
20     Q. You don't think you're any better than they
21 are, right?
22     A. No, I don't.
23     Q. You don't think you're any better than the
24 women who actually dance at the gentlemen's
25 establishments, do you?

Page 131

1     A. Absolutely not.
2     Q. Okay. And the same goes for the people who
3 are employed at gentlemen's clubs. You don't think
4 you're any better than they are, right?
5     A. No.
6     Q. And you're certainly not arguing that society
7 shouldn't have gentlemen's clubs or that the city
8 shouldn't have gentlemen's clubs, are you?
9     A. No, I'm not.
10     Q. What's your understanding of the relationship
11 between XTC Cabaret Dallas and Rick's Cabaret
12 International?
13     A. From my point of view, XTC Cabaret is simply
14 a product line. And Rick's Cabaret International, RCI
15 Entertainment, is the -- the -- the corporation.
16     Q. So XTC Cabaret Dallas is not a corporation?
17     A. Technically, I don't know. I -- I think they
18 are incorporated.
19     Q. Okay. So I'm trying to get your
20 understanding with regard to the relationship, and
21 maybe it is that you just don't have one. But so far,
22 you've told me you believe that Rick's is a certain
23 bigger corporation and that XTC Cabaret is a product
24 line, meaning one of the services or facilities for
25 services that's offered by Rick Cabaret International

Page 132

1 and there are others?
2     A. Yes.
3     Q. Okay. So what are the others that are
4 offered?
5     A. There's Rick's itself. There's Onyx. And
6 there are other miscellaneous clubs.
7     Q. So what is your understanding of what Rick's
8 Cabaret International does or interacts with each of
9 these other clubs?
10     A. Rick's is the parent company.
11     Q. Okay. What does that mean, the parent
12 company?
13     A. That means that Rick's is the -- the nucleus.
14 That's where the organization for all the -- all
15 the -- the smaller brands comes from.
16     Q. Okay. So the people who come up with the
17 ideas for these other clubs, those ideas come from
18 Rick's Cabaret International?
19     A. Right.
20     Q. Okay. What about who actually controls each
21 of these other clubs on a daily basis?
22     A. Typically, I can only speak to XTC that --
23 Dallas where I worked; but typically, what I saw was
24 there was a GM who was supported by an appointee from
25 Rick's in Robert Bonilla and another appointee from

Page 133

1 **Rick's in Houston, Joseph Kyle, who worked for the**
2 **corporate office would be there to oversee security**
3 **on -- in other parts of the operations.**
4 Q. So there was a GM at the club that was solely
5 devoted to that particular club?
6 **A. Right.**
7 Q. Then working under him or her is an appointee
8 from Rick's?
9 **A. Yes.**
10 Q. Does --
11 **A. Not under. I think it's sort of a lateral**
12 **position.**
13 Q. Okay. So just someone who is from the parent
14 company just to make sure everything goes okay?
15 **A. Yeah. That would be Joseph Kyle. And then**
16 **there is Robert Bonilla who managed much of the, I**
17 **would say, illegal activity that happened at the door.**
18 Q. Robert Bonilla, it's your understanding, was
19 a Rick's Cabaret International employee?
20 **A. I believe so. He received -- I believe he**
21 **was employed by Rick's because I did see a check**
22 **from -- a check stub of his one time that said Rick's**
23 **on it.**
24 Q. Okay. And what did Robert Bonilla do? What
25 was his job title?

Page 134

1 **A. He was in a support position.**
2 Q. Well, do you know what his job title was?
3 **A. I don't. He has a business card from Rick's.**
4 **I have it at home. And it says manager.**
5 Q. And do you not think he's a manager?
6 **A. It's not my place to say. I believe he is a**
7 **manager.**
8 Q. What you were describing sounded like he
9 didn't have a position. So you said he's in a support
10 position?
11 **A. I also said he's laterally placed with Josh**
12 **Stern so --**
13 Q. I'm sorry. I thought you were talking about
14 the other one. You said Joseph Kyle?
15 **A. Yes.**
16 Q. Who is that?
17 **A. He is the head of security for Rick's.**
18 Q. Okay.
19 **A. I believe he is sent from club to club**
20 **depending on how dangerous the club is. The more**
21 **dangerous the club would warrant his presence. He**
22 **was -- he's at XTC Dallas on Thursdays, Fridays, and**
23 **Saturdays every week.**
24 Q. Okay. So it's your understanding that
25 Rick's, the parent company, sends someone around to

Page 135

1 each of the clubs to maintain security or to check on
2 security?
3 **A. From my understanding, it's just Joseph.**
4 **He's the only one.**
5 Q. But that's the one you're talking about?
6 **A. Yes.**
7 Q. Sent to Rick's, the parent company, per your
8 testimony, to check on security at each one of these
9 clubs or lines?
10 **A. Right.**
11 Q. Is that your testimony?
12 **A. Yes, to check on security and to also report**
13 **other operational aspects of the club directly to**
14 **corporate.**
15 Q. What else? What other operational aspects?
16 **A. I saw him discussing things with the bottle**
17 **runners. I saw him discussing operational aspects of**
18 **the business with Josh Stern.**
19 Q. Okay. And then Robert Bonilla is the one
20 who's lateral, you believe, to the GM of the club?
21 **A. Yes.**
22 Q. And each club has a Robert Bonilla type of
23 person there?
24 **A. I don't know.**
25 Q. You just know that XTC did when you were

Page 136

1 employed there?
2 **A. Yes.**
3 Q. And do you know the title of that person's
4 position?
5 **A. On his business card, it says manager.**
6 Q. Okay. So other than Robert Bonilla, the,
7 quote, unquote, manager from Rick's, and Joseph Kyle,
8 who you think is the head of security of Rick's that
9 goes around from club to club making sure that
10 security is going okay and other things with regard to
11 operations, are you aware of anyone from Rick's
12 actually participating or engaging in the daily
13 activities of a particular club, specifically XTC?
14 **A. I did see Eric Langan and Ed Anakar run XTC**
15 **Dallas for two to three weeks in April of 2010.**
16 Q. Okay. What does that mean?
17 **A. They fired Erin or transferred Erin somewhere**
18 **else. And they came in and ran the club, but other**
19 **than that, no.**
20 Q. What's your understanding of why Erin was
21 fired?
22 **A. I don't know. I wasn't privy to that**
23 **information.**
24 Q. And you don't have an understanding?
25 **A. There were rumors, but I don't know.**

Page 137

1   Q.  What's the rumor?
2   **A.  That she was transferred after the cab driver**
3   **was killed.**
4   Q.  Does she still work for the company?
5   **A.  No.**
6   Q.  Okay.  Any other employees, executives from
7   Rick's Cabaret International that you believe has had
8   or somehow participates in the daily activities of XTC
9   Dallas?
10  **A.  Ian Crissman, he's a regional manager.**
11  Q.  Regional manager of what?
12  **A.  For Rick's.**
13  Q.  Okay.  What does he do?
14  **A.  He oversees G -- general managers'**
15  **responsibilities and duties.**
16  Q.  Anyone else?
17  **A.  No.**
18  Q.  Now, when you started at XTC in March of
19  2009, you were hired as the waitress manager; is that
20  correct?
21  **A.  Yes.**
22  Q.  And you reported to Erin Frye who was then
23  the general manager?
24  **A.  Yes.**
25  Q.  What was your schedule at the time?  How many

Page 138

1   hours a week were you working?
2   **A.  When I was first hired, I was working between**
3   **nine hours --**
4   Q.  A shift?
5   **A.  Yes.**
6   Q.  Okay.
7   **A.  -- nine hours and 12 hours.**
8   Q.  A day?
9   **A.  Yes.**
10  Q.  Okay.  When did you start and end?  Did it
11  vary?
12  **A.  It varied.**
13  Q.  Sometimes you would work the lunch shift?
14  Sometimes you would work the night shift?
15  **A.  No, I always worked the night shift.**
16  Q.  Okay.  You would just have different times to
17  come in?
18  **A.  Yes.**
19  Q.  What did you do as the waitress manager?
20  **A.  I hired.  I recruited, sched -- did the**
21  **schedules, prepared schedules for waitresses.  I**
22  **trained.  And then sometimes I had to discipline.**
23  Q.  It was very important as their manager that
24  you communicated to those you were training and those
25  you supervised in a manner that would allow them to

Page 139

1   learn from you, right?
2   **A.  Yes.**
3   Q.  And you probably thought about that each time
4   you spoke with them, right?
5   **A.  Yes.**
6   Q.  And sometimes the success or failure of a
7   manager is dependent upon how well he communicates
8   with those he supervises.  Would you agree with that?
9   **A.  Yes.**
10  Q.  Sometimes very smart people don't make for
11  good managers because they're not good communicators?
12  **A.  That's true.**
13  Q.  Do you consider yourself a good communicator?
14  **A.  I do, yes.**
15  Q.  Okay.  Do you consider yourself someone who
16  is respectful to those who he supervised?
17  **A.  Yes.**
18  Q.  You were making $125 a shift when you were
19  the waitress manager?
20  **A.  I was making 100.**
21  Q.  When did you start making 125?
22  **A.  When Erin was transferred out of the club,**
23  **the corporate office came down to XTC, in particular**
24  **Ed Anakar.**
25  Q.  Okay.

Page 140

1   **A.  And --**
2   Q.  So two to three months after you were hired
3   on is when you were promoted to get $125 a shift; is
4   that right?
5   **A.  No, it was about a year.**
6   Q.  Okay.
7   **A.  More precisely, ten months.  It was a -- it**
8   **was a raise given to everyone.  It was issued by the**
9   **corporate office.**
10  Q.  So were all the managers making $100 a shift
11  at the time?
12  **A.  I don't know.**
13  Q.  Do you have any idea what any other manager
14  was making while you were there?
15  **A.  Josh used to brag to me that he makes --**
16  **he -- he would say that he makes $175 a shift.**
17  Q.  Okay.  Do you believe that to be true?
18  **A.  I don't know.**
19  Q.  I mean, you're not complaining that you
20  didn't get paid as much as somebody else, are you?
21  **A.  No.**
22  Q.  Okay.  So you know everyone else got a raise,
23  including you, ten months into your employment; but
24  you don't know what they were making prior to and
25  subsequent to the raise?

Page 141

1     A.  No.  I just -- I know that the floor hosts
2  received raises because they mentioned it in
3  conversation after Ed came.  I don't know what they
4  made after the raise, but I know that everybody got a
5  raise.
6     Q.  And for the remainder of your employment at
7  XTC Cabaret Dallas, you made $125 a shift?
8     A.  Yes.
9     Q.  In addition to those other tips and
10 commissions that you described earlier?
11    A.  Yes.
12    Q.  And again, you don't know that to be below,
13 the same as, or more than other managers at XTC
14 Cabaret Dallas, correct?
15    A.  I know that I was paid less than other
16 managers for certain things, such as on Sundays and
17 Mondays when I worked two shifts in a row -- I'd open
18 and close -- I was paid less than subsequent managers
19 like Marty Ray Carl and Cesar Corolla who worked those
20 shifts.  They were paid time and a half, so I was paid
21 less than them for that.
22    Q.  You were -- you were paid your $125 a shift?
23    A.  I was paid $100 for two shifts.
24    Q.  Okay.  This is after you got your raise to
25 125 a shift?

Page 142

1     A.  This is before I got my raise.
2     Q.  Okay.  Let's just talk about after; although,
3  I will get back to what you just told me.  After you
4  got a raise --
5     A.  Uh-huh.
6     Q.  -- to $125 a shift, are you aware of anyone
7  who got paid more, the same, or less than you as a
8  manager?
9     A.  Yes, there was one occasion where I was in
10 the front office with Tim St. Onge.  This was in
11 the -- this is late in 2011.  I believe it was in
12 September.
13    Q.  Let's just start by you identifying the
14 persons who you believe made more or less than you --
15    A.  Okay.
16    Q.  -- as a manager.
17    A.  Okay.
18    Q.  What would the name be?
19    A.  Tim -- Tim St. Onge.
20    Q.  Okay.  Is it your belief that Tim made more
21 or less than you?
22    A.  He made more than me.
23    Q.  How much did Tim make a shift?
24    A.  Tim would receive a larger portion of the
25 tipout than I would.  On one instance, when we opened

Page 143

1  our envelopes, he had almost $200 in his envelope and
2  I had $100.
3          And I went and complained to Josh about
4  it.  This was in September 2011.  And subsequently, my
5  shifts were cut from five shifts a week to four in
6  October of that year.
7     Q.  Okay.  Do you remember what night this was?
8     A.  It was on a Tuesday -- it was on a Tuesday
9  night -- or a Wednesday afternoon, actually.
10    Q.  And what month, what year?
11    A.  It was in September of 2011.  I confronted
12 him about it in the cage.  Jennifer Andis was
13 working -- the cage -- the cage person.
14    Q.  Okay.  Well, hold on.
15    A.  Okay.
16    Q.  So that's the first time that you recognized
17 in your mind that Tim got more of the tipout than you?
18    A.  Yes.
19    Q.  Okay.  You don't have any reason to believe
20 that he made more per shift than you?
21    A.  I -- no.
22    Q.  Okay.  So --
23    A.  You mean in shift pay?
24    Q.  Yes, I mean in shift pay.
25    A.  Okay.

Page 144

1     Q.  So did you confirm with Tim that, "hey, did
2  you just receive 200 to my 100"?
3     A.  Yeah, I did.
4     Q.  And what --
5     A.  He --
6     Q.  What did he say?
7     A.  He -- he is the one that pointed it out to
8  me.
9     Q.  He said, "hey, I just got 200; and you only
10 got 100"?
11    A.  He said, "wow, I made -- we made a hundred
12 and," I think he said, "ninety dollars last night."
13    Q.  And how much did you have?
14    A.  I had 100.
15    Q.  Okay.  So you went to complain to whom?
16    A.  I went to complain to Josh Stern.
17    Q.  And what did you say?
18    A.  I said that I found out that Tim St. Onge is
19 getting paid more per shift than me in tipout.  And
20 Josh Stern was responsible for dividing the tipout, so
21 I asked him why and how come it wasn't being paid
22 evenly.
23    Q.  Uh-huh.  And what did Josh Stern say?
24    A.  He -- he stumbled and stuttered.  He really
25 didn't have a lot to say.  He didn't know how to

Page 145

1  respond. I continued by asking what I needed to do in
2  order to be paid equally, and he still didn't respond.
3  And it was probably a month later where I came to work
4  and I was taken off of Wednesday nights and I only had
5  four days on the schedule.
6      Q. Before, you had five?
7      A. Before, I had five.
8      Q. And you worked every Wednesday night before
9  then?
10     A. I did, yes.
11     Q. Well, who did he give your Wednesday night
12 shift to?
13     A. I don't know. I -- I -- I think he just kept
14 it for himself.
15     Q. What manager were you at that time?
16     A. At the time, I was an entertainer manager.
17     Q. Okay. And it was a month later that you were
18 taken off Wednesday nights?
19     A. It was a -- a -- it was a few weeks, maybe a
20 month, yeah.
21     Q. Okay. And so do you think that your
22 complaining or asking what you had to do to make more
23 money was the reason why Josh Stern would take you off
24 of Wednesday nights?
25     A. I -- I believe he retaliated against my

Page 146

1  com -- against me complaining and --
2      Q. He didn't like you complaining about the
3  money, did he?
4      A. No, he didn't.
5      Q. Okay. And did you think he had a special
6  relationship with Tim St. Onge?
7      A. I do, but that's -- that's speculative so --
8      Q. Why would he treat Tim better?
9      A. I think it was because he was Caucasian.
10     Q. Was Tim the only Caucasian there?
11     A. Yes.
12     Q. Other than Josh?
13     A. Yes.
14     Q. So he wasn't giving those special tips or
15 bigger percentage to any other manager --
16     A. No.
17     Q. -- per your recollection?
18     A. He was not.
19     Q. Okay. How were -- how do you know that?
20     A. Because from our envelopes that day, it
21 became clear. You know, Cesar was there, as well.
22 Cesar had received the same amount that I did. I
23 asked him after that.
24     Q. Okay. So do you think it was because you
25 complained?

Page 147

1      A. He hadn't worked that specific shift, but I
2  asked him what he makes for that shift on -- on
3  average or typically. And he told me he always makes
4  100.
5      Q. Okay. And by the way, Cesar is Hispanic?
6      A. Yes.
7      Q. Okay. So do you believe that Josh Stern
8  didn't pay you as much as he paid Tim because you
9  complained about the money, or do you believe that --
10 strike that. Do you believe that Tim just woke up one
11 morning and started paying the white manager more than
12 he paid the other managers?
13     A. I think you're -- I don't understand your --
14 because Tim is not a GM.
15     Q. Sorry. Do you think Josh just woke up one
16 morning and started paying the white manager, Tim,
17 more out of the tipout than the other managers?
18     A. I don't know how long it was going -- going
19 on for.
20     Q. Well, did you ask him?
21     A. No, I didn't.
22     Q. Okay. And it's a manager's discretion, is it
23 not, to determine how much of the tipout goes to each
24 of his subordinate managers? Right?
25     A. No, it was supposed to be divided evenly.

Page 148

1      Q. Is that in a contract?
2      A. That was a verbal agreement.
3      Q. With whom?
4      A. With all of us.
5      Q. You had a verbal agreement with Josh Stern
6  and the other managers that "we're going to split this
7  evenly"?
8      A. Yes. There were some occasions where I was
9  responsible for dividing the money. Josh Stern would
10 leave early, almost -- freq -- frequently, he would
11 leave at 5:00, 5:30. And he would say "just divide
12 the money up evenly and leave it in envelopes in the
13 front office."
14     Q. And a general manager can put you in charge,
15 right?
16     A. Yes.
17     Q. And that's a duty that you assumed, right?
18     A. Yes.
19     Q. And you felt qualified to be the acting
20 general manager during some shifts, right?
21     A. Yes.
22     Q. Okay. You weren't unqualified to do it,
23 right?
24     A. No.
25     Q. And in fact, isn't there a part of you that

Page 149

1  liked being the person in charge of the establishment
2  for an evening?
3      **A. It made no difference to me.**
4      Q. You like responsibility, don't you?
5      **A. I do, yes.**
6      Q. You like when people treat you with respect
7  because that's how you believe you treat them?
8      **A. That -- that's true.**
9      Q. And would you agree, sir, that being a
10  general manager -- an acting general manager of an
11  establishment commands respect that perhaps a more
12  subordinate employee does not garner?
13      **A. I don't believe so. I mean it's possible.**
14      Q. Do you want more responsibility in a job --
15      **A. Yes, I do.**
16      Q. -- in general?
17      **A. Yes.**
18      Q. Okay. And -- and your being in charge of the
19  establishment was certainly more responsibility?
20      **A. Yes.**
21      Q. Other than that one evening in September of
22  2011 -- strike that. Other than that Wednesday
23  afternoon in 2011, September specifically, where Tim
24  mentioned to you that he had received $80 more in the
25  tipout or $90 more in the tipout, are you aware of any

Page 150

1  instance in which Tim or anyone else got paid a higher
2  percentage of the tipout than you?
3      **A. Let me clarify. It was around Wednesday**
4  **evening. I'm not exactly sure when we opened the**
5  **envelopes, but I know it was that week. It was a week**
6  **in September. It could have been Friday; but, yes,**
7  **there was another instance where I found out after I**
8  **was given the 125 raise that the managers on Sundays**
9  **were being paid one and a half times per shift -- or**
10  **per Sunday's open and closing when I was being paid**
11  **one shift's pay.**
12      Q. And when was this?
13      **A. It was right after Josh took control of the**
14  **club and he gave my -- my Sunday and Monday open and**
15  **close shifts to Marty Ray Carl.**
16      Q. Okay. So you had not yet been given a raise
17  to 125 a shift yet?
18      **A. Yes, I had.**
19      Q. You had. Okay. So when did Josh take
20  control of the club?
21      **A. After Erin was transferred.**
22      Q. I understand. When was that?
23      **A. It was in May of 2010.**
24      Q. And how much were Sunday morning managers
25  making? Time and a half for their shifts?

Page 151

1      **A. Sunday morning? You mean Sunday -- the**
2  **entire Sunday shift?**
3      Q. Yes. I'm sorry.
4      **A. Sunday shift, they were making one and a half**
5  **times their shift pay. I had worked Sundays and**
6  **Mondays open to close for approximately 10 months, 11**
7  **months at that point. And I never got more than one**
8  **shift's pay.**
9      Q. So it obviously wasn't all the Sunday shift
10  managers, then?
11      **A. I'm sorry?**
12      Q. It obviously wasn't Sunday shift managers
13  because that would have been you, right?
14      **A. I was taken off Sundays and Mondays when Josh**
15  **came on.**
16      Q. Josh comes on, then takes you off Sundays and
17  Mondays. Then you learn that Josh is paying the
18  Sunday managers time and a half for their shifts?
19      **A. Right. I worked Sundays and Mondays for**
20  **about a month after Josh took over. After that month,**
21  **he put Marty Ray Carl in charge of Sundays and**
22  **Mondays. And he also initiated a raise for Marty Ray**
23  **Carl.**
24      Q. Well, so who else was working Sunday shifts?
25      **A. Or not a raise. He just paid him more.**

Page 152

1  Excuse me.
2      Q. Who else was working Monday shifts besides
3  Marty Ray Carl? You used plural.
4      **A. Later, Cesar Corolla was working Sunday and**
5  **Monday shifts.**
6      Q. And would Cesar get time and a half?
7      **A. Yes.**
8      Q. Okay. So is Marty Ray Carl white?
9      **A. Yes, he is.**
10      Q. And Cesar Corolla, you said, is Hispanic?
11      **A. Yes.**
12      Q. So do you think you were getting picked on by
13  getting taken off Sunday shifts, then finding out that
14  Josh Stern is paying Sunday shift managers time and a
15  half?
16      **A. I felt that I was being paid less than my**
17  **peers for the same amount of work -- equal work.**
18      Q. Okay. But you would agree that those peers
19  who were getting paid more, from your perspective,
20  were white and Hispanic?
21      **A. They were white and Hispanic. That's**
22  **correct.**
23      Q. Any other Sunday shift managers you can think
24  of?
25      **A. No.**

Page 153

1    Q. At some point, you became the entertainment
2    manager, right?
3    A. Yes.
4    Q. Sometime in late 2010?
5    A. That's correct.
6    Q. How was it that you were transferred to this
7    position?
8    A. I was given the responsibility by Josh, which
9    included more duties. And I believe what he
10   communicated to me was that he wanted the entertainer
11   count to increase because it was an estimator of the
12   health of the club. And he knew that I knew a lot of
13   people in Dallas, so he felt like it was a job that I
14   could do.
15   Q. Okay. So you took that as a compliment,
16   didn't you?
17   A. I was happy to receive the -- the extra
18   responsibilities.
19   Q. Sure. And you said he complimented you --
20   these are my words. He recognized you for knowing a
21   lot of people in Dallas who you believe could help
22   recruit for entertainers, right?
23   A. Well, if you're interpreting, will you allow
24   me to interpret, also?
25   Q. I want you to answer my questions.

Page 154

1    A. Well, no.
2    Q. If you don't understand them --
3    A. I don't think it was a compliment, no.
4    Q. Okay. So you just said you were happy to do
5    it. You really weren't that happy to do it?
6    A. I was happy to have more responsibilities.
7    Q. Okay. But you weren't happy to be
8    transferred from waitress manager to entertainment
9    manager?
10   A. I was happy to have that transfer because it
11   entailed more responsibilities.
12   Q. Okay. Well, what does the entertainment
13   manager do?
14   A. Our main responsibility is to increase the
15   entertainer count --
16   Q. Number --
17   A. -- and to --
18   Q. -- of dancers?
19   A. Yes. I did so by recruiting heavily. And I
20   also created a program of retention by creating a
21   binder that had day care -- child care services for
22   the entertainers. It had family law services. It --
23   it had, I believe, some other miscellaneous services
24   that entertainers needed. And so I helped them
25   basically overcome any obstacles for them to come to

Page 155

1    work.
2    Q. You thought you brought some new and helpful
3    things to the entertainment part of it?
4    A. Well, I -- I just wanted to treat them better
5    than they had been treated previously.
6    Q. And that includes how you talk to them, too,
7    right?
8    A. Yes.
9    Q. Okay. And you feel like you were respectful
10   to the dancers?
11   A. Yes, I was.
12   Q. Okay.
13   A. And it reflected in the entertainer count.
14   When I took over entertainer manager, I had 50
15   entertainers on a Friday night. By the time that I
16   was taken off of the entertainer position by Josh and
17   demoted, I had -- averaging anywhere from 70 to 80
18   entertainers a night.
19   Q. Okay. And that's all because of you?
20   A. Yeah, it was heav -- very heavily based on --
21   on my actions.
22   Q. Okay. And that's what the entertainers would
23   say, too?
24   A. I -- I don't know. On a different occasion,
25   I was put in charge of Sundays. And that was in

Page 156

1    October. When I took over that shift, I was asked to
2    increase entertainer count and to reduce incidents.
3    Q. So you were put back on Sunday shifts?
4    A. I was put back on Sunday shifts, yes.
5    Q. And did you get time and a half because of
6    it?
7    A. No, because I wasn't opening and closing. I
8    just closed, but I increased the entertainer count
9    consistently every week, started at 30; and in one
10   month, I had it at 50 entertains.
11   Q. I thought you said it started at 50. Or you
12   were --
13   A. Well --
14   Q. -- talking about Friday nights --
15   A. I'm talking about --
16   Q. -- then.
17   A. -- Sundays now.
18   Q. I'm sorry.
19   A. That's okay.
20   Q. Got it?
21   A. That's okay.
22   Q. Okay. So you increase the Friday night
23   census, and you increase the Sunday census.
24   A. Yes, over --
25   Q. And you feel like the actions you took as

Page 157

1  entertainment manager were directly attributable to
2  how successful or how many more dancers or
3  entertainers wanted to come to XTC?
4      A.  Sure.  Generally speaking, I believe that the
5  entertainer count increases reflected the fact that
6  entertainers liked to work on my shifts.
7      Q.  Okay.  And you were still getting paid $125 a
8  shift, right?
9      A.  Yes.
10      Q.  You do -- strike that.  You don't consider
11  your being transferred to entertainment manager as a
12  demotion, correct?
13      A.  No.
14      Q.  Now, at some point, you went from
15  entertainment manager to floor host manager; is that
16  right?
17      A.  Yes.
18      Q.  When was that?
19      A.  It was after I had complained about my being
20  paid less.  My shifts were cut from five to four.  And
21  then subsequently, I was demoted from entertainer
22  manager to floor host manager --
23      Q.  Okay.  You --
24      A.  -- which -- which --
25      Q.  You keep --

Page 158

1      A.  -- had a --
2      -- saying "demoted."
3      A.  Well, it had a reduced level of
4  responsibilities and -- and duties.
5      Q.  Okay.  So then you would --
6      A.  So it's a --
7      Q.  -- consider --
8      A.  -- less favorable work assignment.
9      Q.  So you would then consider your being
10  transferred to entertainment manager in late 2010 as a
11  promotion?
12      A.  No, because it did not accompany -- it was
13  not accompanied by a raise.  So I just had more
14  responsibilities.
15      Q.  But your floor host manager wasn't
16  accompanied by a decrease in pay, was it?
17      A.  No, but it was a less favorable work
18  assignment.
19      Q.  Because of less responsibilities.  Isn't --
20      A.  Yes.
21      Q.  -- that what you just said?
22      A.  Yes.
23      Q.  So because you obtained more responsibilities
24  when you were transferred to entertainment manager in
25  late 2010, did you not, sir, consider that a

Page 159

1  promotion?
2      A.  No.  I'll tell you why, because I believe
3  what that was, was an opportunity for -- for myself to
4  show what I could do to impact the overall health of a
5  club and hopefully get a promotion based on my success
6  in that role.
7      As a floor host manager, I had reduced
8  capacity to impact overall business.  So it wasn't a
9  promotion.  It was an opportunity to prove myself on a
10  higher level, a higher playing field.
11      Q.  With more responsibility?
12      A.  Yes.
13      Q.  Which is the very reason why you consider
14  entertainment manager to floor host manager a
15  demotion, because it was less responsibility?
16      A.  Yes.
17      Q.  And was it when you were transferred to floor
18  host manager that your shifts per week lessened from
19  five to four?
20      A.  No, it happened before -- it happened before
21  the -- my shifts being cut happened before my demotion
22  to floor host.
23      Q.  Then you said only after being paid less?
24  Did I understand your testimony there?
25      A.  I was being paid less.  And when I found out,

Page 160

1  I complained about it.  And it was not even a month
2  later that my shifts were cut.  And then shortly after
3  that, I was demoted to floor host.
4      Q.  Okay.  And when you say "being paid less,"
5  you're talking about that incident in September of
6  2011 where you learned that St. Onge got more of the
7  tipout than you?
8      A.  Yes.
9      Q.  Okay.  And sometime thereafter, your shifts
10  lessened from five to four?
11      A.  That's correct.
12      Q.  And you had a -- then eventually, this
13  transfer, which you're referring to as a demotion --
14  although you were getting the same amount of pay --
15  occurred from entertainment manager to floor host
16  manager?
17      A.  Yes.
18      Q.  Now, what does a floor host manager do?
19      A.  Basically, we create the floor host schedule.
20      Q.  What's a floor host?
21      A.  A floor host is someone who is supposed to
22  provide customer service while also reducing
23  incidents.
24      Q.  What's an incident?
25      A.  It could be a fight.  It could be an

Page 161

1  argument.  It could be something that just disturbs
2  the -- the overall operations or the ability of us to
3  make money one way or another.
4      Q.  Would you agree that XTC Cabaret Dallas'
5  floor host service needed improvement?
6      A.  Yes, it did.
7      Q.  And did you not take it as a compliment or a
8  recognition that they needed you in an area that
9  needed improvement; and for that, you were grateful?
10     A.  I -- no.  I mean I will do any job that I get
11  to the best of my abilities.  I did recognize the fact
12  that the company did not provide floor hosts with
13  earpieces and flashlights, and I did go out and
14  purchase those for my floor hosts.  At the time, the
15  only earpieces they could buy were 35 or $40.  I was
16  able to find a supplier for, I think, $11 an earpiece.
17     Q.  Okay.  So your point is you think you did
18  some good things as the --
19     A.  I did the best I could.
20     Q.  But do you --
21     A.  Absolutely.
22     Q.  -- think you did a good job as floor host
23  manager?
24     A.  I was told I did a good job by Josh and
25  Joseph Kyle in January.  They -- Jo -- Josh told me

Page 162

1  that I was becoming a seasoned club manager, that he
2  was going to prepare papers to make me an assistant
3  general manager.
4          And he also said that Joseph Kyle told
5  him that I was doing a very good job because the floor
6  hosts were very motivated and they were staying in
7  their sections and working hard.
8      Q.  Okay.  So -- and when did Josh tell you that
9  he was happy with your work performance and that he
10  was going to prepare papers to make you an assistant
11  manager?
12     A.  It was assistant general manager.
13     Q.  I'm sorry.  An assistant general manager.
14     A.  It happened in January of 2012.
15     Q.  Okay.  So in January of 2012, even though you
16  had been transferred to now your third spot at the
17  club, you had every reason to believe you were doing
18  well and were being appreciated by the general
19  manager?
20     A.  That was the -- that was the feedback I
21  received, but his actions didn't really reflect what
22  he was saying.
23     Q.  Okay.  But you agree that what he was saying
24  to you about your work, about your journey at XTC
25  Cabaret Dallas was positive?

Page 163

1      A.  He -- what he said to me was positive; but
2  the fact that he was cutting my shifts, that he was
3  paying me less, that I was being demoted to floor host
4  roles, those things spoke louder to me than -- than a
5  few sentences.
6      Q.  Okay.  And again, we -- we already talked
7  about what you're calling demotion.  And you can say
8  it --
9      A.  Yes.
10     Q.  You can --
11     A.  Yes.
12     Q.  -- say it every time you want but --
13     A.  Less favorable work assignment.  Okay.
14     Q.  And -- and -- well, that's -- that's for you.
15  Wouldn't you agree that a general manager and
16  assistant general manager has to have familiarity of
17  the whole floor?
18     A.  Yeah, I do agree with that.
19     Q.  Would it not benefit you, sir, to have actual
20  experience in each part of the club?
21     A.  Sir, I had already been managing floor hosts
22  in my role as an entertainer manager and as my role as
23  a waitress manager.  It was not a new -- it was not
24  anything new.
25     Q.  So did Josh Stern recognize one day that

Page 164

1  there needed to be a floor host manager?
2      A.  There was a floor host manager.
3      Q.  So how is it that you were doing it already
4  as entertainment manager?
5      A.  Because -- because I was -- I took on the
6  responsibility of every problem area in the club that
7  I could.  If there was something that needed to be
8  done, I would put myself in a position to try and
9  assist that area of the club.  I wanted to --
10     Q.  Even if you weren't the floor host manager?
11     A.  That's correct.
12     Q.  Would you take his or her job when they're
13  trying to do it?
14     A.  I'm not -- I'm not taking anyone -- I -- I --
15  I -- I think you're confused.  I wasn't taking
16  anyone's job.  I had my own floor to run.  I was on
17  the second floor.  If you don't want me to explain, I
18  won't; but I was a VI --
19     Q.  I'd rather you be a little less condescending
20  since I'm being --
21     A.  No --
22     Q.  -- polite --
23     A.  -- not at all --
24     Q.  -- with you.
25     A.  -- sir.  Not at all.  I'm sor -- I'm -- I'm

Page 165

1    sorry you take it that way.
2        Q.  Well, I'm just --
3        A.  I just -- I just wanted to explain to you
4    exactly what was going on so you could understand.
5        Q.  That's okay.  I -- I appreciate it.  Let me
6    ask the questions, though, because we need to try to
7    get through this.  But your point is that when you
8    were acting as floor host manager, you didn't think
9    you were assuming anyone else's job duties when doing
10   so even though you were also the entertainment manager
11   at the time or even before that, the waitress manager;
12   is that right?
13       A.  Well, throughout this time, I was the VIP
14   manager.  And the VIP manager is responsible for the
15   second floor, the upstairs floor.  Under my
16   supervision, I had several floor hosts on that floor.
17   There was no floor host manager on that floor during
18   shift.
19       Q.  Okay.
20       A.  So I -- I had to play sort of a versatile
21   role in that because of the fact that there was no
22   other supervisors on that floor.
23       Q.  What about when you actually became the floor
24   host manager?
25       A.  Yes.

Page 166

1        Q.  Was that downstairs?
2        A.  I was still upstairs, but I frequently went
3    downstairs to check on the floor hosts.
4        Q.  But were you responsible for downstairs floor
5    hosts?
6        A.  I was, yes.
7        Q.  Okay.  Isn't that the difference compared to
8    what you're spending all this time trying to tell me
9    you had experience in on the second floor?
10       A.  That is the difference between what?
11       Q.  What you were doing and what you were now
12   responsible for doing.
13       A.  Yes, that's the difference.
14       Q.  Would you agree, sir, that that experience
15   would help you in trying to become an assistant
16   general manager?
17       A.  No.
18       Q.  Okay.  That's fine.  And you remained the
19   floor host manager for the remainder of your
20   employment at XTC Cabaret?
21       A.  Yes.
22       Q.  And isn't it true, sir, that you were
23   receiving $125 a shift for the remainder of your
24   employment at XTC Cabaret Dallas?
25       A.  Yes.

Page 167

1        Q.  Do you recall being talked -- strike that.
2    Did you have a conversation with Josh Stern as to why
3    it was that he was transferring you to floor host
4    manager from entertainment manager?
5        A.  No.  We did have a conversation about the
6    entertainer count falling afterward.
7        Q.  Do you recall Josh Stern or anyone else
8    telling you that Mr. St. Onge had more experience
9    supervising entertainers?
10       A.  No.
11       Q.  Do you recall Mr. Stern or anyone else saying
12   that there were several complaints from the
13   entertainers regarding your behavior?
14       A.  No.
15       Q.  Had you ever heard of an entertainer
16   complaining about how you treated her?
17       A.  Yes.
18       Q.  Okay.  How many?
19       A.  A couple.
20       Q.  Okay.  What were the complaints?
21       A.  Well, as the entertainment manager, I was
22   responsible for making sure our collections of
23   entertainer house fees didn't become exorbitantly
24   high.  And so I did have some altercations with
25   dancers that did not want to reduce their house fees.

Page 168

1    I had to suspend some until they paid
2    those fees, and it led to conflict.  It happened to
3    several of the girls because the policy with the house
4    fees wasn't stringent enough.  They didn't pay up
5    front, and they typically tried to leave the club
6    without paying their house fees.
7        Q.  How many times do you think that happened?
8        A.  It happened over a dozen times.
9        Q.  Okay.  And do you think that's the -- strike
10   that.  Do you recall that being the only time that a
11   dancer or entertainer complained about how you treated
12   her?
13       A.  Yes.
14       Q.  Okay.  Do you recall any entertainers or
15   dancers complaining about how you talked to them?
16       A.  No.
17       Q.  Okay.  Did you ever hear that some of them
18   had complained about how you talked to them?
19       A.  No, and it never was brought to my attention
20   by anyone including Josh Stern that I was speaking to
21   the entertainers in any sort of negative way.
22       Q.  And you don't recall any feedback from the
23   dancers themselves; is that right?
24       A.  I said no, yeah.
25       Q.  Okay.  Do you recall Josh Stern or anyone

Page 169

1 else visiting with you about moving you from floor
2 host manager to floor host?
3     A. No. It was assistant general manager is what
4 the discussion was.
5     Q. Would you agree that each one of your
6 management positions was an important position at XTC
7 Cabaret Dallas?
8     A. Yes.
9     Q. Okay. It's important for any manager to
10 supervise his employees and do a good job at that,
11 right?
12     A. Yes.
13     Q. And if you're not doing a good job
14 supervising your employees and making certain things
15 are done for which you're responsible, it could affect
16 other parts of the club?
17     A. That's true.
18     Q. Okay. Now, why do you believe that you were
19 a good fit at XTC Cabaret Dallas?
20     A. Well, for one, when I started there, we
21 were -- I think our profit was 25,000 a month. When I
22 left, our revenues had -- had quadrupled. I mean it
23 had skyrocketed. We were making a ton more money.
24     Q. Because of you?
25     A. I -- I think that I was a part of that. I --

Page 170

1     Q. What did you do that made the company more
2 profitable?
3     A. I promoted the club. I frequently went out
4 with both floor hosts and entertainers. We flyered
5 cars. We -- we did perform some networking. And let
6 me explain that. Basically, we would go to clubs,
7 talk to their managers, general managers, and create
8 relationships to where we could invite their customers
9 to our club and, in turn, send our customers to their
10 club.
11     Q. Which --
12     A. So --
13     Q. -- clubs did you do this with?
14     A. I did it at OUI Discotec, which is on
15 Northwest Highway. I did it at Plush. I did it at
16 Wish. I did it at House of Blues. I did it at -- I
17 did it at several clubs. I'm trying to remember the
18 rest of them. I did it on Greenville Avenue at --
19     Q. What --
20     A. -- at -- at M Street.
21     Q. The name of the bar is M Street?
22     A. Yes. It was Tommy C's -- Tommy C is the
23 owner. I did it at Kismet. I did it at Malibu.
24     Q. So you believe that --
25     A. I did it at vari -- other various places, as

Page 171

1 well.
2     Q. Okay. You believe that you were a good fit
3 at XTC Cabaret Dallas because you believe you were a
4 good reason or good part of the reason why the
5 revenues had quadrupled?
6     A. I believe that I definitely helped.
7     Q. And -- and that, in your mind, made you a
8 good fit there?
9     A. In -- in addition to that, I -- I almost
10 single-handedly increased the entertainer count by
11 recruiting on Friday and Saturday nights at various
12 places, recruiting on my off time, and then developing
13 different sort of retention techniques.
14     Q. Okay. So you believe you were a good fit at
15 XTC Cabaret Dallas because you were a big part of why
16 revenue had quadrupled in the time that you were
17 there. And also, you almost single-handedly increased
18 the entertainer count?
19     A. As -- as I became entertainer manager, the
20 entertainer count skyrocketed.
21     Q. Okay. Do --
22     A. Yes.
23     Q. What I just said was accurate, then?
24     A. Yes.
25     Q. Okay. Did you like your job at XTC Cabaret

Page 172

1 Dallas?
2     A. I enjoyed my job, yes.
3     Q. Okay. What did you enjoy about it?
4     A. I enjoyed motivating my staff. I enjoyed
5 bringing a level of righteousness to a
6 semi-questionable environment.
7     Q. What do you mean, "righteousness"?
8     A. Such as actually caring about my staff,
9 caring about the entertainers, you know, things
10 like -- like I mentioned earlier, helping them with
11 their day-care services or helping them find family
12 lawyers when their children were removed from their
13 custody, which I did for Layla, and also just treating
14 people fairly and not -- not -- not talking down or --
15 or treating people as though they are less than --
16 than a human being, which I feel like is sort of
17 cust -- sort of something that happens a lot in that
18 industry, especially with the managers that I had
19 worked with.
20     Q. So what you're telling me are things that you
21 believe you contributed. And what I'm asking you is
22 if you actually liked working there.
23     A. Yeah, I did like working there.
24     Q. Did you like the people who you worked with?
25     A. Yes, I very much liked the people I worked

Page 173

1  with. I hired most of them. I hired a lot of the
2  waitresses. I hired a lot of the floor hosts. And I
3  had developed a rapport with the waitresses and the
4  floor hosts.
5      Q. Okay. What about your fellow managers? Did
6  you like working with your fellow managers?
7      A. I did not like working with Tim and Josh. I
8  felt that they were very unprofessional. I --
9      Q. Okay.
10     A. -- didn't like being -- being called names
11  based on my race and my religion.
12     Q. Which managers did you actually like working
13  with?
14     A. I didn't mind working with Cesar.
15     Q. Okay. So you've identified Tim and Josh as
16  managers who you didn't like working with. And by the
17  way, was that the whole time?
18     A. That was the whole time.
19     Q. Okay. You never liked working with Tim and
20  Josh?
21     A. No, I didn't.
22     Q. You did like working with Cesar?
23     A. I did, yes.
24     Q. Okay. Plenty of other managers, right?
25     A. No.

Page 174

1      Q. Just the four of you were the only managers
2  you worked with?
3      A. We worked with a gentleman named Debo for a
4  short while.
5      Q. D-e-v-o?
6      A. D-e-b-o, I believe. I think his real name is
7  Agence.
8      Q. Okay. And did you like working with Debo?
9      A. I did like working with Debo.
10     Q. Okay. Okay. St. Onge?
11     A. No.
12     Q. Did not like working with him ever?
13     A. No. He constantly referred to customers in
14  derogatory names. He would call people spicks and
15  wetbacks. He call me Italian mafia, Muslim.
16     Q. Okay.
17     A. So I didn't like working with Tim. I felt
18  like he was -- he was an unprofessional,
19  disrespectful, racist manager.
20     Q. I'm sorry. You had already told me about Tim
21  anyway. Okay. So just Tim, Josh, Cesar, and Debo are
22  the only other fellow managers you could think of?
23     A. I worked with Erin and Marty.
24     Q. Okay. Did you like working with Erin?
25     A. Not really.

Page 175

1      Q. Okay. Did you like working with Marty?
2      A. No, I didn't.
3      Q. So it sounds like you only wor -- liked
4  working with two of your fellow managers and didn't
5  like working with four of your fellow managers?
6      A. Actually, there was one other manager that I
7  liked working with. His name was Jay.
8      Q. Jay what?
9      A. I don't remember his last name.
10     Q. Okay. When did he get there?
11     A. He was there when I first got hired.
12     Q. Okay. Then did he leave?
13     A. Yes.
14     Q. And you liked all your staff?
15     A. I liked most of my staff.
16     Q. Okay. Any ones that you didn't like?
17     A. There were some staff members that used to do
18  things they shouldn't do, such as sell tables. There
19  were entertainers that did illegal things they
20  shouldn't do.
21     Q. Okay. And you dealt with those, right?
22     A. I -- I -- I tried, yes.
23     Q. Okay.
24     A. And some of the work I did was undone by the
25  general manager but --

Page 176

1      Q. Anyone else who you can think of that you
2  didn't like working with?
3      A. No.
4      Q. How about the gentleman who you referenced
5  that you believe worked for Rick's or worked for
6  Rick's?
7      A. Oh, Robert Bonilla.
8      Q. Yeah. Did you like working with Robert?
9      A. No, I did not. Robert Bonilla was always
10  drunk, literally from the time he stepped on the floor
11  to the time he left.
12     Q. How about Joseph Kyle? Did you like working
13  with him?
14     A. I never really worked with Joseph. He was
15  there, but we didn't have much interaction at all.
16     Q. How about Ian Crissman?
17     A. Ian Crissman and I didn't have much
18  interaction either.
19     Q. Okay. Did you like him, though?
20     A. I did like Ian. I thought he provided -- I
21  thought he was beneficial to the club. He used to
22  point out things that others didn't see.
23     Q. And you respected that?
24     A. Yes. Robert Bonilla, though, I mean we
25  complained about him frequently. Erin and I both

Page 177

1  complained about him frequently. He assaulted
2  dancers.
3         MR. HURST: Okay. I'm going to object
4  as nonresponsive.
5  A. Okay.
6  Q. (BY MR. HURST) Would you agree that it's
7  important for an employee to treat other employees
8  with respect?
9  A. Yes.
10  Q. Would you agree that it's fair for an
11  employer to evaluate an employee based on how well he
12  gets along with other employees?
13  A. Yes.
14  Q. Would you agree that it's important for an
15  employee to treat customers with respect?
16  A. Yes.
17  Q. Would you agree that it's fair for an
18  employer to evaluate an employment based on how well
19  he gets along with customers?
20  A. Yes.
21  Q. Your employment with XTC was at-will, right?
22  A. I believe, yes.
23  Q. It could have been terminated by either party
24  at any time with or without cause, with or without
25  notice?

Page 178

1  A. I'm not sure.
2  Q. Okay. You recall seeing the phrase "at-will
3  employment"?
4  A. No.
5  Q. Did you have an employment agreement?
6  A. I -- I don't -- I don't remember. I don't
7  have a copy of it.
8  Q. Okay. So we've talked a lot about your job
9  over the last couple of hours. Do you believe that
10  you are a good employee at XTC Cabaret?
11  A. Yes.
12  Q. Were you ever evaluated?
13  A. No.
14  Q. You had told me about a compliment that Josh
15  Stern had given to you in January of 2012, I believe,
16  when he said he wanted you to go through the ranks to
17  become an assistant GM?
18  A. That's correct.
19  Q. Okay. Would you consider that a compliment,
20  by the way?
21  A. I do, yes.
22  Q. Okay. And you told us about your raise that
23  you got ten months into your employment at XTC
24  Cabaret?
25  A. Yes.

Page 179

1  Q. And you said everyone got a raise at that
2  time?
3  A. Yes.
4  Q. Okay. Any other compliments from managers or
5  general managers you can think of?
6  A. Ian Crissman, he tried to -- he tried to
7  actually move me from that club to a different club.
8  Q. Was that a compliment to you?
9  A. Yes.
10  Q. Why was Ian trying to move you?
11  A. He said that I was articulate, that I was
12  more refined than most of the managers at XTC, and
13  that I would do well on a -- on the higher brand of
14  Rick's Cabaret, which is the actual Rick's Club in
15  Fort Worth.
16  Q. And when did he tell you this?
17  A. In summer of 2009, a few months after I
18  started.
19  Q. Okay. Did you ever follow up with him on
20  that?
21  A. I told him that I wanted to decline the
22  position.
23  Q. You told him that in the summer of '09?
24  A. Yes.
25  Q. And did he ever follow up with you about it?

Page 180

1  A. No, he didn't.
2  Q. Okay. Any other compliments?
3  A. Cesar Corolla -- when I was demoted to floor
4  host manager, the entertainer count fell substantially
5  immediately. I think with -- within a month, we saw a
6  40 percent reduction in entertainers. It went from 72
7  my last night I was entertainer manager to 50.
8         And Josh Stern brought up the fact that
9  our entertainer count was falling, and Cesar Corolla
10  gave me a compliment then. And he said "Ryan did a
11  great job as entertainer manager; why don't we make
12  Ryan the entertainer manager again?" And Josh replied
13  "only a white manager can do that job correct; isn't
14  that right, Ryan?" He thought it was funny.
15  Q. "Isn't that right," who?
16  A. "Ryan."
17  Q. "Ryan" as in --
18  A. Yeah.
19  Q. -- you?
20  A. Yes.
21  Q. Well, had you guys had a discussion about
22  something like that before?
23  A. No.
24  Q. "Only a white man can be an entertainment
25  manager"?

Page 181

1    A.  "Only a white manager can be entertainer
2  manager; isn't that right, Ryan?"
3    Q.  You had no idea what he was talking about nor
4  had you ever spoken about such a thing with him or
5  anyone else?
6    A.  I thought it was a weird comment to make.
7    Q.  Any other compliments?
8    A.  Not that I can recall.  Actually, no, there
9  was.  Jody, the house mom, and Christine -- Christi,
10  they both used to compliment me all the time.  They
11  would say that whenever they needed entertainers to
12  come in to work, that they could rely on me on sending
13  me a text that I would make sure some entertainers
14  showed up.  And they would frequently exercise that.
15    Q.  That was when you were entertainment manager?
16    A.  Yes.  And do you want -- do you -- do you --
17  are you referring to compliments from anybody on the
18  staff including entertainers?
19    Q.  Right now, we're just going to go through
20  maybe managers and --
21    A.  Okay.
22    Q.  But that's a good question.
23    A.  Okay.
24    Q.  That's a fair question.  I'm assuming you
25  have stories about how dancers complimented you?

Page 182

1    A.  Dancers, floor hosts, waitresses.  I
2  frequently was complimented by -- by my staff.
3    Q.  So is it your understanding -- back to the
4  time and a half thing that you said Josh Stern
5  implemented for Sundays, was it just Sunday?
6    A.  It was for double shifts.  Anybody working a
7  double shift was paid time and a half.
8    Q.  Okay.  So it had nothing do with Sundays,
9  then?
10    A.  No.
11    Q.  It was something that was consistent
12  throughout --
13    A.  That was --
14    Q.  -- the week?
15    A.  That was just an example that I was supplying
16  to you because I used to work Sundays and Mondays
17  double shift and I was only paid one shift.
18    Q.  Okay.  So you could have just as easily
19  worked double shifts any other day of the week?
20    A.  Yes.
21    Q.  Did you ask to work double shifts any other
22  day of the week?
23    A.  No.
24    Q.  Did you want to work double shifts?
25    A.  I didn't mind it.  If -- if I felt -- if I

Page 183

1  felt like they needed somebody to do that, I didn't
2  mind contributing to the team.
3    Q.  Okay.  So I'm trying to understand what it
4  was then where you found out that Josh Stern was
5  paying time and a half for double shifts and that made
6  you bitter.
7    A.  I wasn't bitter.  I was -- I was not happy
8  that I was paid less than my peers for the same -- for
9  equal work.
10    Q.  Okay.  Your point is when you would work
11  double shifts, you would not get time and a half?
12    A.  Exactly.
13    Q.  But then you were taken off double shifts.
14  Is that what you're saying?
15    A.  Yes.
16    Q.  Did you want to be taken off double shifts,
17  or did you want to continue working double shifts?
18    A.  I wanted to continue working double shifts.
19  Josh said that because -- when he -- when he put Marty
20  into the double shifts, he said that he wants to keep
21  me close to him; and so he's taking me off double
22  shifts and putting Marty Ray Carl into double shifts.
23    Q.  He wants to keep you close with whom?
24    A.  With himself because Josh only worked from
25  Tuesday through Saturday.  So he want -- he basically

Page 184

1  changed my schedule to work coinciding with his
2  schedule.
3    Q.  Because he trusted you?
4    A.  He didn't know me.  He just started.
5    Q.  So why is it, do you believe, that Josh
6  wanted you to be close to him?
7    A.  I think --
8    Q.  So --
9    A.  I think because he wanted me to help him
10  learn the ropes of the club and because I was the
11  most -- I think I was probably the most knowledgeable
12  manager regarding club operations and the club staff
13  and the customers.
14    Q.  Okay.  And didn't you take that as a
15  compliment?
16    A.  I -- I don't know.  I didn't take it in any
17  way.
18    Q.  Okay.  But -- so the time and a half thing
19  was anyone who worked double shifts or over 14 hours,
20  right?
21    A.  It -- just double shifts.  I don't know how
22  many hours.
23    Q.  You don't know the actual number?
24    A.  It varies.  It was maybe 15, 16 hours some
25  shifts -- some days.  I don't know.

Page 185

1    Q. Okay. And you got paid time and a half for
2  your work on double shifts thereafter, correct?
3    A. No, I didn't.
4    Q. Ever?
5    A. Ever.
6    Q. Your pay records would show one way or
7  another, wouldn't they?
8    A. Yes.
9    Q. Okay. Do you recall working double shifts on
10  Thursdays?
11    A. No. I would -- I would -- they -- they
12  changed my schedule from working nights to working day
13  shift on Thursdays.
14    Q. Do you recall working double shifts on
15  Thursdays for which you were paid time and a half?
16    A. I don't recall.
17    Q. Is it possible that you did?
18    A. I -- I don't recall.
19    Q. Okay. That would certainly change your
20  testimony about your being treated fairly for not
21  getting paid time and a half, wouldn't it?
22    A. No, because for one year, I was paid only one
23  shift pay for working double shifts.
24    Q. What year was that?
25    A. All of 2009 and part of 2010.

Page 186

1    Q. And it was your --
2    A. Half of 2010.
3    Q. And it was your understanding that during
4  that whole time, other people were getting time and a
5  half while you were just getting regular pay for
6  working doubles?
7    A. It was my understanding that other managers
8  were paid time and a half for working double shifts.
9    Q. At times where you weren't?
10    A. I -- I don't know.
11    Q. You don't know one way or another?
12    A. I do know that Marty told me that he was
13  getting paid time and a half. I don't know what --
14  what -- if what you're referring to is true or not.
15    Q. When did Marty say he was getting paid time
16  and a half?
17    A. Right after he was promoted to -- or right
18  after he was transferred to work Sundays and Mondays
19  double --
20    Q. When was --
21    A. -- shifts.
22    Q. When was that?
23    A. It was in the summertime of 2010.
24    Q. Okay. Were you not getting time and a half
25  yourself for working doubles at that time?

Page 187

1    A. No, I wasn't.
2    Q. Okay. When did you start getting time and a
3  half for working doubles, if -- if you recall?
4    A. I -- I didn't work -- I was not asked to work
5  doubles after that.
6    Q. Okay. I may have asked you this earlier. Do
7  you recall any complaints about you from coworkers or
8  other managers?
9    A. No.
10    Q. Do you recall anyone commenting or
11  complaining about your unprofessional behavior or your
12  aggressive behavior?
13    A. No.
14    Q. Do you recall your getting into arguments
15  with customers and in some instances having to throw
16  them out?
17    A. Yes.
18    Q. And that comes with the territory, you
19  would -- you would testify?
20    A. Well, customers sometimes drunk or
21  intoxicated, they've got into fights or they've
22  threatened people or they interfered with club
23  operations so that the contractors couldn't make
24  money. And they had to be removed from the club.
25    Q. Okay. How many times do you think that you

Page 188

1  threw customers out of the club?
2    A. I don't know.
3    Q. Any more than any other manager?
4    A. No, just the same amount but --
5    Q. Okay. You were testifying a while ago about
6  a meeting among management staff in December of 2011.
7  Do you remember that?
8    A. Yes.
9    Q. Okay. So you recall that meeting that was in
10  Dallas in December of 2011, right?
11    A. Yes.
12    Q. And at the time, you were the floor host
13  manager?
14    A. Yes.
15    Q. Okay. And because of that, you were required
16  to attend the meeting?
17    A. That's correct.
18    Q. And do you recall that you and a couple of
19  other managers went out afterward?
20    A. Aft -- no, the meeting continued on the road.
21  We went to different clubs and inspected other clubs.
22    Q.
23    A. I believe we went to at least three to four
24  other locations to inspect the clubs and to sort of
25  just learn from their business.

Page 189

1    Q.  Or maybe to blow off some steam among
2  management staff?
3    A.  It was -- from my understanding, it was
4  professional.  We would walk around each club.  We
5  would tour the clubs.  We would maybe talk to the GM
6  for a little bit.  And then we would head out and go
7  to the next club.
8    Q.  Do you drink beer?
9    A.  Sometimes, yes.
10    Q.  Did you drink beer that night?
11    A.  I don't think I did, no.
12    Q.  Okay.  Do you specifically recall that you
13  did not drink beer or any other alcohol?
14    A.  No, we -- I did drink alcohol.  The regional
15  manager, Wayne Fenlon, he insisted that we all take
16  shots of Rumplemintz.  And we did take, I think, one
17  shot at one -- no, two shots at one club.
18    Q.  Do you think that Wayne or anybody else was
19  trying to make this a pleasant environment among the
20  managers that they could enjoy?
21    A.  I think -- I think Wayne's intentions were
22  not bad.
23    Q.  Okay.
24    A.  I think he wanted us to learn from -- from
25  our experience at the other clubs.

Page 190

1    Q.  Do you recall visiting with Josh Stern and
2  Tim St. Onge that very evening?
3    A.  We discussed -- is that what you're saying --
4  discussed something?
5    Q.  Do you recall sitting with them at one of
6  those clubs?
7    A.  When we were at Cabaret North, we were --
8    Q.  Weren't you sitting with them at Cabaret
9  North?
10    A.  Yes.
11    Q.  The three of you?
12    A.  Yes.
13    Q.  Okay.
14    A.  No, not the three of us.  It was more than
15  three of us.  It was -- it was three general managers,
16  a regional manager, and a -- just a regular manager.
17    Q.  Who were you sitting next to?
18    A.  I was sitting next to everyone.  We were all
19  sitting next to each other.
20    Q.  Do you remember who was sitting to your
21  right?
22    A.  Where?  At which club?  We went to four
23  clubs.
24    Q.  We're talking about Cabaret North.  Remember?
25    A.  At Cabaret North, we were -- I was standing.

Page 191

1  And we were all standing in a circle.
2    Q.  You didn't sit down at all at Cabaret North?
3    A.  I think we sat down downstairs for a few
4  minutes; but then we went upstairs, and we were
5  standing.
6    Q.  So I take it you don't remember who you were
7  sitting next to at Cabaret North.  Is that what you're
8  trying to tell me?
9    A.  No, I don't remember.
10    Q.  Okay.  You do remember going to Cabaret
11  North, though, right?
12    A.  Absolutely.
13    Q.  And by the way, do you agree that it's
14  important for a manager at a club to conduct himself
15  in a professional manner both at the club and when
16  he's at another club?
17    A.  Yes.
18    Q.  And why is that?
19    A.  Because that's the responsibility of any
20  person who works for any company.
21    Q.  Because how you act is a reflection on you
22  personally and the club.  Would you agree with that?
23    A.  Yes.
24    Q.  Do you recall getting into an argument with
25  one of the entertainers at Cabaret North that evening?

Page 192

1    A.  What happened was --
2    Q.  Hold on.  Let me ask the questions.  You will
3  get an opportunity to tell your story, but I'm not
4  going to --
5    A.  It --
6    Q.  -- let you just go on.
7    A.  It wasn't an argument, no.
8    Q.  Okay.
9    A.  It was more of an -- it was more of just a --
10  a beratement on her part against me and just the --
11    Q.  Okay.  Do you remember her name?
12    A.  No.  She was a guest of one of the managers.
13    Q.  What does that mean, a guest of one of the
14  managers?
15    A.  That means that when we were on the upstairs
16  floor, it was about closing time.  There were no
17  patrons left in the club.  She was one of the
18  manager's guests who stayed with us and was in the
19  circle with us upstairs.
20    Q.  Okay.  And what was the situation about?
21    A.  Basically, we were all asked to introduce
22  ourselves and talk about the club we come from.  At
23  one point, I said "I'm Ryan, and I come from XTC."
24  The entertainer began to yell at me.  She said, quote,
25  unquote, "you -- you -- you are a nigger.  You come

Page 193

1    from niggers.  Go back to your niggers."
2           And then she started to chant "nigger,
3    nigger, nigger" over and over again.  She started to
4    yell it.  And I mean this went on for almost a minute.
5    And the managers were all standing right next to me,
6    and they didn't intercede on my behalf.
7           And I was embarrassed, humiliated.  I
8    felt like I needed to do something.  So I decided at
9    that point that I should leave and go home.  And I
10   said to the entertainer "if you worked for me, you
11   would not have a job using that type of language" in
12   the most professional way I could.  That was the
13   extent of my conversation with her.
14          I turned around to walk out of the club.
15   As I got close to the staircase, one of the male
16   managers yelled out "nigger."  And then I just -- I
17   turned around, and I saw them all laughing.  And I was
18   deeply offended.
19      Q.  What male manager did that?
20      A.  I don't know which one it was because my back
21   was toward them; but when I turned, I saw them all
22   laughing.  And at that point, I decided that I needed
23   to leave and make a complaint to Josh, which I did the
24   following day.
25      Q.  Okay.  So do you believe you were respectful

Page 194

1    to this entertainer?
2       A.  Yes, I was.
3       Q.  You believe you were condescending?
4       A.  No, I wasn't.
5       Q.  Insulting?
6       A.  No.
7       Q.  Okay.  Do you recall the manager of Cabaret
8    North trying to remove the entertainer from the
9    discussion with you?
10      A.  He did not.  He did not.  Nobody -- nobody
11   interceded on my behalf.  In fact, I was told by
12   Josh -- when I complained the following day to Josh, I
13   said "what had happened at the regional manager's
14   meeting was humiliating.  I was deeply offended.  And
15   I -- I wanted to lodge a complaint with HR."
16          He told me that I had to call the
17   general manager of Cabaret North and apologize for
18   being discriminated against, which I thought was
19   just -- added insult to injury.  And then I told
20   him --
21      Q.  And he told you what?
22      A.  To apologize, to call and apologize.
23      Q.  Well, so why didn't you call HR?
24      A.  I asked him to call -- I told him -- I said
25   "I want to write HR."  And he said "there is no HR

Page 195

1    department."  I said, "well, then I want to write Ed.
2    I want to write Ed a letter."  And he said "you are
3    especially forbidden from writing Ed or Wayne anything
4    about this club.  Your decisions or your actions must
5    not control -- must not affect my control of this
6    club."
7       Q.  "You're prohibited from e-mailing Ed or
8    Wayne"?
9       A.  That's what he said.  He -- he made it -- he
10   made it clear to everyone -- there was another
11   instance where --
12      Q.  Hold on.  Hold on.  Let's just --
13      A.  Yeah.
14      Q.  -- go one at a time.  Okay?
15      A.  Okay.
16      Q.  So did you ever e-mail with Ed?
17      A.  No, I did not.
18      Q.  Isn't it true that Ed e-mailed you?
19      A.  No, he didn't.
20      Q.  You don't remember that?
21      A.  I mean he may have.  I don't remember.
22      Q.  Didn't he request that you apologize to Mike
23   Watkins for being rude to the entertainer?
24      A.  He didn't e-mail me directly.  If he e-mailed
25   somebody, he e-mailed Josh or somebody else.  I never

Page 196

1    even heard of that e-mail.
2       Q.  You didn't write him back and say that the
3    dancer was intoxicated and out of line?
4       A.  I don't recall.
5       Q.  You don't remember telling him that you said
6    to the dancer "well, maybe us over at XTC aren't as
7    classy as you; what do I have to do to be as classy as
8    you"?
9       A.  I -- I never said that.  These are all --
10   these are all fabrications.  My -- my conversation
11   with her was to the extent that I described.
12      Q.  How many weapons do you currently own?
13      A.  Zero.
14      Q.  Okay.  How many have you owned and which ones
15   in the last, say, five years?  Let's take guns first.
16      A.  Okay.
17      Q.  How many guns have you owned in the last five
18   years or carried around even if you don't own them?
19      A.  I had a handgun and a rifle.
20      Q.  Okay.  What kind of handgun?
21      A.  I don't remember what kind it was.
22      Q.  Where did you buy it?
23      A.  At a store somewhere.
24      Q.  What store?
25      A.  I don't remember.

Page 197

1    Q.  You don't remember where you bought a
2  handgun?  Do you have a license?
3    A.  No, I don't.
4    Q.  How did you even know that the store would
5  sell you a handgun?
6    A.  It was a -- it was a gun store.  I went in
7  and I applied and I got the gun.
8    Q.  So you applied to own the handgun, but you
9  didn't get a license?
10    A.  You mean a CHL?  Is that what you're saying?
11    Q.  Sure.
12    A.  Okay.  No, I don't have a CHL.
13    Q.  So you went and applied for a license to own
14  the handgun.  You went on the waiting list.  You got
15  the handgun.  Or did you get it immediately?
16    A.  They gave it to me immediately.
17    Q.  Was it a pawnshop, or was it --
18    A.  No.
19    Q.  -- like a retail establishment?
20    A.  It was a gun store.  It was an actual gun
21  store.
22    Q.  And you don't remember which one in the area?
23    A.  I don't, no.
24    Q.  Do you remember what kind of gun it was?
25    A.  It -- I don't remember.  I think it was a .45

Page 198

1  caliber gun.
2    Q.  Did you buy it new or used?
3    A.  I bought it new.
4    Q.  When did you buy it?
5    A.  I bought it -- I believe it was in 2009.
6    Q.  Remember how much you paid for it?
7    A.  I think it was about $500, $600.
8    Q.  What kind of bullets did you have?
9    A.  There were .45 caliber bullets.
10    Q.  What kind?  Do you know?
11    A.  No, I don't.
12    Q.  Where is the gun now?
13    A.  It's -- I don't have it any longer.
14    Q.  Did you sell it?
15    A.  No.
16    Q.  What happened to it?
17    A.  It -- when I was -- when I was arrested, it
18  was taken by the County.  And I just never went and
19  retrieved it.  I didn't -- I didn't have a need for it
20  any longer after not working at XTC.
21    Q.  So -- and -- and by the way, you -- you
22  understood that you should be carrying a -- a pistol
23  like that if you worked at XTC?
24    A.  I felt that it was -- because of all the
25  incidents that we had and the people being hurt or

Page 199

1  killed or assaulted, I felt like it was probably a
2  good decision just to have a gun somewhere near my
3  vehicle.
4    Q.  Okay.  But it didn't take away from your
5  enjoyment at working at XTC, right?
6    A.  I didn't like it.  I -- I wanted the
7  incidents to reduce, and I wanted -- I wanted a
8  reduction in the incidents but --
9    Q.  But you -- but you still enjoyed working at
10  XTC.  That's how you testified earlier.
11    A.  I enjoyed having a livelihood, paying for my
12  livelihood.  And I --
13    Q.  So --
14    A.  -- enjoyed -- and I enjoyed working with the
15  staff.
16    Q.  I -- I mu --
17    A.  I didn't --
18    Q.  I must have --
19    A.  I didn't --
20    Q.  -- misunderstood your testimony.  I thought
21  you said you enjoyed working at XTC Cabaret Dallas.
22  Correct?
23    A.  I did not enjoy working there.  I enjoyed
24  working with my -- the staff that I had hired and put
25  in place.

Page 200

1    Q.  Okay.  But you did not like working at XTC
2  Cabaret Dallas, then?
3    A.  It was -- it was -- it was up and down.
4  There were positives, and there were negatives.
5    Q.  Okay.  So you're not able to say
6  unequivocally that you did or did not like working at
7  XTC Cabaret Dallas?
8    A.  I liked parts of it, and I didn't like other
9  parts.
10    Q.  Okay.  The part that you believe required you
11  or suited you to carry a .45 caliber pistol on a daily
12  basis was something that you didn't like?
13    A.  I didn't carry it on a daily basis.
14    Q.  How long --
15    A.  I didn't carry it -- I didn't carry it on my
16  person.  I --
17    Q.  I'm sorry.  You carried it in your car?
18    A.  Yes.
19    Q.  Okay.  Daily?
20    A.  It was in my car.
21    Q.  You left it in your car?
22    A.  Yes.
23    Q.  Every day?
24    A.  Yes.
25    Q.  And why is it that your car was the right

Page 201

1  place to keep a gun?  Is that where something bad was
2  going to happen to you?
3      A.  Based on the people that were hurt leaving
4  the club, such as the cab driver that we mentioned
5  earlier, I just felt like I needed to have a gun in my
6  vehicle.
7      Q.  That's where someone was going to give you
8  trouble is when you were in your car?
9      A.  I don't know.
10     Q.  But you --
11     A.  I don't know.
12     Q.  But you felt like keeping a gun in your car
13  was better than not having a gun at all?
14     A.  Yes.  There was one incident in particular
15  where I was leaving the club after work and there was
16  a -- a -- a Hispanic gentleman sitting in a truck
17  waiting in the neighboring parking lot with binoculars
18  and nunchakus waiting for me to get off work.
19     Q.  Why?
20     A.  To injure me or hurt me.
21     Q.  How could you tell he had nunchakus?
22     A.  Because my front-line security went and
23  apprehended the guy.  And they called the police to
24  come and arrest him, and he said "I'm waiting for --
25  I'm waiting for the tall, brown guy to come out."

Page 202

1      Q.  Okay.  And if you were walking to your car,
2  your gun in your glove box wouldn't have helped you,
3  would it?
4      A.  It depends.
5      Q.  It depends on what?
6      A.  On the circumstances.
7      Q.  If this guy got to you when you were walking
8  to your car, the gun in your car wouldn't have helped
9  you.  Would you agree with that?
10     A.  No, it wouldn't have helped me.
11     Q.  Okay.  What about your rifle?  Do you still
12  have it?
13     A.  No.
14     Q.  What happened to it?
15     A.  I sold it after I left XTC.
16     Q.  Do you feel like you had to have a rifle
17  because you were working at XTC?
18     A.  I bought the rifle to help out a marine vet
19  who I had hired as a floor host.  He's -- he had a
20  family, and he was struggling.  And he asked me if I
21  would help him out and give him basically a pawn loan.
22     Q.  Okay.
23     A.  And so I gave him -- I gave him a loan.  And
24  he said he was going to come and retrieve it, and
25  he -- he just never did.

Page 203

1      Q.  Okay.  You agree that your having a rifle had
2  nothing to do with your seeking to protect yourself
3  from customers at --
4      A.  No.
5      Q.  -- XTC, right?
6      A.  No, I never carried the rifle at work.  I
7  never brought it to work.
8      Q.  Okay.  Are those the only guns that you've
9  carried or purchase or owned in the last five years?
10     A.  No.  I also purchased a -- for my girlfriend
11  at the time back in 2008, I purchased a small caliber
12  handgun.
13     Q.  Is that the one that the police found when
14  you guys were pulled over in Denton?
15     A.  Yes.
16     Q.  But you said quickly that it was hers.
17     A.  She -- she asked me to get it for her.
18     Q.  But you bought it for her?
19     A.  Yes.
20     Q.  And it's because of you that she had it?
21     A.  Yes.  She asked me to help her find a gun
22  that she could carry that had low recoil.  So I
23  just -- I went and talked to a gun shop owner and
24  bought it for her.
25         VIDEOGRAPHER:  Excuse me.  I have less

Page 204

1  than two minutes left on this tape.
2         MR. HURST:  Go ahead and flip it.
3  Thanks.
4         VIDEOGRAPHER:  We're off record.  This
5  is the end of Tape 2.  Time is 2:32.
6         (Recess.)
7         VIDEOGRAPHER:  We're back on the record,
8  beginning of Tape 3.  Time is 2:42.
9      Q.  (BY MR. HURST)  You were talking before our
10  last break about the small caliber handgun that you
11  purchased for your girlfriend at the time.  Is that
12  Sheena?
13     A.  Yes.
14     Q.  Okay.  And that was the small caliber handgun
15  that the police found when you guys were pulled over
16  in Denton, I think, in 2008?
17     A.  Yes.
18     Q.  And so did she keep it in her car?
19     A.  Yes, she did.
20     Q.  Were you driving at the time?
21     A.  I was.
22     Q.  Do you know whether she still has that small
23  caliber handgun?
24     A.  No, she does not have it.
25     Q.  Do you still keep up with Sheena?

Page 205

1  A. No, I don't.
2  Q. Okay. How do you know she doesn't have that
3  small caliber handgun?
4  A. Because the -- the police took it.
5  Q. And neither she nor you got it back?
6  A. No, we didn't.
7  Q. Was it in your name?
8  A. I believe so, yeah.
9  Q. Are those the only three guns you've handled,
10 carried, owned in the last three year -- five years?
11 A. Yes.
12 Q. Okay. What about knives? Do you have any
13 hunting knives or --
14 A. No, I don't.
15 Q. What about bear mace?
16 A. I did have a -- a can of mace. I don't know
17 if it was bear mace -- that Robert Bonilla gave me
18 which was the prohibited weapon charge that I told you
19 about.
20 Q. And that was the only time you had mace?
21 A. Well, he gave it to me when I first started
22 working there.
23 Q. But that was the only time, the only instance
24 in which you were carrying or driving around with
25 mace?

Page 206

1  A. I also had a very small key chain can of mace
2  that I kept with me just in case of a large fight,
3  which happened frequently.
4  Q. Did you ever have to use it?
5  A. Yes, I did.
6  Q. How many times did you use the mace on your
7  key chain?
8  A. I believe twice.
9  Q. On customers?
10 A. Yes.
11 Q. Customers that got out of hand?
12 A. Customers that were fighting, yes.
13 Q. Do you remember when that was?
14 A. No, I don't.
15 Q. How about lead-lined gloves? Did you ever
16 have those?
17 A. No.
18 Q. Any other weapons that you owned, carried,
19 drove around with?
20 A. No.
21 Q. Do you know anyone to have lead-lined gloves?
22 A. I know the security had gloves, and I -- I
23 sometimes had gloves; but that was only when -- when
24 we had several fights in one night and things were
25 getting very out of hand.

Page 207

1  Q. So you did have gloves?
2  A. We had -- we had gloves, but they weren't
3  lead-lined. I don't even know what that means.
4  Q. So what kind of gloves are we talking about?
5  Boxing gloves?
6  A. No, they were just regular gloves because
7  people would throw bottles sometimes and there would
8  be broken glass, et cetera. So they were just gloves
9  to protect your hands.
10 Q. Are they like black gloves?
11 A. They were -- mine were like baseball gloves.
12 Q. You would just walk around with them through
13 the course of the evening?
14 A. No, I wouldn't walk around with them. I
15 would put them on if things were getting out of hand
16 in the club. There was some nights where we had eight
17 fights, nine fights in one night.
18 Q. Okay. So you would keep gloves in your
19 pocket?
20 A. No, I would keep them in the office,
21 downstairs in the front office.
22 Q. And did you buy these gloves?
23 A. Yes, I did.
24 Q. Did anyone else have these gloves in the
25 office?

Page 208

1  A. Cesar Corolla had a pair. Shrek, Jose
2  Franco, had a pair. Chewy had a pair. A lot of
3  people had them.
4  Q. Did you bring any weapon with you to work at
5  XTC Cabaret?
6  A. Sometimes I -- after -- when we were counting
7  money at night, I would bring my gun inside because we
8  were counting thousands -- 50,000, $100,000 sometimes
9  in the safe and putting it in the safe. And I would
10 be the only person there. If security would go home,
11 I'd be alone with the girls.
12 Q. And that's the only instance in which you
13 would bring a gun inside?
14 A. Yes.
15 Q. When counting the money?
16 A. Right. When counting the money, the cash,
17 the -- the --
18 Q. Well --
19 A. -- receipts for the day.
20 Q. So that -- that happened during every shift,
21 didn't it?
22 A. It happened at the end of shift.
23 Q. So weren't you very often there during the
24 counting of the money?
25 A. I was there sometimes, yes.

Page 209

1    Q. I didn't ask about sometimes.  I said,
2  weren't you often there?
3    **A. I -- it depends on who was closing.**
4    Q. Okay.  So each time you would close, you
5  would bring the gun in?
6    **A. I would, yes.**
7    Q. Okay.  And how many times during the course
8  of a year do you think you worked a shift that was
9  closing?
10   **A. I don't know.**
11   Q. More than 50 percent of the time?
12   **A. I -- I don't know.**
13   Q. Maybe more than half?
14   **A. I -- I'm -- I'm not sure -- maybe a third of**
15  **the time.**
16   Q. Did you ever yourself use or make racial or
17  ethnic slurs or epithets while working for XTC
18  Cabaret?
19   **A. No.**
20   Q. Did you refer to the house mother, Christine
21  Good -- Goodgion?
22   **A. Goodgion (pronunciation).**
23   Q. Goodgion.  Did you refer to her as "Navajo"?
24   **A. No.**
25   Q. Did you ever call Josh Stern "Meyer Lansky"?

Page 210

1    **A. No.**
2    Q. Did you ever make slurs or epithets regarding
3  Hispanic customers or employees?
4    **A. Absolutely not.**
5    Q. Did you ever make racial slurs or ethnic
6  slurs or epithets regarding African-American customers
7  or employees?
8    **A. No.**
9    Q. How about referring to yourself?  Did you
10  ever refer to yourself as "sand nigger" or anything
11  that would be offensive to other people?
12   **A. No.**
13   Q. Did you ever use illegal drugs at work while
14  working for XTC Cabaret Dallas?
15   **A. No.**
16   Q. Did you ever smoke marijuana while on the
17  premises?
18   **A. No.**
19   Q. Not in the elevator shaft?
20   **A. No.**
21   Q. Do you remember an instance where a marijuana
22  pipe was found in the office and you were the last one
23  in the office?
24   **A. No.**
25   Q. Do you remember an instance in which a bag of

Page 211

1  marijuana was found in the rest room shortly after you
2  left it?
3    **A. No.**
4    Q. Remember Robert Bonilla telling you that you
5  left something in the bathroom?
6    **A. No.**
7    Q. You recall working as the on-duty manager on
8  Monday, February 6, 2012?
9    **A. No, I don't recall.**
10   Q. That was the last shift you worked at XTC
11  Cabaret Dallas, right?
12   **A. No.**
13   Q. When did you last work for XTC Cabaret
14  Dallas?
15   **A. On a -- on a Friday night.**
16   Q. Okay.  Was there a rule in place that
17  required the on-duty manager to remain at the club
18  until it closed and everyone was out?
19   **A. There wasn't a rule, but there was some**
20  **changes made at the time that I was working there to**
21  **where that was instituted.**
22   Q. Okay.  So you knew that was the rule, then?
23   **A. Yes.**
24   Q. Do you recall leaving the club when you were
25  the on-duty manager on February 6th before it closed?

Page 212

1    **A. No.**
2    Q. No, you don't recall leaving at -- early?
3  Or, no, you didn't leave early?
4    **A. I didn't.**
5    Q. Because that would have been a violation of
6  the rules, right?
7    **A. There was no rule in place.**
8    Q. Well --
9    **A. Josh frequently left before the money was**
10  **counted or the cage was counted.**
11   Q. With someone else in charge?
12   **A. I -- people frequently left.**
13   Q. Okay.  If you were on-duty manager, then you
14  thought it was okay to leave?
15   **A. I mean, typically, you would stay; but if the**
16  **cage person or the house mom was taking too long**
17  **because they were drunk, et cetera, sometimes people**
18  **would leave early.**
19   Q. Okay.  Did you ever leave early when you were
20  the on-duty manager?
21   **A. I -- I believe I may have.**
22   Q. How many times?
23   **A. A few, but this was before any rule was**
24  **created about leaving early.**
25   Q. Okay.  So that's why you're certain that you

Page 213

1  did not leave early as the on-duty manager on February
2  6, 2012?
3      A.  I mean I was never written up for it.  I was
4  never reprimanded for it.  So I don't -- I don't -- I
5  don't know what the problem is.
6          MR. HURST:  Objection.  Nonresponsive.
7      Q.  (BY MR. HURST)  Do you have a specific
8  recollection of staying the whole time when you were
9  the on-duty manager February 6, 2012?
10     A.  No, I don't.
11     Q.  Okay.  Is it possible, sir, that on that
12  date, you were the on-duty manager and you left early?
13     A.  What day was it?
14     Q.  February 6, 2012.
15     A.  What day is that?
16     Q.  Monday.
17     A.  No, it's not possible.
18     Q.  Is there a camera that videos people walking
19  in and out of the club?
20     A.  At the front door, there is, yes.
21     Q.  And would you come and go through the front?
22     A.  Yes.
23     Q.  So it should be on video, then, right?
24     A.  Yes.
25     Q.  You do not recall visiting with Josh Stern

Page 214

1  on/or about February 11, 2012, about how you left your
2  shift early on February 6, 2012?
3      A.  No.  What day was that?  A Friday or a
4  Saturday?
5      Q.  Of the discussion?
6      A.  What day was February 11th?  I don't -- I
7  don't know.  I have to look.
8      Q.  That would have been a Friday.
9      A.  No, I did not have a discussion with him
10  about leaving early.
11     Q.  All right.  That would have been a Saturday.
12  February 11, 2012, I believe was a Saturday.
13     A.  Okay.
14     Q.  Do you re --
15     A.  No, I did not have a discussion with him.
16     Q.  Okay.  And -- and you already testified that
17  you do not recall Josh Stern demoting you to floor
18  host during that conversation?
19     A.  It didn't happen.
20     Q.  Okay.  Do you remember having a discussion
21  with Mr. Stern about your leaving early?
22     A.  It -- it -- we never did.
23     Q.  Okay.  Do you remember walking away from the
24  conversation saying "fuck this; take my keys; I don't
25  need this"?

Page 215

1      A.  That's not what happened.  He told me to
2  leave the premises and that I have to leave right
3  away.  He told me I was terminated.
4      Q.  Okay.  Why did Josh Stern say that you were
5  terminated?  And by the way, did this happen on
6  February 11th?
7      A.  No, it happened on February 10th, the end of
8  Friday night's shift.  And it was a few days before
9  that that I had found Daniel Castaneda, the doorman --
10  he was allowing minors into the club and -- under 18
11  years old and charging them between 20, 50, and $100
12  for entrance.  I --
13     Q.  What is Daniel Castaneda's position?
14     A.  He is a -- he's a doorman.
15     Q.  Okay.  And this was the first time that you
16  supposedly saw this thing going on?
17     A.  Yes.
18     Q.  What -- now, did you just happen to be
19  walking by the door on Friday, February 10th?
20     A.  No, I heard from customers that it was up --
21  up -- something that was occurring.  And so I -- after
22  shift, I asked Daniel to join me in the front office.
23  And I asked him about it.
24         He readily told me that he was allowing
25  minors into the club.  And sort of boisterously, he

Page 216

1  said "I made $2,000 tonight" or "I made a thousand --
2  a couple of thousand dollars tonight doing it."
3      Q.  Well, who would keep the money?
4      A.  He would.  It was a -- I -- I guess he would
5  give some of it to Josh.  I'm not sure.
6      Q.  Well, did he tell you that?
7      A.  He told me that he used to give confiscated
8  drugs to Josh.  He told me, in fact, that night that
9  he had given Josh a couple of ounces of marijuana that
10  he had confiscated at the door.  I asked Cesar --
11     Q.  Is Daniel Castaneda still there?
12     A.  I don't know.
13     Q.  Was he there at the time that you left?
14     A.  No, I fired him.  When I found out that Jo --
15  Daniel Castaneda was letting these people into the
16  club, I immediately went inside and got a second
17  manager to join us in the front office as a witness.
18         I brought Cesar Corolla in.  It was
19  about 5:30 or 5:45 in the morning after shift.  Daniel
20  Castaneda at that point off -- I basically told him
21  that what he was doing was a huge liability for the
22  club and that he -- I was going to terminate his
23  position.  He immediately offered half of the money as
24  an apology to the club and asked to keep his job.
25     Q.  And this is all with Cesar --

Page 217

1      A. I --
2      Q. -- in the room?
3      A. This is all with Cesar in the room.  During
4  this time, I took the money and I walked to the bar
5  and I rang up the money as a VIP sale -- the amount of
6  that money was $900 -- after which I contacted Josh
7  Stern because he had been calling fre -- frequently
8  when he found out that Daniel Castaneda, Cesar, and
9  were in the front office.  He had been calling Robert
10 Bonilla's phone and other people.
11      I contacted Josh, and I said -- I told
12 him what had happened.  I said that I had found Daniel
13 Castaneda allowing in minors under the age of 18 into
14 the club and that I had terminated him for it.
15      He told me to return the money to Daniel
16 right away and that Daniel -- that he was working very
17 closely with the front door and they were doing
18 exactly what he wanted.  I told him that I had already
19 fired Daniel and that I had rang up the money in the
20 register as a VIP sale.
21      My intention was to put the corporate
22 office on notice because I knew that Josh was working
23 with Daniel.  I knew that he was getting a cut of what
24 Daniel was -- was taking from the door.
25      So when I told Josh that, he started

Page 218

1  yelling that -- he said "you did what?  You rang up
2  that money?  How dare you ring up that money?  That's
3  minor cover charges, you stupid nigger."  And then --
4      Q. Okay.
5      A. -- he said we needed to have -- have a
6  sit-down and have a conversation about what was going
7  on because how I operate -- or how I was -- what I was
8  doing was not how he operates.  And this happened less
9  than a week before I was terminated.  I walked away
10 fr --
11      Q. Well, it happened -- you said this happened
12 February 10?
13      A. This happened a week before.  This
14 happened -- this happened less than seven days before.
15      Q. What day did this happen?
16      A. On/or around February 3rd -- or -- or -- or
17 sometime in the first week of February or last week of
18 January.
19      Q. Okay.
20      A. So at that point, I hung up the phone.  And
21 Robert Bonilla came up to me and said to me that I
22 needed to stay away from his door and to stay inside
23 the club and it -- and it was not my job to police the
24 front door.
25      And he said that he always has a machete

Page 219

1  in his car, he carries it with him all the time, at
2  which point he grabbed my finger.  And he bent it back
3  as hard as he could, and it really upset me because
4  it -- not only did it hurt, but I was emotionally
5  upset that I was being treated this way after trying
6  to help the club avoid liability.
7      And I told him at that point sort of out
8  of emotion but I also -- but I did mention to him -- I
9  said I know that -- I know for a fact that you're
10 taking several thousand dollars in charge money
11 from the door every weekend and that he was not going
12 to get away with it.  And I had evidence to that fact.
13     Q. Where is your evidence?
14     A. I -- two different pieces of evidence.  One
15 was the fact that I had a door girl tell me about it.
16     Q. Okay.  Who is the door girl?
17     A. Sammy Riley.  And --
18     Q. Sammy Riley?
19     A. Yes.
20     Q. R-i-l-e-y?
21     A. Yes, that's correct.  Sammy knew the exact
22 procedure in which he was stealing money.  He was
23 putting money that he keeps in his left pocket and
24 putting money that he rings up in his right pocket.
25 He never rang up any cover charges as he received it.

Page 220

1      Q. We're talking about Daniel?
2      A. We're talking about Robert Bonilla at this
3  point.
4      Q. So what did -- did Robert and Daniel have it
5  going together?  I thought you said Daniel --
6      A. Daniel was at the front door, and Robert
7  worked the front door.  He was the manager of the
8  front door area.  He was the one that was taking the
9  cover charge money.
10     Q. Okay.  Okay.  So Sammy Riley, you believe, is
11 going to say that she saw Bonilla doing this; and
12 she's the one that told you about it?
13     A. She -- yes, she'll -- she'll -- she will tell
14 you the fact of the matter that -- that -- what was
15 happening.  In addition --
16     Q. Have you talked to Sammy Riley about this?
17     A. No, I have not.
18     Q. Okay.
19     A. Also, in addition -- but -- but she did
20 complain to me about what -- she did tell me that --
21 she said, "hey, do you know that Robert is stealing a
22 bunch of money from the door and giving it to
23 everyone?"  He was giving all the floor -- Frontline
24 security officers a couple of hundred dollars a night.
25 He was giving Marshawn several hundred dollars a

Page 221

1 night. He was basically taking the money from the
2 register and just handing it out to the front door
3 people and keeping --
4 Q. Okay.
5 A. -- a large chunk for himself.
6 Q. So Sammy Riley is one of the pieces of
7 evidence. You said there were two. What's the other
8 one?
9 A. On one occasion, I went outside to talk to
10 Robert. And his car was parked in the front of the
11 building. And I looked at the window, and I was going
12 to knock on the window. And I saw tons of money just
13 spread out all over the car, the center console, his
14 lap, the side. And he had some money in his hands,
15 and he was just counting it. And I mean it -- it was
16 100's, 20's. I mean it was tons of money.
17 Q. And do you recall when this was?
18 A. This was in the summer of 2011.
19 Q. And that, to you, suggested he must have been
20 getting something from the door to have that kind of
21 cash?
22 A. Well, when Sammy Riley told me what was
23 happening, then I -- I put two and two together and
24 realized that this money that he was taking was from
25 cover charge money.

Page 222

1 Q. Did you ever ask Robert Bonilla, "hey, man,
2 what are you doing with all that money"?
3 A. No, I did not.
4 Q. All right. Those are the two pieces of
5 evidence that you have that show that what you're
6 testifying is accurate?
7 A. Yes.
8 Q. Okay. So did you ever have a confrontation
9 with Josh Stern where you allege he terminated your
10 employment?
11 A. Yes.
12 Q. When was that?
13 A. It was on the 10th.
14 Q. And that was the following Friday night?
15 A. Yes.
16 Q. Okay.
17 A. On/or around the 10th of February.
18 Basically, he came up to me. And he told me that he
19 and Robert had found a pipe in the upstairs general
20 office that everybody uses.
21 He said that they believe that the pipe
22 is mine and that they were terminating me from my
23 position and that I needed to leave the club property
24 right away and not take anything with me.
25 He also asked me to hand over my keys,

Page 223

1 at which point I told him that I would be willing --
2 more than happy to take a drug test and pay for a
3 fingerprint analysis on the pipe. I told him that it
4 wasn't mine. And he said "it's too late; you just
5 have to leave."
6 Q. Now, you smoked pot at the time, right?
7 A. No, I did not.
8 Q. You were not smoking pot at all during the
9 time of your leaving XTC?
10 A. No, I wasn't.
11 Q. Okay. Had -- had you been smoking pot in the
12 previous year to that?
13 A. No.
14 Q. Okay.
15 A. I'll be happy to take a drug test for you.
16 Q. I didn't ask you to take one.
17 A. Okay. I'm just offering.
18 Q. And we're also talking about a couple of
19 years ago.
20 A. Okay. Well, I -- I'm just offering.
21 Q. Okay. So what about when you were arrested
22 with pot in your possession?
23 A. That was the -- that was the last time that I
24 had smoked.
25 Q. And what were you smoking it with?

Page 224

1 A. I hadn't -- we hadn't smoked anything. I
2 don't know -- maybe papers. I don't know.
3 Q. Did you have --
4 A. We hadn't --
5 Q. -- a pipe with you?
6 A. No.
7 Q. Okay. Did you ask Josh why he thought that
8 the pipe was yours?
9 A. He said that he and Robert believed that it
10 was mine. And when I insisted to take a fingerprint
11 analysis on the pipe, he just refused, flat-out
12 refused.
13 I believe the real reason why I was
14 fired was because I just -- I did my best to stop the
15 illegalities that were happening at the front door
16 with the allowance of underage minors into the club.
17 Q. Well, tell me what you did to stop it.
18 A. I terminated Daniel Castaneda. I took the
19 money and rang it up in the register to put the
20 corporate office on notice. I did everything in my
21 power.
22 Q. But you didn't advise anyone of it, did you?
23 A. I did. I told Josh what had happened. As
24 soon as I -- as soon as I had discovered it, I felt
25 like it was my obligation as a manager to terminate

Page 225

1    that employee, which is what I did.
2          The next step I took was to ring up the
3    cover charge money because I felt like I was going to
4    have problems with Josh regarding this matter.  So I
5    rang up that money as a VIP charge way later than any
6    moneys usually ring up, $900.  So it's in the -- it's
7    in the records.  But then, once I was on record,
8    at that point, I called Josh and talked to Josh about
9    it.
10       Q.  And you would have nothing to do with such a
11   scheme, right?
12       A.  Absolutely not.
13       Q.  In fact, you knew nothing about it during
14   your whole employment there?
15       A.  No.
16       Q.  And, in fact --
17       A.  If I had known about it, I would have done
18   something.
19       Q.  You were never asked to participate in it?
20       A.  I was not asked to participate in it.  And I
21   was -- I don't work the front door; typically.  So I
22   didn't know what was happening.  Once I found out, I
23   did investigate it.  That's why I took Daniel into the
24   front office and I interviewed him about it because I
25   didn't know about it until that point.

Page 226

1    Q.  Had you been asked to participate in it, you
2    certainly would have said, "no, thank you; I don't
3    want anything to do with this"?
4    A.  Absolutely not.
5    Q.  To you, that was something unethical and
6    something that shouldn't be done, right?
7    A.  For me, it wasn't about ethics.  For me, it
8    was about the safety of the customers, of having young
9    minors in the club that had a lot of problems.  And in
10   addition, equally important was to protect the club
11   from liability.  We were making a lot of money.  The
12   last thing I wanted to happen was for the City or the
13   County to come in with a bogus charge because some
14   doorman or -- or et cetera was taking a few dollars
15   and putting it in their pocket.
16         So I felt like it was a dual
17   responsibility on my part to protect the safety of the
18   customers and at the same time to make sure that the
19   business is safe from liability.
20   Q.  And so you testify now that Josh Stern
21   unequivocally terminated your employment on February
22   10, 2012¹?
23   A.  Yes.
24   Q.  Was anyone else near you?
25   A.  No.

Page 227

1    Q.  Just the two of you?
2    A.  Yes.
3    Q.  And did you visit with anyone on your way
4    out?
5    A.  I immediately went to Joseph Kyle who was
6    sitting at a table with a few people.  And I said "I
7    just got fired.  Did you know I -- did you know that I
8    was going to get fired?  I just got fired."
9          And he -- he said "really?"  And he
10   stood up and went into the back and didn't come back
11   out at which point I tried to call Ed Anakar.  I left
12   him a message, and he responded by sending me a text
13   saying "please give me a call when you get a chance."
14   Q.  And did you call him?
15   A.  I called him at 10:00 in the morning.  He
16   didn't answer.  I gave him some time.  I thought he
17   might call me back.  He didn't.  I called him again at
18   7:00 p.m.  He didn't answer.
19         My intention was to describe to him
20   everything that was going on in the club including the
21   illegalities and the discrimination that I was
22   facing --
23   Q.  Uh-huh.
24   A.  -- and also the theft.
25   Q.  The theft of --

Page 228

1    A.  Cover charge money.
2    Q.  It was your intention after you were fired to
3    complain to Ed about these racial epithets and slurs
4    to which you say you were subjected?
5    A.  Yes.
6    Q.  And was that the first time that you reached
7    out to Ed to make such a complaint?
8    A.  I wish I had done it before.  The only reason
9    that I hadn't was because Josh was so adamant about
10   his control of the club.  And there was an instance
11   where Christine Goodgion, the house mom, had written a
12   letter to Ed regarding somebody that was working at
13   the club.  And Josh almost fired her for it.  And he
14   made her life miserable for several weeks because of
15   it.
16         And once I saw how marginalized she was
17   for making such a complaint, I was really in fear of
18   making the same sort of -- taking the same sort of
19   measure.
20   Q.  Okay.  So your testimony is that you never
21   complained to anyone above Josh Stern of any of the
22   names you were supposedly being called or any of the
23   harrassments or racial epithets?
24   A.  No, I com -- I just complained to Josh
25   directly.

Page 229

1    Q.  Okay.  And you never complained to anyone
2  other than Josh?
3    A.  No.
4    Q.  Never sent an e-mail or wrote a letter to
5  anyone at all complaining about this?
6    A.  I wanted to -- I -- I -- I --
7    Q.  Hold --
8    A.  -- wanted to --
9    Q.  Hold on.
10    A.  -- cont --
11    Q.  I -- we -- we have a limited time left.
12    A.  No, I --
13    Q.  And -- and I'm --
14    A.  -- did not.
15    Q.  I'm sorry to interrupt you, but I'm not --
16    A.  That's okay.
17    Q.  -- asking you if you wanted to.  I'm asking
18  you if you did.
19    A.  I asked for permission to write the HR
20  department, and Josh told me that there is no HR
21  department.
22    Q.  Okay.
23    A.  And I also told him that I wanted to contact
24  Ed and -- Ed, and he told me I'm -- I'm especially
25  forbidden from contacting Ed or Wayne.

Page 230

1    Q.  Okay.  And you had spoken with Ed and Wayne
2  several times during the course of your employment
3  about many things, right?
4    A.  I mean I spoke to -- maybe -- I spoke to them
5  a couple of times.
6    Q.  Yeah.  And if you thought the circumstances
7  warranted it, you would be able to reach out to either
8  one of them?
9    A.  I -- I -- Wayne, not really.  Ed, I mean he
10  was in the corporate office.  I -- you know, there
11  were occasions where I tried to put Josh on notice of
12  things.  Like I sent him an e-mail exam -- for
13  example, one ti --
14    Q.  We're not talking about Josh.  We're talking
15  about Ed and Wayne right now.
16    A.  No, I did not -- I was not -- I did contact
17  Ed, but I contacted him on the 10th.
18    Q.  After you say you had been terminated?
19    A.  Yes.
20    Q.  You testified earlier about Erin Frye
21  allegedly saying to you, "oh, my God, you're a Muslim
22  terrorist," right?
23    A.  Yes.
24    Q.  Anything you want to add to that?  Or do you
25  feel like you've told me the whole story --

Page 231

1    A.  She --
2    Q.  -- in that instance?
3    A.  That -- that's the whole story.
4    Q.  You allege in your complaint that Josh Stern
5  would say to you comments such as "where is your bomb"
6  and "does your girlfriend wear veils and cover her
7  body," right?
8    A.  Yes.
9    Q.  And just to be clear, you never complained to
10  anyone above Josh Stern about his supposed comments
11  here, right?
12    A.  No.
13    Q.  And going back to Erin Frye's comment which
14  you believe was heard by coworkers who you already
15  identified, you never complained to anyone above Erin
16  Frye that she supposedly made this comment or
17  subsequently made other comments that you would
18  consider racial epithets?
19    A.  No.
20    Q.  Same as the case for comments that Mr. Stern
21  supposedly made to you about your having ties to
22  Al-Qaeda or Osama bin Laden, correct?
23    A.  Did I complain about it?
24    Q.  Yes.
25    A.  I complained about it to Josh.

Page 232

1    Q.  And Josh didn't stop at that point?
2    A.  No, he did not.
3    Q.  Okay.  And you didn't complain to anyone
4  above Josh for these supposed comments?
5    A.  No, excluding the time that I tried to call
6  Ed.
7    Q.  Which was after you were terminated?
8    A.  Yes.
9    Q.  You were no longer an employee at that time,
10  were you?
11    A.  Right.  I was -- I was already terminated at
12  that point.
13    Q.  Okay.  And who else, if you haven't
14  identified already, would have heard Josh Stern say to
15  you where is your bomb, does your girlfriend wear
16  veils and cover her body, you have ties to Al-Qaeda
17  or -- and Osama bin Laden?  Who else would hear that?
18    A.  He made other comments, as well; but he did
19  it typically in front of managers.
20    Q.  So who else would have heard --
21    A.  Cesar -- Cesar Corolla.
22    Q.  Okay.
23    A.  He referred to me and customers and Cesar as
24  spick, wetback.
25    Q.  No, I'm asking about these comment specifics.

Page 233

1    A. Oh, those two specific comments. I'm sorry.
2    Q. Did Cesar hear Josh Stern say to you "where
3  is your bomb; does your girlfriend wear veils?"
4    A. When I -- when he said the "where -- where is
5  your bomb" comment, I was coming in the front door.
6  And he sort of acted like he was searching me. He
7  made like a -- like a mime.
8    Q. Okay.
9    A. He said, oh, you know, da, da, da, da. I
10  don't know who was at the front door at the time. I
11  think maybe a Frontline officer was there.
12    Q. Okay. So Cesar was not present?
13    A. No, he wasn't.
14    Q. Okay. Did Cesar or anyone else hear Josh
15  Stern supposedly say to you that you had ties to
16  Al-Qaeda or Osama bin Laden?
17    A. He -- he made those sort of comments in front
18  of managers, so Tim and Cesar might have -- might have
19  been there. I don't recall right now if they were or
20  not.
21    Q. Josh Stern supposedly referred to you as a
22  Muslim terrorist and an Arab, right?
23    A. Yes.
24    Q. Anyone hear that?
25    A. Yes, the --

Page 234

1    Q. Who?
2    A. -- managers did.
3    Q. Okay. Who specifically?
4    A. Cesar and Tim and Marty.
5    Q. And just to be clear, you never complained to
6  anyone with management that Mr. Stern supposedly made
7  these comments about you or to you?
8    A. No.
9    Q. You testified earlier and consistent with
10  your pleadings that sometime around November 1, 2011,
11  Mr. Stern stated that you would not be manager because
12  only a white person could be manager?
13    A. Yes.
14    Q. Was he referring to entertainment manager?
15    A. He said entertainment manager, yes.
16    Q. Okay. Who else heard that?
17    A. Cesar Corolla was there, and Tim was also
18  there; but Tim participated in most of the derogatory
19  racial and religious comments that were made.
20    Q. Cesar did not?
21    A. Cesar did not.
22    Q. Okay. He just put his head in the sand?
23    A. Yes.
24    Q. And just so we're clear, with regard to this
25  supposed comment that Mr. Stern made in/or around

Page 235

1  November of 2011, you didn't complain to management or
2  anyone else?
3    A. No.
4    Q. You complain in your pleadings that sometime
5  in/or around November of 2011, you were demoted from
6  entertainment manager to floor manager or floor host
7  manager, right?
8    A. Yes, sir.
9    Q. We've already talked about that, that doing
10  so was in favor of Tim St. Onge who was white?
11    A. Yes.
12    Q. Okay. You didn't complain to anyone about
13  that, did you?
14    A. I complained to Josh.
15    Q. Okay. Anyone else?
16    A. No.
17    Q. Okay. You complained to the very person who
18  you think was behind the act and to no one else?
19    A. Right.
20    Q. You testified earlier about how you believe
21  you were paid less money per shift and received a
22  lower percentage of tips than Tim St. Onge?
23    A. Yes.
24    Q. Have you told me everything about that?
25    A. Yes.

Page 236

1    Q. Okay. And do you believe that Josh Stern
2  made it that way because Tim was white and you're not?
3    A. I do, yes.
4    Q. What about Cesar?
5    A. Cesar received the less portion of tipout, as
6  well.
7    Q. And that's because he's not white?
8    A. Yes.
9    Q. All right. How do you know that?
10    A. Because he's Hispanic.
11    Q. How do you know how much he was receiving is
12  my question?
13    A. Because we -- we shared the amounts of our
14  envelopes. Specifically that week, I asked him how
15  much he made.
16    Q. So it was just in that one instance then that
17  he made the same amount that you did?
18    A. The one instance was the first time I found
19  out about it.
20    Q. Well, did you --
21    A. Tim told --
22    Q. -- const --
23    A. -- me that he typically makes that much at
24  that point.
25    Q. What did Cesar say? Did he --

Page 237

1    A. Cesar said that he never gets more than $100
2    per day shift.
3    Q. And did you ever get more than $100 for a day
4    shift?
5    A. Never.
6    Q. What about a night shift?
7    A. Yes, I did.
8    Q. Okay.
9    A. But Tim would receive -- like I said, in
10   that -- in that instance, Tim said he made 190, $200
11   on day shift. And at that point, he said "I always
12   make this; I always make at least 150, $200."
13   Q. Did you ask Josh about that?
14   A. I did.
15   Q. What did Josh say?
16   A. I told him in front of Jennifer Andis in the
17   cage.
18   Q. Uh-huh.
19   A. I said "why is it -- why is it that he's
20   receiving more money in tipout than I am?" And he
21   didn't have anything to say. He had no response. He
22   actually acted as though he was offended that I
23   brought it up.
24        And I asked him what I need to do in
25   order to receive an equal amount of money, how --

Page 238

1    how -- what sort of performance am I lacking in. And
2    he had nothing to say.
3    Q. And you believe that Tim St. Onge was the
4    only one who got paid better than all the other
5    managers?
6    A. Yes.
7    Q. So before Tim St. Onge came to XTC,
8    everything was okay with regard to paying?
9    A. I don't know.
10   Q. When did he come to XTC?
11   A. He came in -- summer of 2011.
12   Q. And when was it that you recognized he was
13   getting paid more than you?
14   A. It was sometime in September of 2011.
15   Q. So shortly after he got there?
16   A. Yes, a few months.
17   Q. Okay. When did Marty Ray Carl get there?
18   A. He was hired in -- sometime in 2009.
19   Q. Now, why is it that it was in the middle of
20   your employment that you claim that your shifts were
21   reduced and given to someone who had been there since
22   2009?
23   A. Because Josh started in 2010.
24   Q. So that was happening around the time that
25   Josh started there?

Page 239

1    A. When Josh started, he made Marty Ray Carl
2    manager on Sundays and Mondays and took me off those
3    shifts.
4    Q. And again, because Marty Ray Carl is white?
5    A. I believe so.
6    Q. Do you have any evidence that that was the
7    reason why the schedule was done the way it was done?
8    A. Just the fact that he was using derogatory
9    names. He had racial -- racially motivated policies
10   in hiring.
11   Q. What were --
12   A. And I just --
13   Q. -- his racially motivated policies in hiring?
14   A. We were not allowed to hire black
15   entertainers. We were not allowed to increase our
16   staff on -- in black floor hosts. And in particular,
17   there was one occasion where Josh came into the
18   kitchen and fired two black waitresses because he said
19   there was too many black waitresses on the staff.
20   Q. Okay. So no hiring black dancers. So are
21   you saying that --
22   A. If a black dancer came to the front door, the
23   door girls are all instructed to tell the dancer to
24   return in two to three weeks and that they're not
25   hiring right now. If in the same afternoon any white

Page 240

1    dancer came to that front door, they were -- they
2    were -- we were required to immediately hire them.
3    Q. Who told you that?
4    A. Josh. And Erin used to do the same thing,
5    but Josh made it explicit.
6    Q. Then who would --
7    A. He said --
8    Q. Who would corroborate this?
9    A. He said his policy -- every door girl will
10   tell you it's true.
11   Q. Okay. Give me the names of door girls.
12   A. Sammy Riley, Angelica Batrez, Beau -- I
13   believe her first name is Renee -- and Amanda --
14   Amanda Norris. Those are the door people I can think
15   of right now.
16   Q. So is it your testimony that there were no
17   African-American dancers hired in the entire time you
18   were there?
19   A. There were African-American dancers hired.
20   Manage -- us managers were not allowed to hire them.
21   The GM was the only one allowed to hire them, and he
22   only allowed a small percentage of our dancers to be
23   African-American.
24   Q. Okay. What was --
25   A. And typically --

Page 241

1    Q. -- his magical percentage?
2    **A. I don't know. It's his formula; but**
3    **typically, what was happened was if we were low on**
4    **entertainer count, he would bring in one or two**
5    **African-American dancers to make up for the loss of**
6    **entertainers.**
7    Q. Did you ever complain to management about
8    this?
9    **A. I hired -- I hired black girls anyway.**
10   Q. Okay. In spite of what he told you to do?
11   **A. Yes.**
12   Q. Did you ever complain to management about
13   Josh Stern's supposed preference or mandate that only
14   white dancers or no African-American dancers be hired?
15   **A. Josh told me that his policy -- yes, I did.**
16   Q. To whom?
17   **A. To Josh.**
18   Q. Okay. Anyone --
19   **A. The policy --**
20   Q. To anyone else?
21   **A. The -- no. The policy --**
22   Q. That's --
23   **A. -- was --**
24   Q. That's okay. That's okay. I got it. You
25   claim that you were given less favorable shifts in

Page 242

1    favor of Marty Ray Carl; is that right?
2    **A. Yes.**
3    Q. What are the favorable shifts?
4    **A. The favorable shifts?**
5    Q. Yeah. Which ones did you want?
6    **A. I wanted to -- I didn't want to be moved**
7    **around. I wanted to keep the shifts that I had.**
8    Q. Okay. Which shifts did you find to be less
9    favorable than the ones that were given to Marty Ray
10   Carl?
11   **A. When I started working there, I was working**
12   **Thursdays through Mondays, Monday nights.**
13   Q. And you liked that?
14   **A. Yes.**
15   Q. Okay. And so when Josh came, what did he
16   give to Marty Ray Carl?
17   **A. When Josh came, he took my Sundays and**
18   **Mondays away and gave them to Marty. And then in**
19   **October, he cut my shifts from five shifts to four**
20   **shifts a week. And he also put me on one day shift a**
21   **week instead of working all evening shifts.**
22   Q. Wait. He gave your Sundays -- so you were
23   working five shifts before Marty Ray Carl got there?
24   **A. Yeah. Well, there were actually seven; but,**
25   **yes, I was working five days.**

Page 243

1    Q. Okay. How many shifts? Seven shifts?
2    **A. Yes.**
3    Q. And you liked that?
4    **A. I did, yes.**
5    Q. Okay. Then he took your Sundays and Mondays
6    away. So were those double shifts?
7    **A. Yes, they were.**
8    Q. So then they went from seven shifts a week to
9    four shifts a week?
10   **A. By October 2011, yes.**
11   Q. Okay. So that's the lesser. But why are
12   those more or less favorable?
13   **A. Because I'm getting paid less when I have**
14   **less shifts instead of --**
15   Q. I understand that. But the Sunday and
16   Monday -- in other words, you then were just working
17   two -- sorry -- Thursday to Saturday, right?
18   **A. I was working --**
19   Q. You said you were working Thursday to Monday.
20   Then Josh gets there --
21   **A. Uh-huh.**
22   Q. -- and he gives your Sundays and Mondays to
23   Marty Ray Carl.
24   **A. Yes.**
25   Q. Isn't that what you said?

Page 244

1    **A. Yes.**
2    Q. So that would leave you with Thursday,
3    Friday, and Saturday?
4    **A. Yes. And I worked Tuesdays and Wednesdays**
5    **instead of Sunday and Mondays.**
6    Q. Okay. Tuesdays and what?
7    **A. And Wednesdays.**
8    Q. Okay. So then you would work from Tuesday to
9    Saturday as opposed to Thursday to Monday?
10   **A. Yes.**
11   Q. Why does that matter?
12   **A. It was a -- just a personal preference. I --**
13   I liked working with the staff that I had in place for
14   Sundays and Mondays. The floor hosts and I were --
15   were somewhat friends.
16   Q. Okay.
17   **A. And the waitresses and I were friends. In**
18   addition, there was additional responsibilities on
19   Sundays and Mondays because absent of the GM, you
20   would basically be responsible for the club sales and
21   entertainer count.
22   Q. Whereas, you weren't responsible for that
23   during the week?
24   **A. You are, but there is -- basically, you are**
25   the head of operations on Sundays and Mondays if the

Page 245

1   GM is absent.
2      Q.  And you wanted that responsibility?
3      A.  I wanted to prove myself to the company so I
4   can get promoted to a GM position.
5      Q.  Well, don't you feel like your being one of
6   the managers in these other shifts helps you prove
7   yourself to the company?
8      A.  Yes.
9      Q.  Okay.  You weren't paid any differently for
10  picking up Tuesday and Wednesday shifts, correct?
11     A.  No, I wasn't.
12     Q.  And by the way, was either one of those a
13  double shift?
14     A.  No.
15     Q.  So how many shifts would that be then when
16  you would work from Tuesdays to Saturdays?
17     A.  Five.
18     Q.  You went from seven shifts to five shifts?
19     A.  Yes.
20     Q.  Well, how many shifts were all the other
21  managers getting?
22     A.  With that change?
23     Q.  Yeah, with that change that took you from
24  seven shifts to five shifts.
25     A.  With -- with that change, Marty was receiving

Page 246

1   seven shifts.  Josh had five.  And Cesar had five.
2      Q.  Do you think Josh wanted more shifts?
3      A.  No, I don't.
4      Q.  Think Cesar wanted more shifts?
5      A.  I think so, yeah.
6      Q.  How many did Cesar have before this change?
7      A.  He had five.
8      Q.  So he -- his shifts were unchanged?
9      A.  Right.
10     Q.  So all he did was equalize you with someone
11  who already had five shifts?
12     A.  Okay.
13     Q.  Would you agree with that?
14     A.  Sure.
15     Q.  It just happened to be the Hispanic and not
16  the white guy who got seven shifts now?
17     A.  Well, the difference was really is that Marty
18  had more responsibility.  With that change, Marty
19  became the person that was responsible for the club on
20  Sundays and Mondays with the GM being absent.  So
21  basically, Josh and Marty were always there one time
22  or another.
23     Q.  While you were there?
24     A.  No, the point is that Josh and Marty were
25  always there.

Page 247

1      Q.  Okay.  I thought you testified earlier that
2   Josh would often leave and leave you in charge of the
3   club.  Did I mishear that?
4      A.  I -- I -- I think you did, yeah.  It was --
5      Q.  Okay.
6      A.  -- basically -- what --
7      Q.  When Josh would --
8      A.  What I was --
9      Q.  -- leave, who would be in charge of the club?
10     A.  What I was saying was after hours, Josh would
11  leave.  Back when the club closed at 5:00, Josh would
12  leave at 5:00.
13     Q.  Oh, okay.  So Josh wouldn't leave during a
14  shift then and leave you in charge?
15     A.  He -- sometimes he left a little early, like
16  4:30-ish, 4:00.
17     Q.  Okay.  Would he leave you in charge?
18     A.  He left -- he left us in charge, yeah.
19     Q.  "Us" or you?
20     A.  The managers, whoever the managers were.
21     Q.  Sometimes you were the on-duty manager --
22     A.  Yes.
23     Q.  -- when Josh left, right?
24     A.  Yes.
25     Q.  Isn't that an opportunity for you to have

Page 248

1   proven yourself, everything you said you wanted to do
2   on a Monday or Sunday?
3      A.  No.
4      Q.  Different scenario?
5      A.  Yes.
6      Q.  Because it's not a Monday or a Sunday?
7      A.  Because you're not responsible for the entire
8   shift.  You're not -- you're not the one that's
9   promoting that shift; whereas, when you're working
10  just one hour at the end of the shift, all you're
11  doing is closing out the shift.
12         On a Sunday and Monday, you can have
13  some control as to the outcome of the sales, outcome
14  of how much the kitchen puts out, the entertainer
15  count.
16     Q.  Okay.
17     A.  That's why I take pride in the fact that when
18  I was put on Sundays in -- in October of 2011 that I
19  raised the entertainer count from 30 to 50 in four
20  weeks.
21     Q.  Okay.  So you were put back on Sundays, then?
22     A.  I was put back on Sundays with Cesar in
23  October of 2011 in order to reduce the incidents
24  because he said there was a lot of conflict and
25  incidents in the club on those days and he asked me to

Page 249

1    increase the entertainer count.

2    Q.  Okay.  So you were taken off Sundays when?

3    A.  I was taken off Sundays in May of 2010.

4    Q.  And you were put back on Sundays in October

5    2011?

6    A.  Right.

7    Q.  What about Mondays?

8    A.  No.

9    Q.  So do you believe that Josh Stern disciplined

10    you or was angry with you or for your hiring

11    African-American dancers?

12    A.  He told me that I needed to stop hiring

13    African-American dancers, especially after I hired

14    this one dancer who was of mixed origin named Ocean

15    from Clubhouse.

16    Q.  What did he say?

17    A.  He said "who hired this girl?"  I said I -- I

18    had hired her.  And he said "she's black."  And I

19    said, "well, she's -- she's a very pretty girl.  And

20    she has a great attitude, and I've heard nothing but

21    good things about her from Clubhouse staff and the

22    girls that work at Clubhouse including Rayne."  And he

23    was very unhappy about it.

24    Q.  Because she was black?

25    A.  That's what he said, yes.

Page 250

1    Q.  He said "I'm happy -- I'm" --

2    A.  He said that --

3    Q.  -- "unhappy?

4    A.  -- his -- he said that he wanted to create a

5    whiter club.  And he attempted by -- to do that by

6    hiring more white dancers and more white floor hosts

7    and waitresses.

8    Q.  Was there a particular incident that you

9    believe caused Mr. Stern to transfer you from

10    entertainment manager to floor host manager?

11    A.  Yes.  I believe it was in retaliation for

12    complaining about being paid less than Tim St. Onge.

13    Q.  Okay.

14    A.  I believe that that happened -- that that --

15    my complaint to Josh affected my shifts being cut from

16    five to four.  And subsequently, it affected my

17    transfer to floor host manager.

18    Q.  Okay.  So you didn't think it had anything to

19    do with your hiring Ocean or any other

20    African-American employee?

21    A.  No, I think it was in response to my

22    complaint.

23    Q.  When was the first time you recall Josh Stern

24    threatening you, supposedly, for the idea of your

25    reporting any of these things?

Page 251

1    A.  Well, he made it clear that we were not

2    allowed to do it from the beginning of his time there.

3    Q.  Okay.  So when he started, he specifically

4    told you "don't be going and complaining about --

5    about me above me"?

6    A.  Well, it was -- it was when Christine

7    Goodgion made the complaint to Ed.  That was when he

8    became extremely -- he became very vocal about the

9    fact that he was very upset that she went around him,

10    that he's not going to have it, that if anybody does

11    that kind of thing, that he's going to put his own

12    team in place and get rid of them.

13    There was a manager there named Rob who

14    was using drugs openly, and everybody wanted him gone.

15    And he insisted on keeping him there.  Even -- even

16    those there was complaints made to corporate about

17    him, he insisted on keeping him there because he said

18    that he was going to keep control of the club and not

19    allow any -- anybody's decisions or anybody's actions

20    to affect his control.

21    Q.  This letter that Christine wrote -- to whom?

22    Ed?

23    A.  Uh-huh.

24    Q.  Did you ever see it?

25    A.  I may have.  I don't remember.

Page 252

1    Q.  What did it say?

2    A.  I don't recall.

3    Q.  It wasn't favorable?

4    A.  It was about -- it was about some hardships

5    she was having with -- with a coworker at the club.  I

6    believe it was either about Rob or Amy Conine, one of

7    the two.  I think it was about Amy.

8    Q.  What did Amy do?

9    A.  Amy was a cage girl.  She was also a house

10    mom.

11    Q.  Do you specifically recall Josh Stern saying

12    you may not contact human resources or corporate

13    officials outside of the club?

14    A.  Yes.  He said that we don't have a human

15    resources department.  And then he also said that I am

16    forbidden from contacting anyone outside of the club,

17    especially Ed or Wayne, because it would affect his

18    control of the club.

19    Q.  And did you tell him what you intended to

20    contact corporate officials about?

21    A.  Yes.  I had already made the complaint at

22    that point.

23    Q.  Which complaint?

24    A.  I had complained to him about the instance at

25    the regional meeting for Rick's and Cabaret North

Page 253

1  where I was called nigger over and over again by the
2  entertainer.
3          And I told him that I felt like it
4  was -- it was an offensive encounter for me and I
5  wanted him to -- to intercede on my behalf and to not
6  allow that type of behavior and I was offended that
7  they were all laughing and -- and the -- the male
8  voice called me a nigger when I was leaving. And that
9  was -- that was the point that he told me that I have
10 to call Cabaret North manager and apologize.
11     Q. Have you told me about each and every
12 instance in which you believe you were subjected to
13 discrimination based on your race, your national
14 origin, or your religion while you were employed at
15 XTC Cabaret Dallas?
16     A. No, I have not told you every instance. It
17 was ongoing and continuous. It wasn't just racial.
18 It was -- it was religiously-based. It started from
19 the day that I walked in the door, and it continued
20 until the day that I left.
21     Q. Sounds like a horrible place to work.
22     A. It wasn't fun.
23     Q. How on earth could you have enjoyed working
24 at such a place for a long period of time?
25     A. I -- I think I already told you that I was

Page 254

1  happy with some parts and I was dissatisfied with
2  other parts. The fact that I was treated this way was
3  the main reason for my unhappiness at XTC.
4      Q. Prior to that, you actually testified that
5  you loved your job. Now are you changing your
6  testimony to you didn't love your job?
7      A. I think what I said was that I enjoyed parts
8  of it and I did not enjoy other parts.
9      Q. Prior to that, you actually said you loved
10 your job. Did you love your job? Let's just get it
11 on the record now.
12     A. I enjoyed parts, and I didn't enjoy other
13 parts.
14     Q. You were discriminated against from the day
15 you walked in?
16     A. Yes.
17     Q. And yet, you're here testifying that there
18 were some parts of your job that you actually liked;
19 is that right?
20     A. Being -- being called names that are racially
21 derogatory and religiously derogatory is --
22     Q. Horrible.
23     A. -- is not -- well --
24     Q. Isn't it?
25     A. Well, you couldn't understand because --

Page 255

1      Q. I -- I could not?
2      A. I have been going through this my whole life,
3  since I was little. My -- my parents changed my name.
4  They got rid of my name, Puya out of my name, because
5  of this sort of thing that has been going on with me
6  since I was a kid.
7      Q. So you would be especially sensitive to
8  walking into a place and being called names, racial
9  epithets. Would you agree with that?
10     A. Yes.
11     Q. You would not want to work at a place that
12 treated you so unprofessionally and cruelly. Would
13 you agree with that?
14     A. I -- I would want changes to be made.
15     Q. How --
16     A. I would --
17     Q. -- on earth --
18     A. I would want --
19     Q. -- would a man --
20     A. -- changes to be made.
21     Q. -- who had already been subjected to these
22 type of racial epithets, to racial slurs, to --
23         MR. CHANDER: Objection.
24     Q. (BY MR. HURST) -- animosity --
25         MR. CHANDER: Argumentative.

Page 256

1          MR. HURST: Hold on. Let me get to the
2  question, and you can make your objection for the
3  record.
4      Q. (BY MR. HURST) How on earth would a man who
5  has already been subjected to such cruelty, racial
6  epithets, slurs, religious unacceptance, all of that,
7  be okay with a place going to work where you were
8  subjected to it the very day you walked in? How would
9  that be okay?
10     A. It wasn't okay. It was horrible.
11     Q. You're glad you're not there anymore. Would
12 you agree with that?
13     A. No, I'm not.
14     Q. You would actually want to be there?
15     A. No, I'm not happy that I was terminated
16 because I worked hard and --
17     Q. But you --
18     A. -- because I did everything to improve the
19 business of that place.
20     Q. But you --
21     A. And I was --
22     Q. -- would --
23     A. -- never -- and I was never, ever accorded
24 any respect for what I did there.
25     Q. Fair enough.

Page 257

1    **A. In the end --**
2    Q. You don't --
3    **A. In the --**
4    Q. You don't --
5    **A. -- end, they brought people over to**
6    **intimidate me and threaten me because I complained**
7    **about the discrimination that I faced in the re -- in**
8    **the --**
9    Q. But --
10   **A. -- regional meeting.**
11   Q. -- you hated --
12   **A. And -- and --**
13   Q. -- being there, though, didn't you, Mr. --
14   **A. I didn't --**
15   Q. -- Badii?
16   **A. I did not hate being there.**
17          MR. CHANDER: Objection.
18   **A. I hired --**
19          MR. CHANDER: Form.
20   **A. -- most of the --**
21          COURT REPORTER: I'm sorry.
22   **A. -- people that worked there. Okay? I hired**
23   **most of the people that worked there. Camaraderie**
24   **goes a long way. When you're working with people that**
25   **you like, it goes a long way. Unfortunately, I had**

Page 258

1    **managers that were discriminatory. And they treated**
2    **me as such.**
3    Q. (BY MR. HURST) What jobs did you interview
4    for, did you even apply for while you were working at
5    XTC Cabaret?
6    **A. I applied for a couple of jobs.**
7    Q. Yes. Which ones?
8    **A. I applied for a job in Las Vegas.**
9    Q. Okay. Which job?
10   **A. At The Marquis.**
11   Q. What else?
12   **A. That's all I remember right now.**
13   Q. That's the only job you remember applying for
14   during your entire time at XTC Cabaret?
15   **A. Yes.**
16   Q. You wanted to explore other opportunities
17   while you were there, right?
18   **A. I wanted -- I wanted things to change. I**
19   **wanted there to be some hope for change. I didn't**
20   **want to continuously go through that sort of**
21   **treatment. So I did look -- I did try to find a job**
22   **outside of the club when -- in Las Vegas simply**
23   **because I was unhappy with my situation.**
24   Q. Anybody would be unhappy with the situation
25   that you are alleging occurred to you from day one.

Page 259

1    Would you agree with that?
2    **A. I should have tried harder.**
3          MR. HURST: Objection. Nonresponsive.
4    Q. (BY MR. HURST) Would you agree that any
5    reasonable person would be unhappy in an environment
6    that you have described and that you allege occurred
7    to you at XTC Cabaret?
8    **A. Yes.**
9    Q. Yet, you tried to stick it out; is that
10   right?
11   **A. Yes.**
12   Q. And now this is a job that you are asking the
13   jury to believe that you still want to be at; is that
14   right?
15   **A. Yes, I do.**
16   Q. You want to go back there?
17   **A. Yeah, I do.**
18   Q. Have you identified each situation in which
19   you believe you were subjected to discrimination based
20   on race, religion, or national origin?
21   **A. I wasn't allowed to finish the -- describing**
22   **the incident with John Henry. I could talk about**
23   **that.**
24   Q. The incident with John Henry has been
25   discussed as to what happened that particular day.

Page 260

1    **A. Okay. And we discussed the -- what happened**
2    **at Cabaret North.**
3    Q. We discussed what happened at Cabaret North.
4    What I'm asking you is, is there any incident that you
5    believe you were subjected to discrimination based on
6    your race, your religion, your national origin, the
7    very things you're alleging in this case that we have
8    not discussed today?
9    **A. It occurred throughout the entire time that I**
10   **was working there.**
11   Q. Okay.
12   **A. It was not a specific incident. There are**
13   **incidents that stand out.**
14   Q. But you understand that this is the only time
15   I'm going to get to visit with you before we file our
16   motion for summary judgment and, if this case goes to
17   trial, before this case goes to trial. You understand
18   that, right?
19   **A. I do.**
20   Q. What you're not allowed to do -- and I think
21   your attorney would agree with me -- is testify to
22   things different than what we talked about or
23   differently than you testified here at this
24   deposition.
25          So I'm doing the best I can to make sure

Page 261

1   that I am getting your entire deposition today subject
2   to something that I'm not able to talk about, which is
3   your tax returns.
4       A. Okay.
5       Q. You understand what my job is?
6       A. Yes.
7       Q. As we sit here today, have you told me about
8   each instance in which you believe you were subjected
9   to discrimination based on your race, religion, or
10  national origin while you were employed at XTC Cabaret
11  Dallas?
12      A. Yes.
13      Q. You're alleging that you were terminated from
14  XTC Cabaret Dallas, correct?
15      A. Yes.
16      Q. Are you aware that XTC Cabaret Dallas says
17  that you voluntarily resigned from your employment?
18      A. No, I'm not.
19      Q. You're claiming in this lawsuit that the only
20  reason why you were terminated is because you found
21  out what was going on at the door with regard to
22  minors and you made -- or took action to stop it?
23      A. Yes.
24      Q. And that's the only reason why you believe
25  you were terminated?

Page 262

1       A. Yes.
2       Q. Have you spoken to employees or former
3   employees of XTC Cabaret Dallas or Rick's Cabaret
4   International relating to the subject matter of this
5   lawsuit?
6       A. No.
7       Q. What employees or former employees of XTC
8   Cabaret or Rick's Cabaret International do you believe
9   would support any allegation that you're making in
10  this lawsuit?
11      A. I think a variety of them would.
12      Q. I just want you to identify who you believe
13  would support any of your allegations.
14      A. In terms of Daniel, Daniel himself, Cesar
15  Corolla was present. And I immediately reported it to
16  Josh Stern. Robert Bonilla was also aware.
17          In regards to discrimination, we can
18  start with John Henry himself, Robert Bonilla who
19  brought John Henry over after I complained about
20  discrimination, the managers, the GM's, and regional
21  managers that were present at Cabaret North during the
22  meeting when I was referred to as a nigger over and
23  over again.
24      Q. Just go with the names.
25      A. I don't know all their names. It was several

Page 263

1   people. Tim was there. Josh was there. Wayne Fenlon
2   was there. The GM of XTC San Antonio was there. And
3   the GM of Rick's in Houston was there.
4       Q. Anyone else who thinks would support your
5   allegations in this lawsuit -- any of them?
6       A. As far as the door people testifying to what
7   I say regarding the discriminatory hiring practices, I
8   think they would all -- if they're honest, they would
9   all tell you what the policy was.
10          I think there are managers such as
11  Cesar -- Marty has passed away -- but other managers
12  such as Debo that would be willing to talk about it.
13  And as far as the discrimination that I faced, I think
14  a variety of floor hosts but mostly the managers would
15  be able to attest to it.
16      Q. Anyone else you can think of?
17      A. Jennifer Andis was in the cage when I
18  confronted Josh about being paid less. She can
19  support that.
20      Q. Anyone else?
21      A. I already mentioned Cesar. Cesar was there
22  when Josh said to me that "only a white entertainment
23  manager can do that job; isn't that right, Ryan?" He
24  was also -- he was also there when Josh referred to me
25  as -- and -- and customers as a spick, beaner, Italian

Page 264

1   mafia, Arab, Muslim, terrorist.
2       Q. Okay. I want you to remember the question I
3   asked you.
4       A. You said who can attest to my allegations.
5       Q. Yes. I'm not asking you to repeat your
6   allegations.
7       A. Well, there -- there's some -- there's
8   various allegations. I just wanted to be clear.
9   That's all.
10      Q. I'm just asking you to identify people.
11  Anyone else?
12      A. No.
13      Q. With whom other than your attorney have you
14  spoken about this lawsuit or your allegations in this
15  lawsuit?
16      A. I called a few people and asked them if
17  they'd be willing to come in and -- and give
18  statements.
19      Q. Okay. Who did you call?
20      A. I contacted Raff, who was an Iraqi who was a
21  floor host. I contacted Chuy. I contacted Breon. I
22  contacted Nawar.
23      Q. Who?
24      A. Nawar, N-a-w-a-r. These are all people that
25  I believed had information relative to the case.

Page 265

1    Q. Okay. Did they -- how did Raff respond?
2    A. Raff said that he was willing to come in
3    and -- and give a statement.
4    Q. Has he given a statement?
5    A. No, not yet.
6    Q. How about Chuy?
7    A. No, Chuy -- Chuy was nonresponsive.
8    Q. How about Breon?
9    A. Breon said he's willing to give a statement.
10   Q. Has he given one yet?
11   A. No.
12   Q. How about Nawar?
13   A. I wasn't able to get ahold of Nawar.
14   Q. You haven't spoken with him?
15   A. No. And also Agence.
16   Q. I'm sorry?
17   A. Agence Smith.
18   Q. Agent (phonetic)?
19   A. Yes.
20   Q. What's the -- Agent?
21   A. A -- Agence with a c-e at the end.
22   Q. Agence Smith. Who is that?
23   A. He was a manager that worked at XTC.
24   Q. And what did he say?
25   A. He said he was happy to come down and -- and

Page 266

1    tell his story.
2    Q. I take it he's not at XTC anymore?
3    A. No, he's not.
4    Q. Was he terminated?
5    A. I believe so.
6    Q. Is Breon at XTC anymore?
7    A. I don't know.
8    Q. What about Raff?
9    A. I don't know. I don't think so, but I don't
10   know.
11   Q. Do you have a contract with Vishal Chander
12   for your representation in this case?
13   A. Yes.
14   Q. Is it a contingent fee contract?
15   A. Yes, with a retainer.
16   Q. Have we talked about all your earnings since
17   your separation from XTC Cabaret Dallas?
18   A. I think we talked about the unemployment I
19   received, as well, so, yes.
20   Q. Are you making a claim for mental anguish in
21   this lawsuit?
22   A. I -- I went through a very long period of
23   depression after this happened. I --
24   Q. Were you diagnosed with depression?
25   A. No. I -- I just began abusing -- I began

Page 267

1    drinking a lot of alcohol.
2    Q. When did you begin drinking a lot of alcohol?
3    A. I was in -- it was in March after my
4    termination.
5    Q. Okay. How much alcohol?
6    A. Several times a week.
7    Q. What does that mean, "several times a week"?
8    Once -- one or two beers several times a week?
9    A. No. I drank -- I drank to the point of
10   intoxication.
11   Q. And before, how much were you drinking?
12   A. Not very much. I was drinking several times
13   a week, maybe four or five times a week. I was -- I
14   was very depressed.
15   Q. How much were you drinking?
16   A. I don't know -- a lot.
17   Q. What does it take to get you intoxicated?
18   A. I -- I -- I drank a lot. I don't know
19   exactly how much I was drinking. I -- I -- I just
20   know that I had just signed a new lease in a new
21   apartment.
22       In January, I had -- I had been told I
23   was going to be made assistant GM. I was expecting to
24   be given that promotion. My apartment rent that I had
25   signed was a few hundred dollars more than my old

Page 268

1    apartment. So it was a -- I was taken by shock.
2        And because I wasn't able to find work
3    and at the same time just because of everything that
4    had happened, I -- I felt like it was so unfair, that
5    I just -- just -- I just went through a hard time.
6    Q. And you coped with that by drinking a lot?
7    A. By running a lot, too. I know it doesn't
8    sound like they're --
9    Q. They're on separate sides of the spectrum.
10   A. I know. I just -- I would get up early in
11   the morning and run several miles. And then I
12   would -- I would go home at night, and I would just
13   drink. In the -- in -- in the middle, I would maybe
14   look for work or try to -- try to deal with it the
15   best I could, I guess.
16   Q. Would the running help you?
17   A. It did, yeah.
18   Q. So when did you start feeling better about
19   everything?
20   A. When I started finally making some income by
21   opening the book.
22   Q. When was that?
23   A. It was February of this year.
24   Q. Did you see any counseling, therapists,
25   medical care provider?

Page 269

1    A. No.
2    Q. Did you want to?
3    A. I don't know.
4    Q. You could have if you wanted to, right?
5    A. I -- maybe.
6    Q. You didn't look into it?
7    A. I didn't have any money. I mean the money I
8    had was earmarked. I was worried. I didn't know how
9    I was going to make a living.
10   Q. I thought you testified earlier that you had
11   a lot of money because you saved it.
12   A. Yeah, but I didn't have a job. And look how
13   long that lasted.
14   Q. You feel like going to therapy just would
15   have been a waste of time?
16   A. No, it may I have helped. I guess we'll
17   never know.
18       COURT REPORTER: I'm sorry.
19       THE WITNESS: I said "I guess we'll
20   never know."
21   Q. (BY MR. HURST) Were you taking any
22   medication? Assuming we're not characterizing the
23   booze as medication, were you taking any medication as
24   a result of how you were feeling after you --
25   A. No, I was --

Page 270

1    Q. -- separated?
2    A. I'm pretty even-tempered most of the time.
3    Q. What has that got to do with it?
4    A. I -- I don't have any -- I'm not under any
5    medications. I don't --
6    Q. You --
7    A. I don't -- I don't -- I'm not psycho -- I
8    don't have any imbalances or anything. I think I'm
9    just -- I'm pretty even-keeled, so I don't have a need
10   for any medication.
11   Q. What medical care providers have you seen in
12   the last, say, five years?
13       THE WITNESS: Can we take a -- a short
14   break?
15       MR. HURST: You bet.
16       THE WITNESS: Thanks.
17       VIDEOGRAPHER: We're off record. Time
18   is 3:55.
19       (Recess.)
20       VIDEOGRAPHER: We're back on record.
21   Time is 3:58.
22   Q. (BY MR. HURST) What medical care providers
23   have you seen in the last five years?
24   A. I -- I went to Baylor Hospital.
25   Q. The emergency room?

Page 271

1    A. Yes.
2    Q. For what?
3    A. I had a broken -- or I had sprained my toe at
4    work breaking up a fight. And I went to Baylor
5    just -- I thought it was broken.
6    Q. When was this?
7    A. I don't recall.
8    Q. Okay. Any other medical care provider? Do
9    you go to a primary care physician or a --
10   A. Not typically, no. I --
11   Q. Have you in the last five years?
12   A. I typically go to Baylor if I need to. I --
13   I also on one occasion was bit by a spider, and I
14   couldn't walk for maybe a week or so.
15   Q. Did you go to Baylor?
16   A. I did, yeah. They gave me some crutches
17   and --
18   Q. Do you go to a doctor?
19   A. Not typically, no, unless I -- unless I have
20   an emergency.
21   Q. You don't have a primary care doctor or
22   someone who you go to just for checkups?
23   A. No.
24   Q. So those two trips to Baylor are the only
25   times you've seen a doctor in the last five years?

Page 272

1    A. Yes.
2    Q. The N word that we have both used while
3    quoting other people --
4    A. Uh-huh.
5    Q. -- is an extremely offensive word. Would you
6    agree with that?
7    A. Yes.
8    Q. One that no one should use in public or at
9    all?
10   A. Right.
11   Q. You never used that word while you were
12   talking to anyone or referring to anyone at XTC
13   Cabaret?
14   A. No.
15   Q. You never used that word on any posts,
16   Facebook --
17   A. No.
18   Q. -- or LinkedIn?
19   A. No.
20   Q. You'd agree that would be inappropriate?
21   A. Yes.
22       (Exhibit No. 1 Marked.)
23   Q. (BY MR. HURST) I'm handing you what has been
24   marked as Exhibit No. 1 to your deposition. Is this
25   you? Or is this a printout of your Twitter pages?

Page 273

1    A. Yes.
2    Q. So this is what you were talking about of
3  ryanbahi1.  It actually has an I, then a 1?
4    A. Yes.
5    Q. Why wouldn't you have two I's here?
6    A. I don't know.
7    Q. Let's go to Page 4 of 14.  There's a tweet --
8  my terminology may be off; but is it called a tweet,
9  each one of these entries?
10   A. I think so.
11   Q. There's a tweet about five down on May
12 12th -- or excuse me -- May 22, 2012, that said "real
13 men don't kiss ass and real men don't trade principles
14 or friends for money."
15   A. What page is this?
16   Q. Page 4 of 14.
17   A. Five from the bottom.  Okay.
18   Q. Yes, sir.
19   A. Yes.
20   Q. Did you tweet that?
21   A. Yes.
22   Q. What does that mean?  Or should I say why
23 would you write that?
24   A. Because I believe that -- I -- I guess what I
25 was referring to was that principles -- principles and

Page 274

1  friends are -- are not to be substituted for transient
2  things in this world such as money.
3    Q. Do you recall what it was that led you to
4  this entry?
5    A. No, I don't.
6    Q. You were just kind of imparting some wisdom
7  on your Twitter page?
8    A. I think I just -- I had just opened this
9  Twitter account.  And I -- I don't know -- I don't
10 know what I -- or why I wrote that.  I just -- I guess
11 I didn't know how to tweet or what to tweet.
12   Q. Okay.  Let's go to Page 6 of 14.  In the
13 middle of the page, there's an entry on May 12 --
14 excuse me -- May 16, 2012, where it starts out with
15 "sick," has a bunch of K's.
16   A. Uh-huh.
17   Q. Are you talking about a basketball lineup?
18   A. It's a concert.  Rock the Bells is a concert.
19 And they had a bunch of artists that were going to be
20 there that I -- I -- I guess I liked.
21   Q. I gotcha.  LL Cool J?
22   A. I'm sorry.
23   Q. Is LL Cool J one of them?
24   A. I don't know.  I think he's an actor now.
25   Q. Well, Rock the Bells was his song.  I was

Page 275

1  just trying to --
2    A. Yeah, I --
3    Q. -- put it together --
4    A. -- remember that.
5    Q. -- but --
6    A. I -- yeah, I remember that.  I'm surprised
7  you know that.
8    Q. All right.  Let's go to Page 7 of 14.
9    A. Okay.
10   Q. Three from the bottom, "The Dic" --
11   A. Yes.
12   Q. -- "The Dictator out in three days,
13 khafla" --
14   A. Uh-huh.
15   Q. -- what country are you talking about over
16 there?
17   A. It's a made-up word.  Dictator is a movie
18 with Sacha Baron-Cohen.  Khafla was a thing that he
19 used to say.  He would -- he would put his hand up and
20 say khafla, and it's -- it's a made-up word.  It
21 doesn't mean anything, I don't think.  I'm not sure if
22 it's Arabic or anything, but he -- he -- in that
23 movie, he comes from a made-up country.  And he just
24 pretends to be one of the dictators like Saddam
25 Hussein or Ayatollah Khomeini.

Page 276

1    Q. Got it.  Okay.  The entry below there, what
2  does that say?
3    A. It says -- I don't know what it was in
4  reference to.  It looked like I was responding to
5  someone else.
6    Q. So Jessica Lavigne says "Jew da best," and
7  you responded back with "Jew da best"?
8    A. I -- my -- my father is half Jewish.  And so
9  I don't know what this was in con -- in the context
10 of; but I guess at the time when I saw it, I just
11 re-Tweeted what she said.
12   Q. Okay.  You don't have an inside joke with
13 her?
14   A. I don't even know who that is.  It says
15 re-Tweeted, so I think I just -- what I did was I
16 re-Tweeted what she wrote.
17   Q. What does that mean, re-Tweet?  Send it back
18 to her or --
19   A. It means that you basically send whatever she
20 wrote out to people that are following you.
21   Q. Okay.  Could you see where looking at that
22 may be offensive to a Jew?
23   A. I am a Jew.
24   Q. I didn't ask you that.
25   A. How -- how could I be discriminating against

Page 277

1  myself? I'm a quarter Jew.
2      Q. You don't think that someone Jewish would
3  read that and be offended?
4      A. I -- I -- I don't really think so. I mean --
5      Q. Okay.
6      A. -- it makes -- I mean I don't know what the
7  context was that this happened in, but I mean I don't
8  see how I can discriminate against myself.
9      Q. Well, these are sensitive terms, aren't they?
10     A. What? Just saying the word Jew is sen -- is
11 sensitive? It's not --
12     Q. Well, see --
13     A. -- derogatory.
14     Q. Actually seemingly making a joke out of the
15 word "Jew," which this seems to do.
16     A. I mean that might be your interpretation of
17 it, but there's nothing derogatory in there. It
18 doesn't -- I'm not -- I mean there are offensive words
19 for Jews, and this -- just the word "Jew" is not
20 offensive.
21     Q. Okay. So --
22     A. So --
23     Q. -- you wouldn't --
24     A. As a Jew, I -- I can tell you -- or as a
25 quarter -- being a quarter Jew, the word "Jew" is not

Page 278

1  offensive to me.
2      Q. The context of it could be offensive. Would
3  you agree with that?
4      A. I don't think we know what the context is
5  here.
6      Q. The -- and that makes it better that the
7  person who wrote it can't even say what the context
8  was?
9      A. It was a long time ago. I don't know what
10 the context was. This is -- during this time period,
11 I was drinking a lot. So I don't quite remember all
12 this -- all these tweets; but I mean for the most
13 part, it looks like so far that I -- I just -- I was
14 just trying to make some connection with the community
15 in -- in -- in a time where I -- I had -- I was sort
16 of going through some things.
17     Q. The -- let's go to Page 9 of 14. And the
18 second one from the bottom is a tweet from you, right?
19     A. Yes.
20     Q. And it says "y'all niggers is gay." Did I
21 read that correctly?
22     A. Yes. It's a quote. It's -- it was not
23 something that I was coming up with. It's from
24 Boondocks. It was a quote -- Huey Freeman is a
25 character on that show, and that's what he always

Page 279

1  says.
2      Q. And your point is you certainly didn't mean
3  any harm by putting a quote on there that has that
4  word in it?
5      A. It's just a -- it's just a quote.
6      Q. But can you understand that someone reading
7  this could be and probably would be offended?
8      A. If they understood the context, no. If they
9  understood the fact that it's a quote, if they are
10 familiar with Boondocks, I don't -- I think they would
11 understand exactly where it's coming from.
12     Q. I would think that someone who was actually
13 called that horrible word would be a little more than
14 sensitive to writing it even if you're just quoting
15 some movie or whatever Boondocks is.
16     A. Yeah, it's a TV show.
17     Q. So you had no problem in writing this word
18 even after you and I talked about less than an hour
19 ago how offensive this word is?
20     A. You know, like I said, this is not -- this is
21 not me being derogatory. This is just a quote.
22     Q. So you have no problem with your having
23 posted it?
24     A. I think I -- I -- I think it was in bad taste;
25 but at the same time, I -- it was just a quote. It's

Page 280

1  not something that originated for me. I think the
2  show was on at the time when I made this quote. It
3  was on TV.
4      Q. Let's go to Page 11 of 14.
5      A. Okay.
6      Q. In the middle of the page, an entry from May
7  7, 2012, do you see where you're tweeting about
8  Shakira?
9      A. Uh-huh.
10     Q. And you said you're not qualified to talk
11 about anything except ass-shaking. I read that right?
12     A. Yes.
13     Q. And obviously, you're making reference to a
14 dance that Shakira does?
15     A. I -- I don't recall exactly. It was in
16 response to something she wrote. I don't know what it
17 was.
18     Q. And would you agree, sir, that this tweet
19 could be interpreted as demeaning and pejorative with
20 regard to women?
21     A. I think it depends on what she said in the
22 beginning, but I think part of this was a response to
23 her criticizing Obama. I think that's why I wrote
24 that.
25     Q. Okay. Let's go to the next page. The second

Page 281

1  tweet on the page, you wrote "got money, so fuck the
2  championship team."  What does that mean?
3       A.  It was my -- it was just my way of describing
4  my unhappiness with the fact that they -- I was -- I'm
5  a big Dallas Mavericks fan.  They had sent -- they had
6  divided up the team and sent them different places.
7  So I was just describing how -- that I was upset.
8       Q.  Okay.  Dropping the F bomb there, too, aren't
9  you?
10      A.  Yeah.
11      Q.  Were you that upset, or is that kind of the
12  way you talk?
13      A.  I mean I -- I went to a lot of games, and
14  it's not the way I talk.  I just -- I mean, like I
15  said, at this time, I was just -- I was drinking a
16  lot.  And I -- I made some decisions that I should --
17  that probably are questionable at this time.  I was
18  probably lashing out a little bit.
19      Q.  You say "I've got money."  What's your money?
20      A.  I'm sorry?
21      Q.  You say "I've got money."
22      A.  Oh, I was -- that was a tweet to Mark Cuban.
23  Basically, I was saying that he divided up the
24  championship team.
25      Q.  You're saying that as if this is what he's

Page 282

1  saying?
2       A.  Right.
3       Q.  Let's go to the third tweet down.  And you
4  wrote "the only thing you're a guru of is homosexual
5  positions."  Who were you tweeting there?
6       A.  I -- I don't really recall.
7       Q.  Okay.  Kind of a pejorative cutdown of
8  someone to insinuate that he is a homosexual or gay?
9       A.  Yeah, it's -- it's in bad taste.
10      Q.  Four down, you use the N word again, don't
11  you?
12      A.  Yes.
13      Q.  Now, truly, you can see now at least two
14  instances of a word that you testified to earlier
15  should never be said and you would never say.  How do
16  you reconcile those inconsistencies?  Is it an okay
17  word to say when you're joking around with your
18  buddies?
19      A.  I think when you -- I think that there's no
20  excuse for it; but at the same time, I think when
21  discrimination is -- is coupled with actionable
22  policy, especially in a work environment, I think it
23  has a different impact than in this context.
24      Q.  But you can certain --
25      A.  I'm not making excuses for myself, but I'm

Page 283

1  just saying that when -- when someone is demoted or
2  retaliated against for complaining at work or paid
3  less than their counterparts --
4       Q.  That allows you to say the word?
5       A.  I think it's different than this context.
6  Like I said, I'm not -- I'm not making excuses.
7       Q.  It sounds like you're making excuses for
8  using a horrible term and actually repeatedly using it
9  on a Twitter account that's open to the public.  But
10  you're not making excuses, sir?
11           MR. CHANDER:  Objection.  Argumentative.
12      Q.  (BY MR. HURST)  Answer as best you can.
13      A.  I think I have.
14      Q.  How many people follow you on your Twitter
15  account?
16      A.  I don't -- I don't even use this account.  I
17  have not logged into this account for a long time.
18      Q.  How many people were following you on your
19  Twitter account?
20      A.  Looks like 92 -- or 15.
21      Q.  You filed a charge of discrimination with the
22  EEOC, right?
23      A.  Yes.
24      Q.  And you met with them -- or the investigator,
25  right?

Page 284

1       A.  Yes.
2       Q.  Do you remember if it was a man or a woman?
3       A.  It was a man.
4       Q.  Okay.  Do you remember his name?
5       A.  No.
6       Q.  And the man told you that your charge was
7  going to be dismissed?
8       A.  He -- I had taken some evidence with me
9  including -- including things that I thought were
10  important to the case, but he refused to even look at
11  it.
12      Q.  What did you take with you?
13      A.  I took a -- some documentation where
14  Josh's -- Josh Stern, my GM, was referring to me as a
15  nigger.
16      Q.  Was it an e-mail or a letter?
17      A.  It was in a text message.
18      Q.  Okay.
19      A.  I don't --
20      Q.  And that's a horrible thing to write, isn't
21  it?
22      A.  Yeah, it is, especially to your subordinate
23  at work.
24      Q.  And so why do you think the man didn't want
25  to even look at it?

Page 285

1    A. He didn't really -- he didn't really seem
2  like he was very happy with his job. He even told me
3  that he's not going to work there very much longer and
4  that he was planning on leaving in the next few weeks.
5    Q. He talked to you about how you weren't coming
6  to the EEOC timely?
7    A. No.
8    Q. He didn't mention to you that a lot of the
9  things that you were complaining about happened over
10 300 days --
11   A. No, he did tell me that the 300 day -- he did
12 talk to me about the 300 day rule, though.
13   Q. Did he talk to you about how there was no set
14 pay that you could identify for each of the different
15 managers?
16   A. I don't recall.
17   Q. Okay. So basically, you're saying you think
18 the investigator to which your EEOC charge was
19 assigned mailed it in, right?
20   A. Mailed it in?
21   Q. Yeah.
22   A. I'm not familiar with the term.
23   Q. Didn't really put much into investigating
24 your claims.
25   A. No.

Page 286

1    Q. And you wish he had, right?
2    A. Yes.
3    Q. Do you remember applying to the Vee Lounge?
4    A. No, I don't; but I think I did apply there.
5    Q. What is the Vee Lounge?
6    A. I don't know.
7    Q. Isn't it a gentlemen's establishment?
8    A. I don't know if -- I don't know what it is.
9    Q. In Fort Worth?
10   A. I -- I'm not familiar. I mean I -- I think I
11 included it -- I recall the name. I just don't
12 remember.
13        (Exhibit No. 2 Marked.)
14   Q. (BY MR. HURST) Exhibit No. 2, I will
15 represent to you, is a copy of an e-mail that you sent
16 to Vee Lounge on October 7, 2012. Does this look
17 familiar?
18   A. Yes.
19   Q. And here, you are wanting to go back to --
20   A. This is a restaurant. This is a restaurant
21 and a lounge. It doesn't say it's a gentlemen's club.
22   Q. Okay.
23   A. So I don't think it is a gentlemen's club.
24   Q. Do you know one way or another?
25   A. Pretty certain that if it was a gentlemen's

Page 287

1  club that they would have written that here.
2    Q. They would have written what there?
3    A. In the subject, in the job posting. They're
4  writing specifically that it's a restaurant or a
5  lounge manager is what they're looking for.
6    Q. Fair enough. Do you think it has anything to
7  do with a gentlemen's club or anything to do with
8  Rick's?
9    A. I've never heard of it.
10   Q. Okay. Do you think this was just a posting
11 on Monster or --
12   A. Yes, it was.
13   Q. You -- you remember that, then?
14   A. No, I don't remember it; but I mean I -- I --
15 I found my -- the job postings through Monster and
16 Craigslist.
17        MR. HURST: Okay. Let me have about
18 five, ten minutes to visit with my client, make sure
19 we covered everything. And then I'll pass the
20 witness, but I'm not passing the witness because I'm
21 done with my questioning. I think it's only fair in
22 light of our not getting these tax records that I
23 reserve my questions for when we do get the tax
24 records because I should be afforded an opportunity to
25 ask him about the tax records once I get them.

Page 288

1        MR. CHANDER: We can discuss that.
2        MR. HURST: So let's take a five, ten
3  minute break.
4        VIDEOGRAPHER: We're off record. Time
5  is 4:22.
6        (Discussion off the record.)
7        VIDEOGRAPHER: We're back on record.
8  Time is 4:35.
9        MR. HURST: At this time, I am going to
10 pass the witness with the understanding that I will be
11 able to ask additional deposition questions when I
12 receive the tax returns from Mr. Badii which I've been
13 waiting on for quite some time. And Mr. Chander has
14 been assisting in the process. And together,
15 unfortunately, we've been unable to get the records
16 directly from the IRS. We're still trying.
17        We will resume this deposition if this
18 case does not settle in the next couple of weeks. We
19 have a mediation scheduled for the 23rd. And if and
20 when this deposition does resume, it will commence
21 with Mr. Chander's cross-examination of Mr. Badii and
22 then my asking questions to Mr. Badii, as well, and
23 including the tax records; is that right?
24        MR. CHANDER: Yes. And the -- the scope
25 of examination, at least from my understanding, will

## Page 289

1  be regarding the tax records in any further deposition
2  of my client.
3      MR. HURST: I'm certainly allowed to ask
4  questions that you raise in your cross-examination.
5  Maybe that's what you're saying.
6      MR. CHANDER: Well, you're -- you're
7  certainly entitled to -- to, if -- if the door is
8  opened, respond to those questions.
9      MR. HURST: Thank you.
10     MR. CHANDER: All right.
11     VIDEOGRAPHER: We're off record. Time
12  is --
13     COURT REPORTER: How do you want to do
14  signature?
15     MR. CHANDER: You can -- you can send it
16  to me. I don't know if you have a card.
17     (Deposition concluded.)
18
19
20
21
22
23
24
25

## Page 290

1          CORRECTIONS AND SIGNATURE
2          RYAN J. BADII - SEPTEMBER 12, 2013
3  PAGE/LINE          CHANGE/REASON
4  _____  _____
5  _____  _____
6  _____  _____
7  _____  _____
8  _____  _____
9  _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14
15      _____
16          SIGNATURE OF WITNESS
16  STATE OF TEXAS  )
17  COUNTY OF        )
18
19      SUBSCRIBED AND SWORN TO by the said witness,
20  RYAN J. BADII, on this the _____ day of
21  _____, 20____.
22
23      _____
24          Notary Public in and
24          for the State of Texas.
    My Commission expires: _____
25

## Page 291

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2              DALLAS DIVISION
3  RYAN BADII         *
       PLAINTIFF,     *
4                     *
   VS.               * NO. 3:12-CV-04541
5                     *
   RICK'S CABARET     *
6  INTERNATIONAL INC., XTC  *
   CABARET (DALLAS), INC.,  *
7  XTC CABARET, INC., AND    *
   XTC CABARET        *
8      DEFENDANTS.    *
9          REPORTER'S CERTIFICATION
10     ORAL AND VIDEOTAPED DEPOSITION OF
11              RYAN J. BADII
12          SEPTEMBER 12, 2013
13
14  I, KATHY BRADFORD, Certified Shorthand Reporter in and
    for the State of Texas, hereby certify to the
15  following:
    That the witness, RYAN J. BADII, was duly sworn by the
16  officer and that the transcript of the oral deposition
17  is a true record of the testimony given by the
    witness;
18
    That the deposition transcript was submitted to the
19  witness or to the attorney for the witness for
    examination and signature;
20
    That the time used by the parties is as follows:
21
       Mr. Monte K. Hurst - 05:39
22
    That a copy of this certificate was served on all
23  parties and/or the witness shown herein on
    _____.
24
    I further certify that pursuant to FRCP Rule 30(e)(1)
25  that the signature of the deponent:

## Page 292

1  _____ was requested by the deponent or a party
   before the completion of the deposition and that the
2  signature is to be before any notary public and
   returned within 30 days from the date of receipt of
3  the transcript. If returned, the attached Changes and
   Signature page contains any changes and the reasons
4  therefor.
   _____ was not requested by the deponent or a party
5  before the completion of the deposition.
6
   I further certify that I am neither attorney or
7  counsel for nor related to or employed by any of the
   parties to the action in which this deposition is
8  taken, and further that I am not a relative or
   employee of any attorney or counsel employed by the
9  parties hereto or financially interested in the
   action.
10
   Certified to by me this 16th day of September, 2013.
11
12      _____
        KATHY BRADFORD,
13      Certified Shorthand Reporter
        in and for the State of Texas.
14      Certification Number: 3082
        Date of Expiration: 12-31-2014
15      Firm Registration Number 38
        Bradford Court Reporting, L.L.C.
16      7015 Mumford
        Dallas, Texas 75252
17      Phone: (972) 931-2799
        Fax: (972) 931-1199
18
19
20
21
22
23
24
25

Home        Connect        Discover        Me

**Tweets**

Following

Followers

Favorites

Lists

**Tweet to Ryan Badi**

@RyanBadi1



| 163 | 92 | 15 | |
|-----|-----|-----|-----|
| TWEETS | FOLLOWING | FOLLOWERS | **Follow** |

Photos and videos

  



**Tweets**

 **Ryan Badi** @RyanBadi1                                    2 Jul 12
@nbcagt since America's got talent is all about judging... Bare
with me judging back 1 million over 40 Years is 25k/yr. Stop the
bullshitNBC
Expand

 **Ryan Badi** @RyanBadi1                                    8 Jun 12
@MikeTyson @thejoanhammer It's good to see your elevated
mind state you can do a lot of good with your rep coupled with your
new charity!
View conversation

 **Ryan Badi** @RyanBadi1                                    6 Jun 12
@NBA congratulations king stern you fixed the lottery, you
fixed the playoffs, you fixed the NBA so we won't watch ANYMORE
#CORRUPTION
View conversation

 **Ryan Badi** @RyanBadi1                                    6 Jun 12
@NBASTORE @okcthunder you won't sell a stitch of gear
outside Oklahoma
View conversation

 **Ryan Badi** @RyanBadi1                                    6 Jun 12
@spurs @NBA what's the pricetag on buying the officiating on
an NBA game? #FIXED
View conversation

 **Ryan Badi** @RyanBadi1                                    2 Jun 12
Misconduct scandal prompts L.A. schools to send 604 teacher
discipline cases to state cnn.com/2012/05/31/us/.   #cnn
View summary

 **Dallas Report** @DallasReport                                    2 Jun 12
Dallas stabbing suspect crashes in Fort Worth  sns mx/kkhWy8
Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                    2 Jun 12

Who to follow  Refresh  View all

 **SUBWAY Restaurants**      @SU...
                 **Follow**     Promoted

 **Cassi Colvin** @REALCassiColvin
                 **Follow**

 **Seth MacFarlane**      @SethMac...
                 **Follow**

Popular accounts  Find friends

**Trends**  Change

#TCAs13
#DoctorWho
#5SOSFOLLOWSPREE
#boobsnturtles
#ThingsPeopleDoThatPissMeOff
Anthony Weiner
TLC
Nicki Minaj
Michelle Williams
Spain

© 2013 Twitter  About  Help  Terms  Privacy
Blog  Status  Apps  Resources  Jobs
Advertisers  Businesses  Media  Developers


EXHIBIT NO. 1
K. Bradford                                    APP 1217

Home        Connect        Discover        Me

Funniest Scene from The Fresh Prince of Bel-Air (Featuring D.L.
Hughley) youtube com/watch?v=BxdUf_    via @youtube
Expand

**Ryan Badi** @RyanBadi1                                               1 Jun 12
Dogs are family pic twitter com/ln57OVi2
View photo

**Ryan Badi** @RyanBadi1                                               1 Jun 12
@RyanBadi1 @SINow @NBA I would love to see a good
article about the benefits of turning NBA Commissioner position into a
3 person committee!
View conversation

**Ryan Badi** @RyanBadi1                                               31 May 12
RT The Point Forward » Posts An NBA draft lottery
conspiracy? « nba-point-forward si com/2012/05/1/an-    via @SINow
Expand

**NBA** @NBA                                                          31 May 12
In the loss, Tim Duncan passed Kareem Abdul-Jabbar for the
most career blocks in NBA playoff history. on.nba com/JVE7Zn
    Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                               31 May 12
bbc co uk/news/world-us-    NY to regulate sales of drink
sizes with too much sugar over obesity/health concerns
Expand

**Ryan Badi** @RyanBadi1                                               30 May 12
@NBA This big dunk by Haslem was only made possible
because the referees did not call the foul on Rondo and he was on the
floor. #NotEarned
View conversation

**Ryan Badi** @RyanBadi1                                               30 May 12
@NBA The officiating in this game is beyond bad. When the
referees decide the outcome of games, the excitement of the NBA is
diminished.
Expand

**Ryan Badi** @RyanBadi1                                               30 May 12
@GetSocialAdept @MrStevenGeorge I totally agree
#BahaiFaith
View conversation

**Steven George** @MrStevenGeorge                                     29 May 12
According to FBI statistics; From the 800,000 children, 99%
are found. That still leaves 8,000-10,000 missing each year. ..still
frightening.
    Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                               29 May 12
Where's the physicality? It's a big boy game! # In Pop We
Trust
Expand

**Ryan Badi** @RyanBadi1                                               29 May 12
@NBA @spurs how can the refs and allow this kind of
fouling strategy? David Stern, you have lost all credibility,begone
#FairnessForGodPower
Expand



Case 3:12-cv-04541-B   Document 37-3   Filed 11/15/13   Page 80 of 94   PageID 416

Home     Connect     Discover     Me

**Ryan Badi** @RyanBadi1                                    29 May 12
@NBA Spurs' teamwork is reminiscent of the Lakers with
Magic in the 90s
Expand

**Darius Johnson-Odom** @KingMe_DJ1                         29 May 12
I thought Parker was older than Westbrook....doesn't look like
it!??
   Retweeted by Ryan Badi
Expand

**Darius Johnson-Odom** @KingMe_DJ1                         29 May 12
Spurs ball movement is incredible. Thunder are playing too
much one-one. That will not do it this series.
   Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                    29 May 12
@spurs @NBA Ginobli Facilitating This Win Using
Playervision tm
Expand

**Ryan Badi** @RyanBadi1                                    29 May 12
@NBA ginoboli playing like THIS equals SWEEPSWEEK
#championship in the bag
Expand

**Ryan Badi** @RyanBadi1                                    29 May 12
@NBA 2years, 2teams, 2champions, 1state #Texasbaby
Expand

**Ryan Badi** @RyanBadi1                                    27 May 12
@NBA @spurs Feeling great thank you Spurs for killing it
#TheDependables
Expand

**Ryan Badi** @RyanBadi1                                    26 May 12
Our inner strength and purity is directly proportional to our
ability to love others without any reservations or conditions
Expand

**Ryan Badi** @RyanBadi1                                    26 May 12
Defend the defenseless. There is no greater honor, no
greater task, and nothing more deserving of the blessings of the
Almighty.
Expand

**Ryan Badi** @RyanBadi1                                    26 May 12
Fairness in all things #ForGodPower
Expand

**Ryan Badi** @RyanBadi1                                    24 May 12
Make money, don't let money make you. #Priority of family &
health
Expand

**Ryan Badi** @RyanBadi1                                    24 May 12
If Grangers ankle keeps him from playing tonight, Miami will
win the 8p game tonight on ESPN. I'm predicting a Heat-Spurs Finals
& SPURS WIN
Expand



Case 3:12-cv-04541-B   Document 37-3   Filed 11/15/13   Page 81 of 94   PageID 417

Home        Connect        Discover        Me



**AFANLV** @AFANLV                                    24 May 12
About 21% of those infected with HIV/AIDS in the US are
unaware of their infection. Be sure to protect yourself and practice
#SafeSex
  Retweeted by Ryan Badi
Expand



**Cedric Ceballos** @cedceballos                     23 May 12
Warriors Moving to San Francisco bit.ly/LDLqKi  via
@LockerSmash
  Retweeted by Ryan Badi
Expand



**RainnWilson** @rainnwilson                         23 May 12
A lovely, crazy video on the Baha'i Lotus Temple in India:
ow.ly/b5yDf
  Retweeted by Ryan Badi
View media



**Mindy Casting** @Minz15                            22 May 12
ENTREPRENEURS who r coming to the LA Call 4
#SharkTank-MAKE SURE you have a COMPLETED Application with
you. @SharkTankABC please RT
  Retweeted by Ryan Badi
Expand



**Ryan Badi** @RyanBadi1                              22 May 12
@undecided Kobe was +50% FGP game 5 everybody was
under 50% with 11 would be assists blown by his teammates. Real
competitors #Dowork
  View conversation



**Ryan Badi** @RyanBadi1                              22 May 12
@undecided Kobe also had one more point then minutes at
42 points.  Kobe bashing makes you look bad, not Kobe.
#Professionalism
  View conversation



**Ryan Badi** @RyanBadi1                              22 May 12
Real men don't kiss ass and real men don't trade principles
or friends for money
Expand



**Dallas Report** @DallasReport                      22 May 12
Driver hits, kills pedestrian but does not stop  sns.mx/kQgPy3
  Retweeted by Ryan Badi
Expand



**Ryan Badi** @RyanBadi1                              22 May 12
Our inner strength and purity is directly proportional to our
ability to love others without any reservations or conditions.
Expand



**Ryan Badi** @RyanBadi1                              22 May 12
@AlexKennedyNBA ill take the Professionals any day of the
week #spurs
  View conversation

**Ryan Badi** @RyanBadi1                              21 May 12
@AlexKennedyNBA Kobes not sticking around forever
they've got one maybe 3 years left Lakers need to revamp now
  View conversation

**Ryan Badi** @RyanBadi1                              21 May 12

Case 3:12-cv-04541-B   Document 37-3   Filed 11/15/13   Page 82 of 94   PageID 418

Home        Connect        Discover            Me    @NBA Oklahoma farmers on high alert as cow tipping celebrations
                                                    expected all night long #Spur Justice Coming
                                                    Expand

 **Michael Smith** @michaelsmith                              20 May 12
James and Wade basically decided to go into NBA Jam
mode
  Retweeted by Ryan Badi
Expand

 **The Source Magazine** @TheSource                           20 May 12
College student loans are making many reconsider getting a
college degree. Lower costs at schools & loan rates at banks.
  Retweeted by Ryan Badi
Expand

 **Alex Kennedy** @AlexKennedyNBA                             19 May 12
The craziest thing? Kobe Bryant will likely retire with just one
MVP award in his trophy case. That's ridiculous.
  Retweeted by Ryan Badi
Expand

 **The Source Magazine** @TheSource                           20 May 12
The Central Park HIV/Aids walk is today in NYC. This is a
very important cause. Join thousands of others and find a way to
support. Peace!
  Retweeted by Ryan Badi
Expand

 **Rachels Challenge** @RachelsChalleng                       29 Apr 12
"Never let a problem to be solved become more important
than the person to be loved."
– Barbara Johnson
  Retweeted by Ryan Badi
Expand

 **Ryan Badi** @RyanBadi1                                     19 May 12
@iChrisV @AlexKennedyNBA Durant and OKC are
hopeless against a more experienced, deeply talented, unselfish Spur
Team #THEPROFESSIONALS
  View conversation

 **Ryan Badi** @RyanBadi1                                     19 May 12
@NBA @spurs The San Antonio Spurs playing as fluidly as
the Dallas Mavericks were last year!R they bringing another title to
Texas?! #YouBet
Expand

 **Ryan Badi** @RyanBadi1                                     19 May 12
6 games in 5 days @staplescenter between the clippers,
Lakers, and kings
Expand

 **Ryan Badi** @RyanBadi1                                    19 May 12
"Sometimes God puts you on your back, so that you
remember His Name."
Expand

 **Ryan Badi** @RyanBadi1                                    18 May 12
@NBA @okcthunder @Lakers great game for Kobe!!!
Playing like he deserved that MVP this year!
Expand

**Ryan Badi** @RyanBadi1                                                          18 May 12

Case 3:12-cv-04541-B   Document 37-3   Filed 11/15/13   Page 83 of 94   PageID 419

Home        Connect        Discover        Me


@NBA @okcthunder @Lakers great game!!!
View conversation


**Ryan Badi** @RyanBadi1                              17 May 12
Lake Lewisville swimming with my dog
pic twitter com/D71Pjdmf
View photo


**Ryan Badi** @RyanBadi1                              17 May 12
Hall pass with Owen Wilson #funny
Expand


**Ryan Badi** @RyanBadi1                              16 May 12
@NBA @Lakers where's the old Kobe at and is this what to
expect? Kobe 0-3 and 2 turnovers in the last 4 minutes to blow a 7
point lead #argh
View conversation


**Ryan Badi** @RyanBadi1                              16 May 12
@NBA @okcthunder @Lakers what a disappointment. OKC
deserves a title, no way no how. #Spur Justice Coming
View conversation


**Elvis K** @LDogg89                                  16 May 12
"@UberFacts: Venustraphobia is the fear of beautiful
women." who could possibly have that fear? Lmao
Retweeted by Ryan Badi
Expand


**Ryan Badi** @RyanBadi1                              16 May 12
@rockthebells rockthebells net
Sickkkkkk lineup I wish I didnt have to go all the way to Cali or Jerzy,
but I might have to!
Expand


**CNN** @CNN                                          15 May 12
Police: Phony officer could be killing Mississippi drivers.
on.cnn com/LPusEV
Retweeted by Ryan Badi
View summary


**Earvin Magic Johnson** @MagicJohnson               15 May 12
After the @Lakers lost last night, sometimes it's better not to
say anything at all.
Retweeted by Ryan Badi
Expand


**Ryan Badi** @RyanBadi1                              14 May 12
Simon Helberg Saw The Metta World Peace Elbowing -
CONAN on TBS: youtu be/q7YdTfpPkfw via @youtube  #hilarious
interview
View media


**Ryan Badi** @RyanBadi1                              14 May 12
@NBA OKC v LAL Game 1 starts in one hour! I'm excited
about these superathletes locking horns yessir!
Expand

**Ryan Badi** @RyanBadi1                              14 May 12
@RikkiBlu all the names of God are one and the same
#bahai faith
View conversation

Home          Connect          Discover          Me   

**Ryan Badi** @RyanBadi1                                    14 May 12
"@DallasReport: Dallas police link 14 robberies to two
suspects sns.mx/kJgLy1" oaklawn/uptown/Katy trail
Expand


**Sam** @ohhdaamnsam                                       14 May 12
You either love someone for their flaws & all that they are or
you don't love them at all.
   Retweeted by Ryan Badi
Expand


**Ryan Badi** @RyanBadi1                                    14 May 12
Looking for any charities, fundraisers, non-profit marathons in
the DFW area to get excited about!!! Let me know! #esp animal/health
related
Expand


**Ryan Badi** @RyanBadi1                                    14 May 12
If LeBrons the MVP the Heat should have no problem
winning games with Bosh out as MVP steps up #status indefinite -
abdominal strain
Expand


**Ryan Badi** @RyanBadi1                                    13 May 12
"@brainpicker: Maurice Sendak's final video appearance, in
delightfully witty conversation with Stephen Colbert
j mp/Jew7Bv"#Comedy
Expand


**Ryan Badi** @RyanBadi1                                    13 May 12
"@DallasReport: Katy Trail robbery victims describe similar
assaults sns.mx/kXgJy6" robbing people for iPhones at gunpoint by
my crib
Expand


**Ryan Badi** @RyanBadi1                                    13 May 12
@Liddo_Bosss Carefully picking a partner is just as important
as committing to a relationship when your in one #control what you
can
   View conversation


**Ryan Badi** @RyanBadi1                                    13 May 12
One day just doesn't seem like enough happy mothers day to
all the real mothers who sacrificed 4 us & accept their children
unconditionally
Expand


**Ryan Badi** @RyanBadi1                                    13 May 12
@ABabyBlueEyes cigar bars are as nasty as XXX theaters
*opens window*
   View conversation


**Ryan Badi** @RyanBadi1                                    13 May 12
The Dictator out in 3 days! KHAFLA!
Expand


**Ryan Badi** @RyanBadi1                                    12 May 12
@s0m3br0ad na Jew the best #khafla!!!
   View conversation

**Jessica Lavigne** @_jessiav                               12 May 12
Jew da best
   Retweeted by Ryan Badi
Expand



Home        Connect       Discover       Me

**Ryan Badi** @RyanBadi1                                12 May 12
Kobe Bryant with 8 assists actin like a real leader
Expand

**Ryan Badi** @RyanBadi1                                12 May 12
@jessicaalba #fatgirlstatus
View conversation

**Ryan Badi** @RyanBadi1                                12 May 12
KRS1 9mm: youtu be/61D6sJycjPA via @youtube
View media

**Frank Madden** @FrankMadden52                        12 May 12
If a genie ever gives me three wishes, goodbye Kardashians.
  Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                12 May 12
Smif-N-Wessun - Sound Bwoy Bureill:
youtu be/OR9qVuLVHvA via @youtube
View media

**Ryan Badi** @RyanBadi1                                12 May 12
Jeff van Gundy hanging on Alonzos leg LOL
youtube com/watch?v=nWqv5f    via @youtube
View media

**Ryan Badi** @RyanBadi1                                12 May 12
@djkhaled @minajtroop @NICKiMINAJ is she tweaking like
a crackhead doin the Owlhead Wideeye cuz that shit go
hard#butnowitsfknannoyingdammmm
View conversation

**Ryan Badi** @RyanBadi1                                12 May 12
@GhostfaceKillah named in Video: Garnett Retaliates
Atlanta Owner Calls Him 'Dirtiest Guy In The League' shar es/28JVa
via @sharethis
Expand

**Roger Ebert** @ebertchicago                          12 May 12
One man, one wife, says Romney--whose great-grandfather
had five wives, and great-great-grandfather had 12.
  Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                12 May 12
Discovery channel Texas Drug Wars#interesting
Expand

**Huffington Post** @HuffingtonPost                     12 May 12
Kris Humphries claims he has proof that will show his
marriage was a fraud huff.to/JGqEXq
  Retweeted by Ryan Badi
View summary

**Ryan Badi** @RyanBadi1                                12 May 12
@nbcsnl don't miss Eli manning episode on SNL!
@SofiaVergara episode also hilarious
Expand

**Ryan Badi** @RyanBadi1                                12 May 12

Home        Connect        Discover        Me

@kanyewest at least tell me he writing his own shit ..cuz you ain't.
MERCY is a remake of SOUND BWOY BURIEL by bootcampclik
#Bitincuzufake
View conversation

**Ryan Badi** @RyanBadi1                                11 May 12
@NBA @LAClippers Mark Davis referee #8 in the middle of
all controversial calls, somebody demote this dude to water boy
#BEFAIR
Expand

**Ryan Badi** @RyanBadi1                                11 May 12
Tim Duncan's Punisher Knee Brace (PIC) shar.es/2E6lQ via
@sharethis
Expand

**Ryan Badi** @RyanBadi1                                11 May 12
@NBA Jeff van Gundy is the worst announcer in any league.
He never has anything nice to say #tvmuted
#hismomshouldhavehuggedhimmore
Expand

**Jim Carrey Parody** @JimCarreyJokes               11 May 12
You're home alone in the middle of the night. you hear a fart.
would you laugh or be scared?
  Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                11 May 12
@LAClippers Memphis puttin on a clinic #LAbrix
Expand

**Ryan Badi** @RyanBadi1                                11 May 12
@ABabyBlueEyes I saw that guy he was at the store with his
pet pomeranian asking the pharmacist if he can use crest white strips
on theahole
View conversation

**Ryan Badi** @RyanBadi1                                10 May 12
@undecided @James_theGrad  "stay low and, keep firing
keep extra clips for extra shit" -notorious BIG kick in the door
#quotekobewhenitsreal
View conversation

**Ryan Badi** @RyanBadi1                                10 May 12
@chicagobulls God bless Derrick Rose while he heals from
the ACL injury #stayuphomie
View conversation

**Ryan Badi** @RyanBadi1                                10 May 12
@DAVID DEWHERST COMMERCIAL "the man who can
fight Obama" like Obama the enemy! Like he Taliban or some!
#FUCKREPUBLIKKKANS
Expand

**Ryan Badi** @RyanBadi1                                10 May 12
@GlobalGrind yall niggas is gay!! #hueyfreemanvoice
View conversation

**Ryan Badi** @RyanBadi1                                10 May 12
Kobe sick and still got more then half Lakers points @19
la38 den45
Expand

Home     Connect     Discover      Me



**Ryan Badi** @RyanBadi1     10 May 12
#BristolBitchUs Weekly Mobile - Celebrity News - JWoww
Slams Bristol Palin: "Keep Your Uneducated, Ignorant Mouth Shut"
usmagazine.com/celebrity-news
View summary



**Ryan Badi** @RyanBadi1     10 May 12
@MTV weakkkkkk
View conversation



**Ryan Badi** @RyanBadi1     10 May 12
@funkmasterflex for real flex is this what its come to homie
#sad
View conversation



**Glenn** @Glenn_OBX     9 May 12
@thelovemaster Limbaugh sez Obama has declared war on
marriage. Limbaugh's 1st, 2nd and 3rd wives couldn't be reached for
comment.
    Retweeted by Ryan Badi
    View conversation



**Ryan Badi** @RyanBadi1     9 May 12
Ex-Viking Carter admits to authorizing bounties
espn.go.com/nfl/story/_/id
View summary



**Ryan Badi** @RyanBadi1     8 May 12
@Nas still can't believe you didn't perform after the interview
at SXSW Belmont I really thought u was gonna say
fuck.this.bitch.I'm.DOINIT
View conversation



**WIZDOM** @WizKhalifa     8 May 12
#ImThatPersonWho falls too fast, crashes too hard, forgives
too easily, and cares too much.
    Retweeted by Ryan Badi
    Expand



**WIZDOM** @WizKhalifa     8 May 12
We have two ears to hear, two eyes to see, and two hands to
hold... But we only have one heart, because we're meant to find the
other one.
    Retweeted by Ryan Badi
    Expand



**Ryan Badi** @RyanBadi1     8 May 12
@WizKhalllifa and that's what's up
View conversation



**MagicJohnsonFDN** @MagicJohnsonFDN     8 May 12
Every1 has a role in the fight against HIV/AIDS - join MJF &
register 4 OUR team at CA Music Fest. & AIDS Walk Sun 5/20
ow.ly/i/AtRa
    Retweeted by Ryan Badi
    Expand



**Ryan Badi** @RyanBadi1     8 May 12
@FloydMayweather you always talkin #moneyteam and
Justin bieber #unfollowfakeniggasallaboutbread
View conversation

**Ryan Badi** @RyanBadi1     8 May 12
@Seth_Rogen_ lol u funny sonuvabeech

Home      Connect      Discover      Me

View conversation

**48 Laws of Power** @48tweetsofpower      8 May 12
Plan all the way to the end.
Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1      8 May 12
@joannemarieo @schrockboy lol at the RT
View conversation

**Ryan Badi** @RyanBadi1      7 May 12
@KimKardashian no wonder your a$$ makes u look wider
then you are tall #do you really need fries with that shake
View conversation

**Ryan Badi** @RyanBadi1      7 May 12
@iamdiddy God bless B.I.G.
View conversation

**Ryan Badi** @RyanBadi1      7 May 12
@robdyrdek you do every day son when fantasy factory
comes on
View conversation

**Ryan Badi** @RyanBadi1      7 May 12
@Shakira_Shak lol you shakira sir, sound like spongebob in
your tweets. #get a life
View conversation

**Ryan Badi** @RyanBadi1      7 May 12
@Shakira_Shak shakira talking about politics and pirates?
You are not qualified to talk about anything except assshaking
#getoffthebullshit
View conversation

**Elvis K** @LDogg89      7 May 12
@DSteve92JMarie sucks the Mavs are out of the playoffs.
Wish they would've kept a lot of u guys from last year
Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1      7 May 12
@Shakira_Shak yeah and shakira is all about shakira
#hypocritedouche
View conversation

**Ryan Badi** @RyanBadi1      6 May 12
@BarackObama Dallas Police are cracking down on cruising.
In other words, driving is illegal. #theconstitutionisdeadindallas
Expand

**Ryan Badi** @RyanBadi1      6 May 12
Anthony BEASTIN with 40 points against the HEAT!!!
Expand

**Ryan Badi** @RyanBadi1      6 May 12
@swish41 you are always a class act
View conversation

**Ryan Badi** @RyanBadi1      5 May 12
@ABabyBlueEyes FUCKTHISWEAKASSSHITWEAINTPAYIN



Home        Connect        Discover        Me

View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@iambigbaby11 YOUBEASTIN
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@mcuban @RealLamarOdom @swish41 @jasonterry31 "I've
got money so fuck the championship team"#barea&Chandler
Expand

**Ryan Badi** @RyanBadi1                                                      5 May 12
@NBAGuru the only thing youre a guru of is homosexual
positions #gayguru
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@mcuban whatever nigga
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@mcuban back?? You just made history. This is the first
sweep in MAVS history. FIRE THE COACH
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@mcuban bullshit. We just played a miserable series. Look at
dirks tweets from January u handicapped us
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@mcuban not if you don't resign the vital components of our
team like you resisted doing last year donkey #moneyinthebank
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@mcuban what the fuck were u thinking only giving Chandler
a 1 year contract and not resigning barea #greedimpedesucceed
Expand

**Ryan Badi** @RyanBadi1                                                      5 May 12
@SekouSmithNBA  real talk? Like the technicals they've
been calling on Dallas are legit?!! #get off the bullshit
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@NBA @swish41 GIVE ME THE 4TH QUARTER! I WANT
THE 4TH QUARTER NOW
Expand

**Ryan Badi** @RyanBadi1                                                      5 May 12
@SofiaVergara I want to celebrate with you mami #fineass
View conversation

**Ryan Badi** @RyanBadi1                                                      5 May 12
@swish41 Perkins should mind his manners, justice works in
mysterious ways
Expand

**Ryan Badi** @RyanBadi1                                                      5 May 12
@swish41 no matter what, God loves your heart and so does
DALLAS

Home          Connect          Discover          Me          Expand

**Ryan Badi** @RyanBadi1                                                    5 May 12
@BarackObama @MichelleObama we've got his back and
his front. The greatest leader of my generation! Think Winston
Churchill w a tan!
View conversation

**Ryan Badi** @RyanBadi1                                                    5 May 12
@mbkessler @ErinSpitler work the track like its an office job!
View conversation

**Ryan Badi** @RyanBadi1                                                    5 May 12
@RealJasonKidd PLAYING LIKE IT'S 1999
Expand

**Ryan Badi** @RyanBadi1                                                    5 May 12
@iambigbaby11 BEASTIN
Expand

**Ryan Badi** @RyanBadi1                                                    5 May 12
@SHAQ you called it BigDog! Respect!
View conversation

**Barack Obama** @BarackObama                                              5 May 12
President Obama: "I don't care how many ways you try to
explain it: Corporations aren't people. People are people."
    Retweeted by Ryan Badi
Expand

**Ryan Badi** @RyanBadi1                                                    5 May 12
@robdyrdek @FloydMayweather Give the people what they
want! Mayweather v. Paquiao!!!!!
View conversation

**Mike Tyson** @MikeTyson                                                   3 May 12
China pulled plug during @andersoncooper report on
#ChenGuangcheng. RT to take stand on censorship
on.cnn.com/JEjEds
    Retweeted by Ryan Badi
View summary

**Ryan Badi** @RyanBadi1                                                    3 May 12
MAVS beat OKC tonight by at least 5 GUARANTEED!
Expand

**Ryan Badi** @RyanBadi1                                                    2 May 12
In the end, we don't remember the words of our enemies, but
the silence of our friends.
Expand

**Ryan Badi** @RyanBadi1                                                    2 May 12
@BarackObama  thank you!!! mitt Romney wants to take
away Pell grants!!
View conversation

**Ryan Badi** @RyanBadi1                                                    2 May 12
Rap music belongs to the streets. If your money leaves u w
nothin to talk about except bread let some young mcs get
on#sickofmoney&hosrhymes
Expand

**Ryan Badi** @RyanBadi1                                                    1 May 12

APP 129

Case 3:12-cv-04541-B   Document 37-3   Filed 11/15/13   Page 91 of 94   PageID 427

Home        Connect        Discover        Me

"I'm not fearing any man. Mine eyes have seen the glory of the coming of the Lord." MLK
Expand

Back to top ↑

**From:** PUYA BADII <badii.ryan@gmail.com>
**Date:** October 7, 2012, 1:46:11 AM EDT
**To:** <JOBS@VEELOUNGE.COM>
**Subject: Restaurant/Lounge Managers**



# Ryan Badii

2626 Reagan St. Dallas, TX 75219
Phone: (214)414-6045
Email: badii.ryan@gmail.com

# Personable, Energetic, Versatile, Dependable & Committed

APP 132

# PROFESSIONAL EXPERIENCE

RCI Entertainment, XTC, Dallas, Texas          2009-2012
Manager
• Recruited, hired, trained, and organized staff.
Performed all management functions relevant to club operations.
This includes but is not limited to the following: diagnosing, developing, and evaluating the performance of staff associates; resolving customer issues effectively; providing clear direction and goals to achieve P/L objectives; managing and driving the sales process; motivating and empowering associates to develop their skills while enhancing the customer experience; setting priorities for resource allocation; and creating overall strategies for competitive success.
• VIP Manager & Floorhost Manager.
Primarily involved in developing and maintaining networks of relationships with Dallas area VIPS and charged with oversight of security personnel in all aspects.

KALGA, Portland, Oregon          2005-2008
Waitstaff Manager
• Responsible for front of the house and all relevant staffing and management functions.
• Recruited, interviewed, and trained new employees.
• Scheduling, goal setting, performance evaluations, and food/drink promotions.

NATIONWIDE STAFFING, Portland, Oregon          1999-2004
Manager
•Office ran 25,000 billable hours/month at peak.
Worked in all 3 divisions: StaffMed, LaborTemp, & Nationwide Staffing.
• In charge of consolidation of all sales reports systemwide, data analysis, and communication of vital statistics to higher  management.
• Director of Sales and Training from 2000-2001 out of Portland, Oregon.
Handled OSHA inspections, workers compensation investigations/hearings, and worked toward amicable solutions in the event of customer dissatisfaction.
• Managed Oakland, California office for 2 years from 2001-2003.


PORTLAND STATE UNIVERSITY, OR  2006
Bachelor of Science, Human Resources Management
Bachelor of Science, General Management
Minor, Psychology