UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN BADII, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-4541-B |
| | § | |
| RICK'S CABARET | § | |
| INTERNATIONAL, INC., et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM ORDER AND OPINION

Before the Court is Defendant Rick's Cabaret International, Inc., XTC Cabaret (Dallas), Inc.,

and XTC Cabaret's Motion for Summary Judgment (doc. 36). For the reasons stated below,

Defendants' Motion is **GRANTED in part and DENIED in part**. Specifically, the Court **GRANTS**

Defendants' Motion as to Badii's Title VII discrimination and retaliation claims as well as his *Sabine*

*Pilot* claim. The Court **DENIES** Defendants' Motion, however, as to Badii's hostile work

environment claim.

## I.

## BACKGROUND[1]

This action arises from the adverse treatment and alleged termination of Plaintiff Ryan Badii

("Badii") by his employer. Doc. 1, Orig. Compl. ¶ 15. Badii alleges that Defendants wrongfully

discharged him after he refused to participate in the admission of minors into a sexually oriented

---

[1]The Court takes its factual account from the uncontested facts contained in the summary
judgment record. Any contested fact is identified as the allegation of a particular party.

business. *Id.* ¶¶ 59, 74. In addition, Badii alleges that Defendants discriminated against him during the course of his employment by reducing his compensation, giving him less favorable work assignments, and demoting him, and that Defendants retaliated against him for opposing discriminatory practices. *Id.* ¶¶ 1, 71. Badii also asserts that Defendants subjected him to a hostile work environment where he experienced verbal and physical intimidation, racial slurs and jokes, and was prevented from contacting corporate officials to report ongoing discrimination. *Id.* ¶ 71.

Badii is a Texas resident. *Id.* ¶ 2. He is Iranian and of the Baha'i faith. *Id.* ¶ 11. XTC Cabaret, where Badii worked, serves as one location in a chain of gentlemen's clubs that contain adult entertainment and restaurants. *Id.* ¶ 15. Defendants Rick's Cabaret International, Inc. (hereinafter "Rick's") and XTC Cabaret (Dallas), Inc. are incorporated in Texas with their principal place of business in Texas. *Id.* ¶¶ 3-5. Defendant XTC Cabaret is the assumed name of Defendant XTC Cabaret (Dallas), Inc. with its place of business in Dallas, Texas. *Id.* ¶ 6. Defendant Rick's is a publicly traded company with 1,200 employees. *Id.* ¶ 3.

Badii began working at XTC Cabaret as Waitress Manager in March 2009. Doc. 37-3, Badii Dep. Ex. C, at 53, 137. In this position, Badii hired, recruited, trained, and prepared schedules for waitresses. *Id.* at 137. Badii alleges that, from the outset of his employment, he experienced racist comments and persecution at the hands of his managers and his coworkers. Doc. 1, Orig. Compl. ¶¶ 20-21. After Badii had been working at XTC for nearly one year, Josh Stern was hired as the general manager. Doc. 37-4, Stern Aff. Ex. D ¶ 2. Badii alleges that, in addition to making racist statements and promoting racist hiring policies at the club, Stern discriminated against him with regards to pay and work assignments. For instance, Badii testifies that right after Stern was hired in May 2010, he reduced the number of shifts Badii worked from seven to five. Docs. 1, Orig. Compl.

¶¶ 23-25; 37-3, Badii Dep. Ex. C, at 106-07, 242-46. Stern also took away coveted Sunday and Monday shifts at that time and gave them to Marty Ray Carl, a White manager who was also a self-professed Klu Klux Klan member. Doc. 37-3, Badii Dep. Ex. C, at 108, 242. Defendants do not contest that Stern reduced Badii's shifts, but instead insist that he did so because he needed to be present to monitor Badii's work. Doc. 37-4, Stern Aff. Ex. D ¶ 10. Badii also asserts that around this time Carl received time and a half pay for working a double shift, while he only received his normal hourly rate. *Id.* at 141-42, 150-52.

In late 2010, Badii was transferred to the position of Entertainment Manager. Doc. 37-3, Badii Dep. Ex. C, at 153. In this position, he recruited entertainers, managed entertainer contracts, and provided customer service to patrons. *Id.* at 154; doc. 37-4, Stern Aff. Ex. D ¶ 3. Badii alleges that there was a policy prohibiting managers from hiring black entertainers and that employees were told to turn away black entertainers at the door. Doc. 37-3, Badii Dep. Ex. C, at 239-40. Though he was aware of the policy, Badii hired black entertainers anyway, and was subsequently reprimanded by Stern, who wanted to create a "whiter club." *Id.* at 249-50. Although Badii insists that he excelled as Entertainment Manager, increasing the number of entertainers and creating programs to provide services that entertainers needed, doc. 37-3, Badii Dep. Ex. C, at 154-56, Stern alleges that he received numerous complaints about Badii and that he witnessed Badii being harsh and confrontational with the entertainers, doc. 37-4, Stern Aff. Ex. D ¶ 3.

In September 2011, Badii alleges that he noticed that Tim St. Onge, another manager, had been paid more in tipouts than he. Doc. 37-3, Badii Dep. Ex. C, at 142-44. "Tipouts" are part of a manager's compensation and are comprised of all of the tips that managers receive throughout the night, divided evenly among all of the managers working that night. Doc. 37-4, Stern Aff. Ex. D ¶ 4.

Badii alleges that St. Onge received nearly $200 in tipouts for one evening, while he received only $100 in tipouts for that same evening. Doc. 37-3, Badii Dep. Ex. C, at 142-44. He complained to Stern about the unequal payment, but Stern had no response. *Id.* at 144-45. Stern denies that the unequal tipout payments or his conversation with Badii ever occurred. Doc. 37-4, Stern Aff. Ex. D ¶ 4.

A month after Badii allegedly complained to Stern about the unequal tipout payments, he maintains that his shifts were further reduced from five to four and that he was transferred from his position as Entertainment Manager to Floor Host Manager. Doc. 37-3, Badii Dep. Ex. C, at 145, 250. Stern maintains that his decision to transfer Badii to the position of Floor Host Manager and replace him with St. Onge was due to Badii's harsh attitude towards the entertainers as well as St. Onge's superior experience with entertainers. Doc. 37-4, Stern Aff. Ex. D ¶ 3, 11. Whatever the reason for Badii's reassignment, he acknowledges that his base pay rate per shift did not change, save a raise from $100 to $125 per shift that he received about a year after he was hired. Doc. 37-3, Badii Dep. Ex. C, at 140-41.

On December 12, 2011, management staff from affiliated nightclubs in Fort Worth, Houston, Dallas, and San Antonio congregated in Dallas for a manager's meeting. Docs. 37-4, Stern Aff. Ex. D ¶ 12; 37-3, Badii Dep. Ex. C, at 140-41. Badii asserts that part of the meeting took place on the road and that the managers visited various nightclubs in order to inspect the clubs and learn from their respective businesses. Doc. 37-3, Badii Dep. Ex. C, at 188-89, 191-93. Stern counters that traveling to the other clubs was merely a social outing that occurred after the management meeting had concluded. Doc. 37-4, Stern Aff. Ex. D ¶ 12. Both parties agree, however, that while at the Cabaret North club, Badii had a verbal altercation with an entertainer. Docs. 37-4, Stern Aff. Ex.

D ¶ 12; 37-3, Badii Dep. Ex. C, at 188-89, 191-93. Badii maintains that, after introducing himself, the entertainer yelled "you are a n****r. You came from n****rs. Go back to your n****rs" and then began to chant "n****r" over and over. Doc. 37-3, Badii Dep. Ex. C, at 192-93. Badii states that, instead of interceding, the other managers merely stood by. *Id.* at 193. Embarrassed, he turned to walk out of the club, when one of the male managers yelled out "n****r" and the other managers laughed. *Id.* Stern offers a different perspective on these events. He testifies that Badii and the entertainer had gotten into an argument in which Badii made condescending comments about the entertainer, and that the entertainer made racist comments about the club's clientele. Doc. 37-4, Stern Aff. Ex. D ¶ 12. He insists that a manager did intervene to remove the entertainer, and that the entertainer repeated a racial slur as she was led away. *Id.* He avers that none of the managers made any derogatory or racist comments toward Badii. *Id.*

Following the Cabaret North incident, Badii alleges that he complained to Stern and stated that he wished to report the incident to HR, but that Stern told him there was no HR and forbade him from contacting any higher authority. Doc. 37-3, Badii Dep. Ex. C, at 194-95, 252-53. Stern denies that he forbade Badii from contacting higher authorities. Doc. 37-4, Stern Aff. Ex. D ¶ 19.

Badii also alleges that, a few days after the North Cabaret incident, he was approached by John Henry, a Rick's employee who worked in a different club. Doc. 37-3, Badii Dep. Ex. C, at 111-12. Badii testifies that Henry asked "do you know what discrimination is?" and then proceeded to poke and shove Badii, yelling, among other things, that "Arab Muslims like [Badii] call him Abdi, which means slave, and have . . . oppressed his people." *Id.* The confrontation became severe enough that club security had to intervene. *Id.* at 112. Badii speculates that the confrontation was orchestrated by Stern in response to Badii's complaints about the North Cabaret incident, but he

points to no corroborating evidence to support these claims. *Id.* at 113; doc. 1, Orig. Compl. ¶ 54. Stern agrees that the John Henry incident occurred, but testifies that it took place before the North Cabaret incident. Docs. 37-3, Badii Dep. Ex. C, at 111; 37-4, Stern Aff. Ex. D ¶ 12.

A short time before his employment ended, Badii asserts that he discovered that one of XTC Cabaret's employees, Daniel Castaneda, was allowing minors under the age of 18 into the club for a cover charge. Doc. 37-3, Badii Dep. Ex. C, at 215-16. Badii maintains that he pulled Castaneda aside and that Castaneda admitted to what he was doing. *Id.* at 216-17. Badii avers further that Castaneda offered Badii part of the cover charges he was collecting in order to retain his job. *Id.* Badii refused and terminated Castaneda and then rang up the money in order to put the corporate office on notice of the cover charges. *Id.* at 217. Badii alleges that Stern later called him and told him to leave the front door alone, "that he was working very closely with the front door and they were doing exactly what he wanted." *Id.* Badii testifies that Stern then became irate when he learned that Badii had fired Castaneda and had rung up the minor cover charges. *Id.* Following his conversation with Stern, Badii alleges that Robert Bonilla, another Rick's employee, approached him and warned him to stay away from the front door. *Id.* at 218. He then told Badii that he had a machete and then grabbed Badii's finger and bent it back aggressively. *Id.* at 218-19.

Approximately one week after Badii fired the employee for taking minor cover charges, his employment with XTC Cabaret ended. *Id.* at 218. Badii asserts that Stern had stated that he was terminating him because he had found a marijuana pipe that he believed belonged to Badii. *Id.* at 222. Badii believes that Stern actually terminated him because he had interfered with the illegal admission of minors into the club. *Id.* at 222-24. Stern contends that Badii voluntarily resigned in anger after he was demoted for leaving the club without telling anyone on a night when Badii had

the responsibility of staying and closing the club. Docs. 37-4, Stern Aff. Ex. D ¶ 12; 37-5, Andis Aff. Ex. E ¶¶ 8-9.

Defendants are quick to point out that Badii was not a sterling employee. During his time at XTC Cabaret, Defendants insist that Badii made inappropriate and racist comments to and about coworkers, customers, and managers. Docs. 37-4, Stern Aff. Ex. D ¶¶ 6-7; 37-5, Andis Aff. Ex. E ¶¶ 5-6; 37-6, Crenshaw Aff. Ex. F ¶¶ 7-8. They also allege that he acted erratically and sometimes dangerously, carrying a gun or other weapons and threatening to shoot others. Docs. 37-4, Stern Aff. Ex. D ¶¶ 8-9, 16; 37-5, Andis Aff. Ex. E ¶ 7. They also allege that Badii stole tips from waitresses and that Stern had received a report that Badii had smoked marijuana at the club. Doc. 37-6, Crenshaw Aff. Ex. F ¶ 6.

Badii filed a complaint with the EEOC on July 31, 2012, in which he alleged claims of discrimination and retaliation based on race, color, religion, and national origin. Doc. 37-8, Charge of Discrimination Ex. H. The EEOC issued Badii a dismissal and notice of right to sue letter on August 13, 2012, and on November 12, 2012, Badii filed the instant lawsuit in federal court. Doc. 37-8, Dismissal and Notice of Rights Ex. H.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden to prove that no genuine issue of material fact exists. *Latimer v. Smithkline*

*& French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the

burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the mere

absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond

the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v.*

*Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325).

In determining whether a genuine issue exists for trial, the court will view all of the evidence in the

light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the

non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make

such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## OBJECTIONS

As an initial matter, the Court addresses the Defendants' objections to some of Badii's

evidence. Defendants first object to Exhibit A that Badii submits with his brief, which contains

statements Badii made to the Texas Workforce Commission (TWC). In the document, Badii

suggests that he was actually terminated from his employment and provides reasons for the

termination. Badii offers no arguments or authority in response Defendants' objections. Doc. 38,

TWC Forms Ex. A. Nevertheless, the Court hesitates to declare this evidence hearsay because it may

fall under the business records or public records exceptions to the hearsay rule. *Gissler v. Ruiz Food*

*Products, Inc.*, No. 4:08-cv-344, 2009 WL 32661565, at *6 (E.D. Tex. Oct. 8, 2009) (finding that

because an EEOC report is admissible under the public records exception, so too is a TWC report). The Court will not engage in a drawn out analysis of the question, however, because Badii only relies upon this evidence for purposes of establishing his *Sabine Pilot* claim. Doc. 38, Pl.'s Resp. 11. Because the Court disposes of Badii's *Sabine Pilot* claim on grounds other than termination, the Court will treat this evidence as admissible without ruling on Defendants' objection.

Defendants also object to certain statements from Badii's deposition that he relies upon as either hearsay or speculative statements. Some of these statements, however, would qualify as statements by a party opponent under Federal Rule of Evidence 801(d)(2) and would therefore not constitute hearsay. Specifically, the statement by Daniel Castaneda as to allowing minors into the club would qualify as a statement by a party opponent because Castaneda was Defendants' employee and was making the statement on a matter within the scope of his employment, specifically with regards to his duties as a doorman. Fed. R. Evid. 801(d)(2)(C). Additionally, the statement by St. Onge that "we made  a hundred and ninety dollars last night" is admissible as nonhearsay because St. Onge was also Defendants' employee of and was speaking on a matter within the scope of his employment relationship, namely his pay. *Id.*; *Villatoro v. Kim Son Restaurant LP*, 286 F. Supp. 2d 807, 810 n.8 (S.D. Tex. 2003) (finding that employees' comments concerning their pay were not hearsay because they concerned a matter within the employees' employment).[2]

---

[2] This statement could also potentially be admitted as a present sense impression because St. Onge made the statement upon opening his envelope and seeing what was contained inside. Doc. 37-3, Badii Dep. Ex. C, at 142-44; *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991) ("The justification for this hearsay exception relies on the contemporaneousness of the event under consideration and the statement describing that event"); *United States v. Mitchell*, 145 F.3d 572, 575 (3d Cir. 1998) ("There are three principal requirements which must be met before hearsay evidence may be admitted as a present sense impression: (1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous.").

The statement from an unidentified manager in which he called Badii "n****r" is also not hearsay because it is not submitted to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Rather, it was submitted only to show that the statement was made. *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1090 (5th Cir. 1988) ("a statement does not fall under the hearsay rule if it was offered, not to prove the truth of the matter asserted, but to prove that the statement was made").

Finally, Defendants posit that the statement from Cesar Corolla that "Ryan did a great job as entertainment manager; why don't we make Ryan the entertainment manager again?" is inadmissible hearsay. As to this statement, the Court is inclined to agree. Badii presents no evidence to show that Corolla was speaking on a matter within the scope of his employment when he made this statement, and, unlike the statements made by Castaneda or St. Onge, the statement is not clearly one that concerns a matter within his employment. Fed. R. Evid. 801(d)(2)(E); *Carroll v. Sanderson Farms, Inc.*, No. H-10-3108, 2012 WL 3866886, at *16 (S.D. Tex. Sept. 5, 2012) (excluding an employee's statements because they fell outside the scope of his employment). Accordingly, this statement will be disregarded as inadmissible hearsay.

The Court therefore overrules Defendants' objections as to all of the alleged hearsay statements save Corolla's statement concerning Badii's performance as Entertainment Manager. The Court also finds that the same statements are not speculative and are competent summary judgment evidence. The Court does not rule on Defendants' objection with regards to Badii's Exhibit A and treats it as admissible.

## IV.

## ANALYSIS

Defendants move for summary judgment on each of Badii's claims, which include race, color,

religion, and national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) *et seq.*, discriminatory retaliation under Title VII, hostile work environment under Title VII, and wrongful termination. Badii opposes summary judgment as to each claim. The Court analyzes each of the causes of action below.

*A. Race, Color, Religion, and National Origin Discrimination*

Defendants argue that Badii cannot establish his Title VII discrimination claims because he cannot make out two essential elements of his *prima facie* case of discrimination. Defendants also assert that, even if Badii can make out a *prima facie* case of discrimination, they had legitimate, non-discriminatory reasons for taking the actions that they did with regards to his employment. Badii insists that evidence he submits pertaining to decisions about his job assignments and pay demonstrate an ongoing bias against him that not only establishes a *prima facie* case of discrimination, but also shows that Defendants' reasons for acting as they did are merely pretext.

Badii submits no direct evidence of discrimination and therefore his claims of discrimination will proceed under the *McDonnell-Douglas* burden-shifting framework. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). Under this framework, a plaintiff must first make out a *prima facie* case of discrimination. *Okoye v. Univ. of Tex. Houston Health Sci. Center*, 245 F.3d 507, 512 (5th Cir. 2001). To establish a *prima facie* case of discrimination, Badii must show (1) that he is a member of a protected class; (2) that he was qualified for his position; (3) that his employer subjected him to an adverse employment action; and (4) either that other employees similarly situated to him were treated more favorably or that he was replaced by someone outside his protected class. *Id.* at 512-13. If a plaintiff is able to build a *prima facie* case of discrimination, the burden then shifts to the defendant, who must provide a legitimate, nondiscriminatory reason for his actions. *Price*, 283 F.3d

at 720. If the defendant is able to provide such a reason, the presumption of discrimination disappears. *Id.* The plaintiff then has the opportunity to provide evidence that the defendant's reason is untrue and merely a pretext for discrimination. *Id.*

Defendants do not contest that Badii is a member of a protected class or that he was qualified for his position. They do, however, argue that Badii has presented no evidence to establish the third (his employer subjected him to an adverse employment action) and fourth (other employees similarly situated to him were treated more favorably) elements of his *prima facie* case.

1.   Third element of *prima facie* case: employer subjected plaintiff to an adverse employment action

An adverse employment action consists of an ultimate employment decision, such as hiring, granting leave, discharging, promoting, demoting, and compensating. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004). An action that does not affect job duties, compensation, or benefits is not an adverse employment action. *Id.*

Badii alleges and presents evidence in the form of deposition testimony to show that he experienced a number of adverse employment actions, including (1) that he was not paid time and a half for working a double shift as other employees were, (2) that his shifts were reduced while another white manager's shifts were increased, (3) that he was replaced on coveted Sunday and Monday shifts with a white manager who was a proclaimed member of the Kl Klux Klan, (4) that Stern paid St. Onge more in tipouts than Badii, and (5) that Stern further reduced his shifts and demoted him from Entertainment Manager to Floor Host Manager after he complained about being

paid less in tipouts. Doc. 37-3, Badii Dep. Ex. C, at 108, 141-46, 151-52, 242, 245-46.[3] Defendants argue that these actions are either insufficient as a matter of law to fulfill the third element of Badii's *prima facie* case, or that Badii has failed to produce sufficient evidence to demonstrate that these actions in fact occurred. *Id.* at 17-21.

      *i.      Unequal double shift payments*

Badii's claim that he was paid less for working double shifts is unclear. On one hand, he could be claiming that he received less than other managers for working the same double shifts that they did. Doc. 37-3 Badii Dep. Ex. C, at 185-86. On the other hand, Badii could also be claiming that he had only ever been paid a single shift's wage whenever he worked double shifts, but that once Josh Stern arrived and took Badii off of double shifts, others who continued to work double shifts began to receive time and a half. Doc. 37-3, Badii Dep. Ex. C, at 150-51. Either way, each of these claims could constitute an adverse employment action because they directly affected Badii's compensation.

Defendants directly address the first possible claim that Badii is making: that he received less than other employees for working the same double shifts. They submit Stern's testimony that XTC has no record of Badii not receiving time and a half for working a double shift. Doc. 37, Defs.' Br. 24. If this is the claim that he is making, then his own testimony undermines his position because he indicates that he only worked double shifts before Stern made the decision to start paying time and a half and that his pay records would show whether he was ever paid time and a half for a double shift. Doc. 37-3, Badii Dep. Ex. C, at 185-87. Accordingly, Badii has not submitted sufficient

---

[3]Although Badii maintains that he was in fact terminated from his employment and did not voluntarily resign, he does not allege in either his Complaint or his Response that his termination was an adverse employment action.

evidence to raise an issue of fact as to whether he was ever paid less than another managers for working the same double shift.

Defendants do not directly negate the second possible claim that Badii makes: that he was taken off of double shifts right when Stern implemented a policy of paying time and a half for double shifts. His deposition testimony supports these allegations, even though he admits that he never requested to be put back on double shifts. Doc. 37-3, Badii Dep. Ex. C, at 182-87. Though the Court has no cases before it that directly address this issue, the circumstances are similar in many ways to cases in which an employer has denied an employee's request for overtime, an action which has been viewed in some circumstances to be an adverse employment action. *Johnson v. Manpower Professional Services, Inc.*, 442 F. App'x 977, 982 (5th Cir. 2011); *Waters*, 2012 WL 5363426 at *9; *but see Hart v. Life Care Center of Plano*, 243 F. App'x 816, 818 (5th Cir. 2007). The Court therefore determines that a fact issue exists as to whether Badii experienced an adverse employment action when he was taken off of double shifts and thus was deprived of additional compensation.

ii.    *Shift reductions and changes*

Badii also alleges that he experienced adverse employment actions when his shifts were reduced. He provides testimony to show that his shifts were reduced from seven to five after Stern was hired, and that they were thereafter reduced further from five to four. Doc. 37-3, Badii Dep. Ex. C, at 157, 245. He also alleges that he was taken off of Sunday and Monday shifts and put on weekday shifts. *Id.* at 150, 244. Defendants do not contest that Badii's shifts were reduced or that he was taken off of Sunday and Monday shifts, but instead present Stern's testimony that he had to reassign Badii to different shifts in order to keep an eye on him. Doc. 37-4, Stern Aff. Ex. D ¶ 10. They also argue that Badii's subjective preference for Sunday and Monday Shifts is not sufficient to

make the change adverse, nor is his belief that Sunday and Monday shifts allowed him to prove himself. Doc. 37, Defs.' Br. 22. Finally, they point out that Badii was reassigned to Sunday shifts again in 2011. Doc. 37-3, Badii Dep. Ex. C, at 248-49.

As noted above adverse employment decisions include decisions related to compensation. *Pegram*, 361 F.3d at 282; *see also Jones v. Seago Manor Nursing Home*, No. 3:01-cv-2506-AH, 2002 WL 31051027, at *6 (N.D. Tex. Sept. 11, 2002) (noting in a retaliation case that a reduction in hours and termination qualify as adverse employment actions); *Davila v. FedEx Trade Systems, Inc.*, No. L-08-74, 2010 WL 346139, at *4 (S.D. Tex. Jan. 22, 2010) (finding that a fact issue existed as to whether plaintiff experienced an adverse employment action in light of evidence that plaintiff's overtime hours decreased from 319 hours to 159 hours). Thus, regardless of Defendants' reasons for changing Badii's shift assignments, the decisions to reduce Badii's shifts would qualify as adverse employment actions because they affected his compensation.

On the other hand, Badii's argument that being removed from Sunday and Monday shifts constitutes an adverse employment action fails because assignments to less desirable shifts are not actionable adverse employment actions. *Jackson v. DaimlerChrysler Corp.*, No. 3:03-cv-0614-P, 2004 WL 690840, at *6 (N.D. Tex. Mar. 30, 2004).

       *iii.*     *Unequal tipout payments*

Badii's allegation that he once received unequal tipouts does not rise to the level of an adverse employment action. Although decisions that affect pay often do qualify as adverse employment actions, Badii only alleges that on one occasion St. Onge told him that he received $80 to $90 more than him in tipouts. Doc. 37-3, Badii Dep. Ex. C, at 144. This alleged denial of tip income in a single instance parallels cases in which other courts have found that an employer's failure

to pay reimbursements or authorize overtime for an employee were not sufficient to constitute adverse employment actions. *Waters v. City of Dallas*, No. 3:11-cv-540-K, 2012 WL 5363426, at *9 (N.D. Tex. Nov. 1, 2012) (finding that a one-time denial of overtime did not rise to the level of an ultimate employment decision); *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000) abrogated on other grounds by *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) (finding that a single deduction in overtime pay of a *de minimis* amount was not an adverse employment action); *Brooks v. Clinton*, 841 F. Supp. 2d 287, 300-01 (D.D.C. 2012) (holding that failure to reimburse an employee for $70 of travel expenses did not rise to the level of an adverse employment action); *Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 76 n.4 (D.D.C. 2002) (noting that the difference between one day's normal wage and one day's overtime wage was a *de minimis* amount that did not rise to the level of an adverse action); *but see Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001) (finding that loss of a bonus of several hundred dollars was sufficient to qualify as an adverse employment action).

Defendants' evidence further bolsters the Court's conclusion that the alleged unequal tipout payment is not an adverse employment action. While Badii submits no evidence to corroborate his claims, Defendants offer Stern's affidavit testimony, in which he denies that he ever gave unequal tipouts, as well as the affidavit of another employee, Amy Crenshaw, who managed payroll and handled tip issues during the period in which Badii alleges that the unequal tipouts occurred. Docs. 37-4, Stern Aff. Ex. D ¶ 4; 37-6, Crenshaw Aff. Ex F ¶ 4. Crenshaw also avers that she never paid unequal tipouts and never witnessed Stern make unequal tipouts. Doc. 37-6, Crenshaw Aff. Ex F ¶ 4.

Badii's claims as to tipouts might be sufficient if he claimed that such unequal payments occurred more than once, but he makes no such claim. He instead merely speculates that these

-16-

alleged unequal payments occurred more than once based on St. Onge's statement that he always made $150 to $200 in tipouts. Doc. 37-3, Badii Dep. Ex. C, at 237. St. Onge's statement is ambiguous at best because it does not specify how much he made per shift or what types of shifts he worked, and therefore does not allow for comparison between the amount he received and the amounts Badii and other managers received per shift. The lack of this information is significant because, as Badii himself admits, the amount a person could make would vary depending on the shift. *Id.* Even viewing the evidence in a light most favorable to Badii, therefore, the Court concludes that he has failed to submit sufficient evidence with regards to his claims of unequal tipout payments such that a reasonable jury could find that he suffered an adverse employment action.

iv.    *Demotion*

Although a demotion would  generally qualify as an adverse employment action, Badii fails to submit sufficient evidence to show that his transfer from Entertainment Manager to Floor Host Manager constituted a demotion.  A transfer will constitute a demotion if the new position proves objectively worse. *Alvarado v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007). This means that a transfer to a new position does not need to be accompanied by a decrease in pay, title, or grade in order to constitute a demotion. *Id.* at 613. Factors to consider include whether the position entails an increase in compensation or benefits; whether it provides greater responsibility or better job duties; whether it provides greater opportunities for career advancement or requires greater skill, education, or experience; whether it is obtained through a competitive selection process; and whether it is otherwise objectively more prestigious. *Id.* A plaintiff's subjective preference for a position or his subjective belief that a demotion has occurred is not sufficient to show an adverse employment action. *Id.*

Defendants maintain that Badii's transfer from Entertainment Manager to Floor Host Manager was a reassignment, not a demotion, and therefore does not qualify as an adverse employment action. Doc. 37, Defs.' Br. 18. They point out that even though Badii states that he felt that the reassignment to Floor Host Manager involved less favorable duties, he also admitted in his deposition testimony that he felt all of his managerial jobs were important and that his pay rate did not change based on his job assignment. Doc. 37-3, Badii Dep. Ex. C, at 141, 157-58, 160, 169. Defendants insist that Badii merely preferred the Entertainment Manager position, but that his preference is insufficient to make out an adverse employment action. Doc. 37, Defs.' Br. 18; Defs.' Reply 20.

Badii argues that his transfer from Entertainment Manager to Floor Host Manager was a demotion, relying on his own deposition testimony to show that the Floor Host Manager position entailed reduced levels of responsibilities and duties. Doc. 37-3, Badii Dep. Ex. C, at 158. He characterized Floor Host Manager as a less desirable work assignment because he was in a better position as Entertainment Manager to affect the overall health of the club and thus secure a promotion. *Id.* at 159. He also asserts that as Entertainment Manager he had more control over his tip income because by increasing the number of entertainers he could generally increase the amount of tips received and split among the managers. *Id.* at 65-66. Badii admits that the transfer did not affect his pay, however, and that each management position was important. *Id.* at 169.

After reviewing the summary judgment evidence, the Court finds that Badii's transfer to Floor Host Manager was not a demotion. The move involved no decrease in pay and benefits, and, even if the move did include changes in duties, Badii agreed that the new duties were important. *Id.* at 169. Indeed, while Badii testifies that the Entertainment Manager position was superior to his

position as Floor Host Manager, much of his testimony indicates that he merely preferred the position ,and subjective preference is not sufficient to raise a fact issue as to whether a reassignment was also a demotion. *Alvarado*, 492 F.3d at 613. Similarly, the fact that a transfer may decrease an employee's chances for promotion does not make the transfer an adverse action. *See Banks v. East Baton Rouge Parish School Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (noting that a decision that only limits an employee's chances for promotion does not qualify as an adverse action under Title VII); *Pegram*, 361 F.3d at 283 (holding that solely showing that a plaintiff was transferred from a prestigious and desirable position to another position is insufficient to establish adverse employment action); *Davis v. Miss. Transp. Comm'n*, 618 F. Supp. 2d 559, 564 (S.D. Miss. 2009) ("we have repeatedly held that an employment action that limits an employee's future opportunities for promotion, but does not itself affect the employee's job duties, compensation, or benefits, does not qualify as an adverse employment action.").

Even if the transfer involved a decrease in duties, a decrease in duties is only one of a number of factors that the Court must take into account when assessing whether an employment action constitutes a demotion. Badii presents no evidence as to the other factors laid out in *Alvarado*, failing to show or allege that the Entertainment Manager position required greater skill, education, or experience; that it was obtained through a competitive selection process; or that it was objectively more prestigious. *Alvarado*, 492 F.3d at 614. Furthermore, Badii's argument that the Entertainment Manager position was more desirable because it gave him more control over his potential tip income is unconvincing because he also testifies that increasing the number of entertainers was only one of a number of ways that managers could increase their tip payout. *Id.* at 66-69. Even viewing the evidence in a light most favorable to Badii, therefore, the Court cannot conclude that he has raised

-19-

a fact issue as to whether his transfer from Entertainment Manager to Floor Host Manager constituted an adverse employment action.

In summary, the evidence Badii submits of his transfer from Entertainment Manager, unequal tipouts, and the change of his shift assignments to take him off of Sundays and Mondays is insufficient as a matter of law to raise a question of fact as to whether Badii experienced an adverse employment action. On the other hand, the evidence he submits to show that his shifts were reduced and that he was paid less for double shifts and subsequently denied then opportunity to work double shifts at a higher rate is sufficient to raise an issue of fact as to whether he experienced an adverse employment action.

2.     Fourth element of *prima facie* case: other similarly situated employees were treated more favorably or plaintiff was replaced by someone outside protected class

Defendants also claim that Badii fails to establish the fourth element of his *prima facie* case of discrimination because he has not shown that he was treated less favorably than similarly situated employees. Employees are similarly situated if the employment actions at issue occur under "nearly identical circumstances." *Lee. v. Kansas City Southern Ry.*, 574 F.3d 253, 260 (5th Cir. 2009). Employment actions occur under nearly identical circumstances when the employees being compared hold the same job or responsibilities, share the same supervisor or have their employment status determined by the same person, and have essentially comparable violation histories. *Id.* Also, the "conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.*

Defendants do not argue that Badii fails to show that he was similarly situated to other employees, and instead only posit that there is no evidence to show that he was treated less favorably.

They argue that there is no evidence to show that the unequal tipout payments, unequal shift payments, or other alleged acts occurred or that they occurred because of a protected characteristic. Doc. 37, Defs.' Br. 22-23. Similarly, Badii submits no evidence to show that St. Onge or Carl, the two individuals whom he compares himself to, labored under nearly identical circumstances, but instead merely asserts the various instances in which he maintains other employees received favorable treatment. Doc. 38, Pl.'s Resp. 21.

On the summary judgment record before it, the Court hesitates to conclude that Badii was treated less favorably than similarly situated employees. Although there is some basis in the record for finding that Badii received different treatment from those outside his protected class, such evidence does not establish that these other employees were similarly situated. Specifically, though the evidence shows that Badii, Carl, and St. Onge were all managers and all had the same supervisor (Stern), there is nothing to show that they shared similar violation histories or were similarly situated with respect to their workplace conduct. Rather than decide whether the little evidence before it is sufficient to raise an issue of fact as to the final element of Badii's *prima facie* case, and because the Court decides this claim on the basis of pretext, the Court will assume without deciding that this element of Badii's *prima facie* case has been met.

### 3.   Legitimate, nondiscriminatory reasons and pretext

If a plaintiff is able to make out a *prima facie* case of discrimination, a presumption of discrimination arises that the employer must then rebut by articulating "some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802.

The only adverse employment actions that Badii manages to establish are that his shifts were reduced and that he was paid less for double shifts. With regards to both of these claims, Defendants

present evidence that Stern reduced and readjusted Badii's shifts so that he and other managers could monitor Badii. Doc. 37-4, Stern Aff. Ex. D ¶ 10. This testimony comports with the testimony of other Rick's employees who testified that Badii often insulted entertainers, threatened others, stole tips from other workers, and used racial slurs. Docs. 37-5, Andis Aff. ¶¶ 5-7; 37-6, Crenshaw Aff. Ex. F ¶¶ 6-7. Defendants also present Stern's testimony that there is no record of Badii ever working a double shift and not being paid time and a half. *Id.* ¶ 5.

The Court finds that the reasons for Badii's shift reductions and for not assigning him to work double shifts are legitimate and nondiscriminatory, and therefore the burden shifts to Badii to demonstrate that Defendants' proffered reasons for their employment decisions are pretext for discrimination. *Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff makes this showing by providing evidence that discrimination lay at the heart of the employer's decision. *Id.* If a plaintiff shows that an employer's asserted reasons for taking the adverse actions are false, then this showing, coupled with the plaintiff's *prima facie* case, may be sufficient for a factfinder to determine that the employer acted discriminatorily. *Id.*

To show pretext in this case, Badii relies on the same evidence that he submits to establish his *prima facie* case, insisting that Stern's behavior thoroughout Badii's employment reveals an ongoing bias against Badii in favor of white managers. Doc. 38, Pl.'s Br. 21. He takes care to stress once again that Carl, a white Klu Klux Klan member, took over some of his shifts only a month after Stern was hired, and that St. Onge replaced him as Entertainment Manager and received more in tipouts. Doc. 38, Pl.'s Resp. 21. Badii presents all of this without any explanation or additional proof to show that any of these actions were taken because of a protected characteristic or that the legitimate reasons that Defendants offer are false.

The evidence that Badii supplies does not raise an issue of fact as to pretext. Although Badii may present sufficient evidence to raise issues of fact as to whether he experienced adverse actions when his shifts were reduced and he received less for working double shifts, such evidence does not necessarily establish pretext. Again, the plaintiff must present evidence that support an "inference that racial discrimination was the real reason for the employment decision," not simply rehearse a timeline for when adverse actions occurred. *Price*, 283 F.3d at 720; *Patel v. Midland Memorial Hospital & Medical Center*, 298 F.3d 333, 342 (5th Cir. 2002) (finding that a plaintiff failed to raise a fact issue as to pretext because he submitted no evidence to connect the allegedly discriminatory acts to racial animus). Badii points to no specific evidence, direct or circumstantial, that would suggest that the reasons Defendants offer for these adverse actions were false or that the actual reasons were based on Badii's race, national origin, or religion.

Badii apparently intends to argue that the fact that he was treated differently on at least five separate occasions over the course of three years indicates ongoing discrimination. But while evidence of disparate treatment may be sufficient to create a fact issue as to pretext, to raise an inference of discrimination a plaintiff must compare his treatment to that of nearly identical, similarly situated employees. *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005). He must show that the employer gave preferential treatment to an employee under "nearly identical" circumstances. *Id.* This requires a showing that the similarly situated employees not only held similar positions and had the same supervisor, but that they had similar violation histories. *Okoye*, 245 F.3d at 514. As noted above with regards to Badii's *prima facie* case, he submits no evidence to show that he was similarly situated to other employees. He insists that he was treated differently from white supervisors who were also supervised by Stern, but he does not indicate that these managers had

-23-

similar violation histories to him, and, indeed, the undisputed evidence shows that Stern reduced

Badii's shifts and transferred him from his position as Entertainment Manager due to complaints he

had received and problems he had witnessed with Badii's performance. Doc. 37-4, Stern Aff. Ex. D

¶¶ 3, 10. Without more to demonstrate that other employees who were similarly situated to Badii

were treated preferentially, the Court cannot conclude that Badii has sufficiently demonstrated that

he experienced disparate treatment such that he has raised an issue of fact as to pretext.

Although Badii does not rely heavily on this evidence in his briefs, Badii also presents

evidence of certain derogatory statements that Stern and others made throughout his employment.

For instance, Badii points out that after he had been transferred from the position of Entertainment

Manager, Stern stated that "only a white manager can do that job." Doc. 37-3, Badii Dep. Ex. C, at

180. Badii's deposition testimony also shows that Stern made other racially charged jokes around the

time that Badii's shifts were reduced in 2010. *Id.* at 107. A plaintiff may submit comments made in

the workplace as evidence of pretext. *Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003).[4] To

determine whether comments are sufficient to overcome summary judgment, the Court applies the

---

[4]The Fifth Circuit has two tests for determining whether comments are sufficient to overcome summary judgment, although it is unclear exactly what test a court should apply in every case. *Katseanas v. Time Warner Cable, Inc.*, 511 F. App'x 340, 345 n.2 (5th Cir. 2013) (recognizing confusion among Fifth Circuit cases). The Fifth Circuit has, in some cases, noted that different tests will apply in cases where comments are offered as direct evidence of discrimination and cases where they merely serve as circumstantial evidence. *Laxton*, 333 F.3d at 583 n.4; *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012). When comments are submitted as circumstantial evidence of discrimination, a plaintiff must show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker. *Laxton*, 333 F.3d at 583; *Reed*, 701 F.3d at 434. The Fifth Circuit has generally applied the more lax two-part test in cases where additional evidence supported a finding of pretext, however. *Laxton*, 333 F.3d at 583-85; *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 226 (5th Cir. 2000). In other cases, even though the Court applied the *McDonnell Douglas* framework, it elected to use the four-part test laid out above when there was no evidence in addition to the comments to indicate pretext. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010); *Rubinstein*, 218 F.3d at 400-01. Accordingly, the Court applies the traditional four part test above.

traditional four step test, asking whether the comments are (1) related to the protected class of persons to which the plaintiff belongs, (2) proximate in time to the complained of employment action, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue. *Rubinstein v. Administrators of Tulane Educational Fund*, 218 F.3d 392, 400-01 (5th Cir. 2000). If remarks fail this test, then they are considered stray remarks which, unsupported by other evidence of pretext, will generally not be sufficient to sustain a case past the summary judgment stage. *Id.* (holding that, without other evidence to indicate pretext, discriminatory comments would not be sufficient to survive summary judgment on a discrimination claim); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003) (noting that discriminatory remarks are probative of discriminatory intent "so long as remarks are not the only evidence of pretext"); *Katseanas*, 511 F. App'x at 346 (reaffirming that stray remarks standing alone are insufficient to raise factual disputes).

The comments at issue here are not sufficient to raise a genuine issue of material fact as to pretext. Even though some of the comments Stern made in 2010 occurred close in time to a reduction in Badii's shifts, there is no indication that the comments were in any way related to the decision to reduce his shifts. Doc. 37-3, Badii Dep. Ex. C, at 107, 232-34. The other comments that Stern made throughout Badii's employment were not related to any specific adverse action and apparently were not proximate in time to the alleged adverse actions. *Id.* at 101-05, 108-09, 218. Stern's statement that "only a white manager" could do the job of Entertainment Manager, while offensive and suggestive of racial animus, is also not sufficient to raise a question as to pretext because the only adverse action it relates to (Badii's transfer to Floor Host Manager) is not an adverse employment action, and therefore cannot support a claim of discrimination.  Accordingly,

even though the remarks were race-based and were made by Badii's supervisor, they are not sufficient alone to raise an issue of fact as to pretext.

Because Badii fails to submit evidence to demonstrate that Defendants' proffered reasons for the alleged adverse actions are false or motivated by race, he has failed to raise a genuine issue of material fact as to pretext. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment as to Badii's discrimination claims.

*B. Retaliation*

Defendants also move for summary judgment on Badii's retaliation claims, asserting that Badii cannot establish any of the elements of a *prima facie* case of retaliation. Badii, in turn, points to evidence that he was reprimanded and demoted for opposing discriminatory policies, that he experienced reduced shifts for complaining about differences in pay, and that he was prevented from reporting racially charged incidents to higher authority, all of which, he claims, demonstrate retaliation.

The *McDonnell Douglas* framework also applies to Badii's retaliation claim. *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001). In order to make out a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that he engaged in a protected activity, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Septimus v. University of Houston*, 399 F.3d 601, 610 (5th Cir. 2005).

1.    First element of *prima facie* case: plaintiff engaged in a protected activity

A "protected activity" under Title VII " is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376,

385 (5th Cir. 2003). An "unlawful employment practice" is defined as the failure or refusal of an employer to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).

Badii insists that he engaged in protected activities under Title VII when, as Entertainment Manager, he hired all qualified applicants in opposition of a discriminatory employment policy and when he complained to Stern about the policy. Docs. 38, Pl.'s Resp. 16-17; 37-3, Badii Dep. Ex. C, at 240-41, 249. He also maintains that he engaged in a protected activity when he complained to Stern that he was being paid less in tipouts than St. Onge. Doc. 37-3, Badii Dep. Ex. C, at 142-45, 250. Finally, Badii claims that he engaged in a protected activity when he sought to report the North Cabaret incident to higher management. Docs. 38, Pl.'s Resp. 19; 37-3, Badii Dep. Ex. C, at 194-95.

Defendants assert that Badii cannot establish that he engaged in a protected activity, both as a matter of law and as a matter fact. Doc. 37, Defs.' Br. 25. They argue that hiring African American employees is not the same as opposing an unlawful practice under Title VII, and therefore does not qualify as a protected activity. *Id.* at 25-26. They also argue that the summary judgment evidence, specifically Stern's and Crenshaw's affidavits, shows that no discriminatory policy existed and that no unequal tipout payments ever occurred. Doc. 39, Defs.' Reply 12-13.

Badii opposed an unlawful employment practice when he hired African American dancers in defiance of an unlawful hiring policy and when he expressed his discontent over the same policy to Stern because both actions would have alerted Stern to Badii's reasonable belief that the policy was unlawfully discriminatory. *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) ("To satisfy the 'opposition clause,' Byers need not prove that TDMN's practices were actually

-27-

unlawful, but only that he had a 'reasonable belief that the employer was engaged in unlawful employment practices.'"); *Matthews v. City of West Point*, 863 F. Supp. 2d 572, 595 (N.D. Miss. 2012) (finding that officer's refusal to consider race when making arrests in defiance of race-based policy qualifies as a protected activity). Similarly, Badii's attempts to avail himself of the internal grievance system following the North Cabaret incident constituted a protected activity. *Long v. Eastfield College*, 88 F.3d 300, 306 n.5 (5th Cir. 1996) (availing oneself of an internal grievance system can qualify as a protected activity); *Hanks v. Shinseki*, No. 3:08-1594-G, 2010 WL 3000835, at *6 (N.D. Tex. July 28, 2010) (same).

Defendants contend that Badii fails to submit sufficient evidence to show that a racially discriminatory hiring policy was in place or that he was reprimanded for hiring African American dancers, but the only evidence that Defendants submit to establish this argument is Stern's affidavit denying that such a policy existed and an affidavit from another employee testifying that XTC Cabaret was racially diverse. Docs. 37-4, Stern Aff. Ex. D ¶ 18; 37-6, Crenshaw Aff. Ex. F ¶ 2. Such evidence does not show that, as a matter of law, no such policy existed or that Badii did not oppose an unlawful hiring policy, but only raises fact issues as to whether the protected activities occurred. Additionally, Defendants present Stern's testimony denying that he forbid Badii from contacting higher management, but this evidence also only manages to create a fact issue as to whether Badii was denied the opportunity to avail himself of Rick's internal grievance system. Doc. 37-4, Stern Aff. Ex. D ¶ 19. The evidence that Defendants submit to show that Badii had spoken to Ed Anaker on other occasions about "operations questions" is not sufficient to show that the alleged event did not occur, and, contrary to Defendants' assertions, Badii's testimony does not state that he contacted Ed Anaker about the North Cabaret incident despite Stern's prohibitions. Docs. 37-7, Anaker Aff. Ex.

G ¶ 3; 37-3 Badii Dep. Ex. C, at 252-53. Viewing the evidence in a light most favorable to Badii, the Court finds that there is an issue of fact as to whether he engaged in a protected activity.

Badii's complaint about receiving less in tipouts does not constitute a protected activity, however, because when he made the complaint to Stern he did not complain that any discriminatory conduct was taking place. *Brown v. United Parcel Service, Inc.*, 406 F. App'x. 837, 840 (5th Cir. 2010) (finding plaintiff's complaints about unfair work distribution, unpaid overtime, and selective enforcement of lunch policy, without claims of discrimination based on a protected characteristic, did not constitute protected activity); *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 349 (5th Cir. 2007) (sending an email that complains of a deteriorating relationship between employees is not a protected activity because it does not refer to any discriminatory conduct). Although Badii speculates that race had something to do with his receiving less in tipouts, at the time he made his complaint he only complained about unequal pay and did not mention race or any other protected characteristic. Doc. 37-3, Badii Dep. Ex. C, at 144-46, 237-38. His complaint about unequal tipout payments therefore did not constitute a protected activity.

2.   Second element of *prima facie* case: an adverse employment action occurred

Defendants also maintain that Badii cannot establish that he experienced an adverse employment action. The requisite showing to establish an "adverse employment action" for a retaliation claim differs from that required for a discrimination claim. *White*, 548 U.S. at 67-68. In order for retaliation to be actionable, the challenged action must rise to a level that a reasonable employee would have found "materially adverse," meaning that it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. While the antiretaliation provision of Title VII does not protect an individual from all retaliation, it does

protect him from retaliation that produces injury or harm. *Id.* at 67. An employee is not protected from "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Drawing on his deposition testimony, Badii argues that he experienced five adverse employment actions. The first three he alleges occurred in response to his complaints about unequal tipout payments and his insistence on hiring African American dancers in defiance of the club's policy: (1) his shifts were reduced, (2) he was reprimanded, and (3) he was demoted from Entertainment Manager to Floor Manager. Doc. 38, Pl.'s Resp. 19; 37-3, Badii Dep. Ex. C, at 145, 157-59, 250. Although he does not point to protected activities that gave rise to these actions, Badii also alleges that he experienced adverse employment actions (4) when Stern refused to allow him to contact higher management after the North Cabaret incident and (5) when John Henry threatened and verbally assaulted him. Doc. 38, Pl.'s Resp. 20; 37-3, Badii Dep. Ex. C, at 111-13, 228, 252-53.

Defendants argue that the alleged shift reduction that Badii experienced does not qualify as an adverse action because after his shifts were reduced from five to four per week, they were restored to five per week a month later. Doc. 37-3, Badii Dep. Ex. C, at 145, 248. Defendants also provide the testimony of both Stern and another employee to show that Stern never paid unequal tipouts to the managers. Docs. 37-4, Stern Aff. Ex. D ¶ 6; 37-6, Crenshaw Aff. Ex. F ¶ 4.

Defendants also assert that Badii was neither reprimanded nor demoted for hiring African American dancers. As to the alleged reprimand, Defendants present Stern's affidavit testimony that he did not maintain a racist hiring policy and that he did not reprimand Badii for hiring African American dancers. Doc. 37-4, Stern Aff. Ex. D ¶ 18. They also maintain that even if Stern did

express displeasure over Badii hiring African American entertainers, such a showing would be insufficient because expressing displeasure is not an adverse employment action. Doc. 37, Defs.' Br. 26-27. Defendants also aver that Badii was merely reassigned from his position as Entertainment Manager, and not demoted. Doc. 37, Defs.' Br. 26-27. They rely on Stern's affidavit testimony in which he states that Badii's reassignment was a lateral move. Doc. 37-4, Stern Aff. Ex. D ¶¶ 3, 17-18. They also note that Badii himself testified that he felt he was reassigned because he complained about tipouts, which is not an adverse action, and thus not because of a protected activity. Doc. 37-3, Badii Dep. Ex. C., at 250.

Defendants further allege that Badii has provided insufficient evidence to show that he was prevented from complaining to higher management after the North Cabaret incident. *Id.* at 29. They submit Stern's affidavit testimony that Badii was never forbidden from making complaints and Anaker's testimony that he spoke with Badii regarding numerous issues and never forbid him from contacting him. Docs. 37-4, Stern Aff. Ex. D ¶ 19; 37-7, Anaker Aff. Ex. G ¶ 3. Furthermore, they argue that restricting access to an internal grievance process is not an adverse employment action. Doc. 37, Defs.' Br. 30.

 Finally, Defendants maintain that Badii's assertions that he was subject to physical and verbal intimidation at North Cabaret and at the hands of John Henry do not rise to the level of adverse employment actions for purposes of his retaliation claim because they are not connected to any protected activity. Doc. 37, Defs.' Br. 28.

       i.     *Shift reduction*

As with Badii's discrimination claims, the Court finds that the alleged reduction in shifts that Badii experienced is an adverse employment action. The fact that Badii was restored to five shifts a

month later does not diminish the adversity of the action if it was taken in response to an a protected

activity. An employee would still likely be dissuaded from making complaints in the future if he

feared that his shifts, and therefore his income, would be reduced in response. *White*, 548 U.S. at 68;

*see also McNairy v. Chickasaw Cnty*, No. 1:09-cv-59-SA-JAD, 2010 WL 3813612, at *4 (N.D. Miss.

Sept. 22, 2010).

### ii.      *Verbal reprimand*

Recent case law has generally held that a verbal reprimand is not sufficiently material to

constitute an adverse employment action in a retaliation case. *Hernandez v. Johnson*, 514 F. App'x

492, 499 (5th Cir. 2013) (finding that a letter of counseling was not an adverse employment action);

*King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008); *Sprouse-Hudson v. Donahue*, No. 4:11-cv-470-

A, 2012 WL 5359774, at *5 (N.D. Tex. Oct. 31, 2012). The alleged verbal reprimand that Badii

received from Stern for hiring an African American dancer is therefore an adverse employment

action.

### iii.      *Demotion*

Badii's reassignment from his position as Entertainment Manager to a new position as Floor

Host Manager also does not constitute an adverse employment action. The inquiries for determining

whether a reassignment qualifies as an adverse action differ slightly for discrimination and retaliation

claims, yet the reasons for finding that Badii's reassignment is not an adverse action are similar for

both his discrimination and retaliation claims. *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d

473,485 (5th Cir. 2008) (finding that a reassignment was not an adverse employment action because,

under the circumstances of the case, it was not materially adverse). Again, the reassignment did not

affect Badii's pay, and there is no evidence that the position was objectively more arduous or less

prestigious. *Id.* Badii may have subjectively preferred the Entertainment Manager position and viewed it as more prestigious, yet such subjective preferences are immaterial in determining material adversity. *Id.* Thus, even though a reassignment does not necessarily have to be accompanied by a decrease in pay to be materially adverse, after considering all of the evidence before it the Court determines that Badii's reassignment to Floor Host Manager does not rise to the level of material adversity necessary to constitute an adverse employment action.

### iv. *Refusal to allow plaintiff to complain to higher management*

Stern's refusal to permit Badii to contact higher management is likely an adverse employment action. While some Fifth Circuit precedent would suggest otherwise, many of these cases were either decided before the Supreme Court's decision in *White* or involved distinguishable fact patterns. *Lynch v. Baylor*, No. 3:05-cv-0931-P, 2006 WL 2456493, at *8-*9 (N.D. Tex. Aug. 23, 2006) (finding that denial of access to an internal grievance process was not an adverse employment action because it was part of a business procedure that foreclosed internal complaints only after a plaintiff filed an EEOC complaint); *Gregory v. Texas Youth Comm'n*, 111 F. App'x 719, 721 (5th Cir. 2004) (finding that denying access to an internal grievance system was not an adverse employment action because it was not an ultimate employment decision). Under the circumstances of this case, however, Stern's refusal could be an adverse employment action because it would likely "dissuad[e] a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. 53, 68 (2006). Indeed, Stern's alleged behavior directly prevented Badii from making a charge of discrimination to higher management, and Badii testified that he hesitated to contact higher management because of the possible repercussions he would experience from Stern. Doc. 37-3. Badii Dep. Ex. C, at 228, 250-52. Thus, the Court concludes that the evidence Badii submits of Stern's refusal to allow him to

complain to higher management raises a fact issue as to whether he experienced an adverse employment action.

> v.     *John Henry and North Cabaret incidents*

The John Henry and North Cabaret incidents are not adverse employment actions because they involved the acts of ordinary employees not in furtherance of their employer's business. *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (finding that harassment, including verbal threats, by coemployees were not adverse actions because "[t]he actions of ordinary employees are not imputable to their employer unless they are conducted in furtherance of the employer's business."); *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) ("The statements and actions of ordinary employees are normally not imputable to the employer."). Thus, even if there is a close temporal connection between Badii's complaints to Stern after the North Cabaret incident and the John Henry incident, and even if John Henry allegedly yelled "do you know what discrimination is?" when he approached Badii, doc. 37-3, Badii Dep. Ex. C, at 111-13, these events are not sufficient to raise a genuine issue of fact as to whether he Badii experienced an adverse employment action.

In summary, the evidence that Badii submits to show that he was reprimanded for hiring African American dancers, that he was demoted, and that he was verbally and physically threatened are insufficient to raise genuine issues of fact as to whether he experienced an adverse employment action. The Court does find, however, that Badii has raised an issue of fact as to whether he experienced an adverse employment action when his shifts were reduced and when Stern refused to allow him to complain to higher management.

> 3.     Third element of *prima facie* case: causal link between the protected activity and

adverse action

Finally, Defendants argue that Badii presents insufficient evidence to demonstrate a causal connection between his purported protected activities and the adverse employment actions he experienced. Because Badii has only managed to raise a fact issue as to whether he experienced an adverse employment action when his shifts were reduced and when he was prohibited from contacting higher management, the Court will focus solely on determining whether there is a causal connection between these actions and a protected activity.

Defendants maintain that there is no evidence of a causal connection between Badii's complaints about shift changes and a protected activity. Doc. 37, Defs.' Br. 31. Again, they point out that while Badii testified that his shifts were reduced, they were increased to five once again only a month later. Doc. 37-3, Badii Dep. Ex. C, at 248. They present the testimony of Stern and Crenshaw to again demonstrate that there were no unequal tipouts, thus suggesting that Badii therefore did not make complaints for which his shifts were reduced. Doc. 37, Defs.' Br. 30.

Badii responds by arguing that his shifts were reduced due to his complaints about unequal pay. Doc. 38, Pl.'s Resp. 19. He presents no evidence to support his claims that these incidents were connected, but seems to suggest that the proximity of the decisions indicates a connection. Doc. 37-3, Badii Dep. Ex. C, at 145, 250. He similarly maintains that Stern's insistence that he not contact higher management and the John Henry incident were both connected, because they also occurred in close proximity to one another. *Id.* at 111-13, 194-95, 251-53.

Although temporal proximity can in some circumstances establish the third element of a prima facie case of retaliation, the Court does not need to determine whether this is the case here because Badii fails to pinpoint protected activities to which his surviving adverse employment actions

are linked or proximately located. *Septimus*, 399 F.3d at 610. Badii states that Stern's refusal to allow him to contact upper management was an "adverse action causally linked to a protected activity," yet he fails to clarify what that protected activity might be. Doc. 38, Pl.'s Resp. 19. Furthermore, no connection to a protected activity is apparent from the face of the record. Unsubstantiated assertions and conclusory allegations are insufficient to survive summary judgment. *Delta & Pine Land Co. v. Nationwide Agribusiness Insurance Co.*, 530 F.3d 395, 399 (5th Cir. 2008). Additionally, while Badii alleges that the reduction in his shifts from five to four was solely linked to his complaints about receiving less in tipouts than St. Onge, doc. 37-3, Badii Dep. Ex. C, at 250, the Court has already determined that Badii's complaint about tipouts was not a protected activity. Accordingly, Badii has also failed to link his reduction in shifts to a protected activity.

Because Badii fails to provide any evidence of a causal link between adverse actions that he experienced and a protected activity, he fails to make out a *prima facie* case of retaliation. Consequently, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Badii's retaliation claims.

## C. Hostile Work Environment

Defendants also move for summary judgment on Badii's hostile work environment claims. They maintain that Badii cannot establish a *prima facie* case of hostile work environment because he cannot show that he experienced harassment that affected a term, condition, or privilege of employment. Badii relies upon the North Cabaret and John Henry incidents and asserts that these incidents raise a genuine issue of material fact as to whether he experienced a hostile work environment.

In order to make out a claim of hostile work environment, an employee must show that he

(1) belongs to a protected group, (2) was subjected to unwelcome harassment, (3) the harassment complained of was based on race, (4) the harassment complained of affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Hernandez*, 670 F.3d at 651. If the harassment was committed by a supervisor with immediate or successively higher authority over the victim, then a plaintiff need only make a showing as to the first four elements. *Celestine v. Petroleos de Venezuela, S.A.*, 266 F.3d 343, 353 (5th Cir. 2001).

Defendants apparently do not contest that Badii is able to make out the first, second, third, or fifth elements of his hostile work environment claim. They instead focus their attention on arguing that Badii fails to establish the fourth element of his claim: that the harassment he alleges affected a term, condition, or privilege of his employment. Doc. 37, Defs.' Br. 34. Harassment affects a "term, condition, or privilege of employment" if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez*, 670 F.3d at 651. When considering whether a work environment is sufficiently hostile, a court takes all circumstances into consideration, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Simple teasing, offhand comments, and non-serious, isolated incidents are not sufficient to show that harassment affects a term, condition, or privilege of employment. *Ballard v. Healthsouth Corp.*, 147 F. Supp. 2d 529, 536 (N.D. Tex. 2001). To be actionable, the environment must be both objectively and subjectively offensive, one that both a reasonable person would perceive, and that the victim did perceive, as offensive. *Hernandez*, 670 F.3d at 651.

Defendants argue, first, that Badii's general catch-all allegations that he was subject to ongoing discriminatory comments are generally insufficient to create a fact issue on his hostile work environment claim. Doc. 37, Defs.' Br. 35. They maintain that Badii only points to a handful of conversations that centered on his faith or national origin, and they argue that if any comments arose out of these conversations they were merely teasing or offhand comments that are not actionable. *Id.* at 34-35. As to the specific instances of harassment that Badii alleges in his Complaint, Defendants argue that these also constitute mere utterances that cannot support a hostile work environment claim. *Id.* at 36-37. Defendants specifically argue that the North Cabaret incident occurred during a social outing and involved crass comments by an entertainer who did not work at XTC Cabaret and under circumstances that would not affect Badii's work environment. *Id.*; doc. 39, Defs.' Reply 9. Defendants similarly aver that, like the North Cabaret incident, the confrontation with John Henry was an isolated incident that involved crass comments that are not actionable. Docs. 37, Defs.' Br. 36-37; 39, Defs.' Reply 10-11. Finally, relying upon prior tweets that Badii made as well as testimony from Stern and other employees, Defendants assert that Badii also participated in the exchange of racial slurs and discriminatory comments as part of the club's rowdy working environment and that he therefore was not likely offended by his coworkers comments such that a term or condition of his employment would be altered. Doc. 37, Defs.' Br. 35-36.

Badii maintains that the North Cabaret and John Henry incidents are sufficient alone to raise a genuine issue of material fact as to whether he experienced a hostile work environment. Doc. 38, Pl.'s Resp. 12-15. He presents deposition testimony in which he states that the North Cabaret incident occurred during a mandatory management meeting, not a social outing, and that not only did the entertainer call him a racial slur, but so did another manager as Badii turned to leave. Doc.

37-3, Badii Dep. Ex. C, at 189, 192-93. Badii testifies that Stern subsequently forbade him from contacting higher management to inform them of the incident. *Id.* at 194-95. Badii also relies on his deposition testimony, in which he relates the verbal and physical intimidation he suffered at the hands of John Henry. *Id.* at 111-13. Badii insists that both of these incidents were severe enough that they altered the conditions of his employment. Doc. 38, Pl.'s Resp. 38-39.

Having considered all of the summary judgment evidence, the Court finds that Badii has submitted sufficient evidence to raise a fact issue as to whether the  harassment complained of affected a term, condition, or privilege of employment. The Court notes that Badii's Complaint alleges many more discriminatory statements than Badii raises in his Response. Despite Badii's failure to rely on most of these comments in his summary judgment brief, the Defendant addresses them in its brief and they stand out on the face of the record as significant instances of harassment. "The district court is not limited to evidence presented in support of summary judgment, rather the court may consider the entire record before it in rendering a decision on a summary judgment motion." *Sandlin v. Dobson Cellular Systems, Inc.*, 265 F. App'x 179, 181 (5th Cir. 2008). Accordingly, the Court will consider these statements in determining whether the harassment Badii experienced was severe or pervasive.[5]

The Court therefore looks first to the various discriminatory comments that Badii alleges occurred throughout his employment at XTC Cabaret. Doc. 37-3, Badii Dep. Ex. C., at 104, 108,

---

[5]While the Court recognizes that some of these statements fall outside the statute of limitations for a hostile work environment claim, neither party has raised limitations as an issue. Furthermore, the continuing violations doctrine may apply in this situation, because the statements are apparently related and continued throughout the entire period of Badii's employment with no remedial action taken by Badii's employer. *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 329 (5th Cir. 2009). The Court does not decide the issue of limitations, but viewing the evidence in a light most favorable to Badii it cannot conclude that he was not subject to continuing violations throughout his three years of employment.

174, 260. Badii asserts in his deposition testimony that, soon after he was first employed, his supervisors and other employees frequently referred to him as "a Muslim terrorist" despite his requests that they cease doing so. Doc. 37-3, Badii Dep. Ex. C, at 101-05. After Stern was hired, Badii further asserts that Stern started making jokes about Badii in front of other managers that were both racially and religiously based, including calling Badii a jihadist, asking where he hid his bomb, whether Badii's girlfriend covered her body, and other offensive comments. *Id.* at 107, 232-234. He also maintains that Carl, another manager, called Badii various epithets on a daily basis and in front of others. *Id.* at 108-09. Badii also states that Stern referred to Badii as a "stupid n****r" when Badii rang up the money Daniel Castaneda collected for minor cover charges, and that he also remarked that "only a white manager can do [the job of Entertainment Manager] correct; isn't that right Ryan?" *Id.* at 180, 218. Badii also makes a general allegations that St. Onge participated in the racial and religious comments and that St. Onge, Stern, and others used derogatory terms when referring to customers. *Id.* at 107, 174, 234, 263-64.

Simple teasing and offhand remarks will not be sufficient to show a hostile work environment, but a regular pattern of frequent verbal ridicule sustained over time can be sufficiently severe or pervasive to support a hostile work environment claim. *EEOC v. WC&M Enterprises, Inc.*, 496 F.3d 393, 400 (5th Cir. 2007). It is unclear whether the few specific instances of derogatory statements that Badii alleges, standing alone, are sufficient to raise an issue of fact as to whether Badii endured a hostile work environment. Doc. 37-3, Badii Dep. Ex. C., at 122-125. On one hand, courts have found that harassment was not sufficiently severe or pervasive in cases where plaintiffs have alleged more specific comments than Badii has occurring within a shorter period of time. *Lacy v. Dallas Cowboys Football Club*, No. 3:11-cv-0300-B, 2012 WL 2795979, at *7 (N.D. Tex. July 10, 2002)

(finding that five racial slurs within a three month period is not sufficient to raise a fact issue regarding a hostile work environment); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 595-96 (5th Cir. 1995) (ten derogatory statements over a two and a half year period not sufficient to raise a fact issue regarding a hostile work environment). Furthermore, it is unclear whether Badii's testimony that similar comments occurred "frequently" or "constantly," without being more specific, is competent evidence that can sustain his hostile work environment claim past summary judgment. *Compare Siddiqui v. Autozone West, Inc.*, 731 F. Supp. 2d 639, 647 (N.D. Tex. 2010) (finding that a plaintiff's testimony that racist comments occurred "many times" over the course of his employment was insufficient to show that the conduct was pervasive or severe) *with Carrera v. Commercial Coating Services, Int'l*, 422 F. App'x 334, 338-39 (5th Cir. 2011) (holding that evidence submitted to show that a plaintiff endured at least three specific instances of discrimination and that he was "constantly" called racial epithets raised triable issues of fact as to racial harassment).

On the other hand, Badii's testimony that comments from Marty Ray Carl occurred on a "daily" basis and that he often made these statements in front of others does tend to show that he suffered pervasive harassment. Doc. 37-3, Badii Dep. Ex. C, at 108-09.[6] Cases that Defendants cite to like *Siddiqui* and *Ellini* are distinguishable on this point because the plaintiffs in those cases either stated only that harassment was "constant" or only alleged specific instances of derogatory statements

---

[6]There is some indication in the record that the comments from Carl may not have continued throughout Badii's entire three years of employment. Doc. 37-3, Badii Dep. Ex. C, at 109. At the same time, Badii insists that he experienced discrimination from the day that he began until the day he left. *Id.* at 253. Both parties acknowledge that Carl has passed away, but neither specifies when this occurred or if he stopped working at XTC Cabaret prior to Badii's departure. Docs. 37, Defs.' Br. 22; 38, Pl.'s Resp. 21. The Court cannot therefore conclusively determine when and if the harassment from Carl ceased.  This evidence would possibly have an impact on the Court's determination of how pervasive the discrimination was, but, either way, the evidence still suggests that Badii was subject to pervasive discriminatory comments.

that occurred infrequently or within relatively discrete periods of time. *Siddiqui*, 731 F. Supp. 2d at 647; *Ellini v. Ameriprise Financial, Inc.*, 881 F. Supp. 2d 813, 821 (S.D. Tex. 2012). Here, by contrast, Badii argues that he experienced derogatory statements at different times in his employment and, with regards to Carl, almost every day. Although the Court hesitates to deny summary judgment on the basis of these comments alone, the facts alleged by Badii do come close to cases in which other courts have found that evidence of pervasive discriminatory statements created an issue of fact as to whether harassment was sufficient to alter a term or condition of employment. *WC&M Enterprises*, 496 F.3d at 400-01 (finding that a plaintiff raised a fact issue as to severe or pervasive harassment when, over a one-year period, a plaintiff was "constantly" called "Taliban" or "Arab," endured other mocking remarks, and was often startled when another employee intentionally banged on a glass partition to his office); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (finding that an issue of fact arose as to the severity and pervasiveness of harassment when African American employees endured over ten specific instances of discriminatory statements during a three year period); *Jackson v. Federal Express Corp.*, No. 3:03-cv-2341-D, 2006 WL 680471, at *9-*10 (N.D. Tex. Mar. 14, 2006) (holding that evidence presented to show that plaintiff endured racial slurs over "several years" and on a "daily basis" was sufficient to raise a fact issue as to severe and pervasive harassment); *Carrera*, 422 F. App'x at 338-39 (holding that evidence submitted to show that a plaintiff endured at least three specific instances of discrimination and that he was "constantly" called racial epithets raised triable issues of fact as to racial harassment); *EEOC v. City of North Richland Hills*, No. 4:08-cv-558-Y, 2009 WL 3321336, at *4-*5 (N.D. Tex. Oct. 14, 2009) (finding a triable issue of fact on a hostile work environment claim when a plaintiff "constantly" endured "numerous" derogatory statements about his age). *But see Lacy*, 2012 WL 2795979, at *7; *DeAngelis*, 51 F.3d at 595.

While evidence of a few discrete offensive comments may not be sufficient to sustain Badii's case beyond the summary judgment stage, the Court finds that evidence of such comments, in addition to Badii's deposition testimony regarding the John Henry and the North Cabaret incidents, does raise an issue of fact as to whether he endured severe or pervasive harassment that affected a term or condition of his employment. Unlike the other events Badii alleges, these latter two events went beyond mere offensive utterances to include either physical threats or humiliation. *Lacy*, 2012 WL 2795979, at *7; *Hernandez*, 670 F.3d at 651. As Badii describes the North Cabaret incident, the entertainer repeatedly referred to him using a racial epithet and, after none of the other managers intervened, he walked away feeling humiliated. Doc. 37-3, Badii Dep. Ex. C, at 190-93. Stern provides a very different account of the event, but determining which version of the incident is most accurate is a credibility determination more appropriate for resolution by a trier of fact. If the event did occur as Badii describes it, it would be both objectively and subjectively humiliating, especially given that Badii's supervisors and other Rick's managers were present. Doc. 37-3, Badii Dep. Ex. C, at 190-93. As to the John Henry incident, Badii's deposition testimony is clear and undisputed evidence that the event occurred and was both physically and verbally threatening, regardless of whether club security intervened. Doc. 37-3, Badii Dep. Ex. C, at 111-113.[7]

Though Defendants argue that both the John Henry and North Cabaret incidents do not show that Badii's work environment was hostile because they involved individuals employed at a different club, harassment does not have to come at the hands of coworkers in order to contribute

---

[7]Although Stern's refusal to allow Badii to contact upper management following the North Cabaret incident apparently adds to the abusive nature of Badii's work environment, the refusal was not based on race but instead on Stern's desire to retain control of XTC Cabaret. Doc. 37-3, Badii Dep. Ex. C, at 194-95. Thus, the Court does not consider Stern's order that Badii not contact higher management in assessing the pervasiveness or severity of the harassment Badii suffered.

to a finding of a hostile work environment. *See, e.g.*, *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073-74 (10th Cir. 1998) ("an employer who condones or tolerates the creation of such an environment [permeated with discriminatory intimidation, ridicule, and insult] should be held liable regardless of whether the environment was created by a co-employee or a nonemployee, since the employer ultimately controls the conditions of the work environment."); *Siddiqui*, 731 F. Supp. 2d 639, 647 (N.D. Tex. 2010) (noting that "customer statements may be sufficient to create a hostile work environment"). The focus of the inquiry when determining a hostile work environment is therefore on the employer's control of the conditions under which the harassment occurred, and both of the harassers in these instances were not complete third parties. They were both employed by Rick's, and there is an issue of fact as to whether both events took place during work or work-related events that were under Rick's control.[8] Thus, it is not unreasonable to say that these events were part of Badii's work environment and contributed to the environment's overall hostility.

Defendants rely upon *Vaughn v. Pool Offshore Co.* and argue that any comments that were directed towards Badii were simply the product of a rowdy environment in which he also participated when he made offensive comments and used racial slurs. But this case is distinguishable from *Vaughn* because in *Vaughn* the Court based its ruling not only on the fact that the plaintiff used racial slurs along with his coworkers, but also the fact that the plaintiff did not believe that the offensive conduct he endured took place due to his race. 683 F.2d 922, 924-25 (5th Cir. 1982).[9] Here, by contrast,

---

[8]The fact that the North Cabaret incident occurred in a different club also does not matter because abuse "need not be confined to working hours in order to affect a 'term, condition, or privilege' of employment within the meaning of Title VII." *Pfau v. Reed*, 125 F.3d 927, 933 (5th Cir. 1997) *abrogated on other grounds by* 525 U.S. 801 (1998).

[9]Even if the harassers were mistaken about Badii's race or national origin, it does not matter because their comments were clearly based on his appearance and their perception of his origins. *WC&M Enterprises*,

Badii alleges that he requested that the comments cease and that he was ignored. Doc. 37-3, Badii Dep. 107-08. *See also Watkins v. Texas CES, Inc.*, No. 4:08-cv-243-Y, 2009 WL 3424736, at *5 (N.D. Tex. Oct. 26, 2009) ("the fact that Watkins participated in using the racial slur does not bar his hostile work environment claim if he shows that at some point he clearly stated that such conduct would, in the future, be considered unwelcome and the conduct continued thereafter") (citing *Erps v. W. Va. Human Rights Comm'n*, 680 S.E.2d 371, 380-83 (W. Va. 2009)); *see also Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that just because a plaintiff provoked discriminatory conduct did not necessarily mean that it was not unwelcome); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (indicating that the proper inquiry is whether a plaintiff indicates by her conduct that the discriminatory conduct was unwelcome, not whether she voluntarily participated in the conduct). Neither party submits evidence to show that derogatory statements and racial slurs were bandied about among the employees at XTC Cabaret without animus and without offense to Badii or others. *Vaughn*, 683 F.2d at 924-25. Instead, Badii alleges that he requested that the statement cease and that he attempted to complain about some of these events, but was either ignored or prohibited from making complaints to higher management. The evidence Defendants submit of Badii's tweets does not change this conclusion because these tweets were not clearly directed towards anyone and were not made in the workplace. Doc. 37-3, Badii Dep. Ex. 1. This case therefore differs from *Vaughn*, and the discriminatory comments and behaviors Badii experienced cannot be dismissed as products of a rowdy and irreverent environment.

Finally, Defendants argue that Badii fails to raise an issue of fact as to whether he endured

---

496 F.3d at 401.

a hostile work environment because he submits no evidence that the North Cabaret incident, nor any other incident, affected his work performance or altered the conditions of his employment in any way. Badii did testify that he felt unhappy at the club due to these incidents and that he felt embarrassed and humiliated by some of the events, but he does not allege that his work performance suffered. Doc. 37-3, Badii Dep. Ex. C, at 193, 254. Regardless, whether alleged harassment affects an employee's work performance is only one factor that a court looks at to determine if harassment is severe or pervasive. *Mota v. University of Texas Houston Health Sci. Ctr.*, 261 F.3d 512, 524 n.33 (5th Cir. 2001).

Viewing the evidence in a light most favorable to Badii, as the Court must at this stage, the Court cannot conclude that no reasonable jury would find that he was subjected to a hostile work environment. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as to Badii's hostile work environment claim.

*D.* Sabine Pilot *Claim*

Finally, Defendants move for summary judgment on Badii's *Sabine Pilot* claim. They specifically assert that Badii submits no evidence to show that he was required to commit a criminal act or that he was terminated, two fundamental elements of a *Sabine Pilot* claim. Badii maintains that he was discharged because he refused to participate in a criminal conspiracy to admit minors into a sexually oriented business.

Texas adheres to the longstanding employment at-will doctrine, which holds that employment for an indefinite term may be terminated at will and without cause. *Safeshred, Inc. v. Martinez*, 365 F.3d 672, 675 (Tex. 2012); *Hancock v. Express One Int'l, Inc.*, 800 S.W.2d 634, 636 (Tex. App.–Dallas 1990, no writ). The Texas Supreme Court recognized an exception to the

employment at-will doctrine in *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985), which allows the employee to recover for wrongful termination when the employee's refusal to perform an illegal act was the basis for his termination. *Safeshred*, 365 S.W.3d at 659; *Nordsell v. GMAC*, 774 F. Supp. 2d 823, 824 (N.D. Tex. 2011). Thus, in order to demonstrate that a case falls under the *Sabine Pilot* exception, an employee must demonstrate that (1) he was required to commit an illegal act which carries criminal penalties; (2) he refused to engage in the illegality; (3) he was discharged; and (4) the sole reason for his discharge was his refusal to commit an unlawful act. *White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003).

Badii claims that he was discharged for refusing to engage in a criminal conspiracy to violate both section 43.25 of the Texas Penal Code and Dallas City Code § 41A-20.1. Under Texas law, a person is guilty of criminal conspiracy if, with intent to commit a felony, he "(1) agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement." Tex. Penal Code Ann. § 15.02.

A person violates section 43.25 of the Texas Penal Code if "knowing the character and content thereof, he employs, authorizes, or induces a child younger than 18 years of age to engage in sexual conduct or a sexual performance." Tex. Penal Code Ann. § 43.25(b). Sexual performance includes "any performance or part thereof that includes sexual conduct by a child younger than 18 years of age." *Id.* § 43.25(a)(1). Performance is additionally defined as "any play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons." *Id.* § 43.25(a)(3). Sexual conduct includes "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic

abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top

of the areola." *Id.* § 43.25(a)(2).

Dallas City Code § 41A-20.1 prohibits the admission of minor into sexually oriented

businesses. Specifically, it states

> (a) A licensee or an operator commits an offense if he knowingly:
>
>> (1) allows a minor to enter the interior premises of a sexually oriented business;
>>
>> (2) employs, contracts with, or otherwise engages or allows a minor to perform adult cabaret entertainment; or
>>
>> (3) employs a minor in a sexually oriented business.
>
> (b) Knowledge on the part of the licensee or operator is presumed under Paragraph (2) or (3) of Subsection (a) if identification records were not kept in accordance with the requirements of Section 41A-7.1, and properly kept records would have informed the licensee or operator of the minor's age.
>
> (c) An employee commits an offense if the employee knowingly:
>
>> (1) allows a minor to enter the interior premises of a sexually oriented business;
>>
>> (2) employs, contracts with, or otherwise engages or allows a minor to perform adult cabaret entertainment; or
>>
>> (3) employs a minor in a sexually oriented business.

Dallas City Code § 41A-20.1. The Code defines an "operator" as "any person who has managerial

control of the on-site, day-to-day operations of a sexually oriented business, regardless of whether

that person is a designated operator of the sexually oriented business." *Id.* § 41A-2(26).

Defendants contest Badii's *Sabine Pilot* claim by arguing, first, that, even assuming there was

a conspiracy to admit minors into the club, there is no evidence that Badii was required to commit

an unlawful act. Doc. 37, Defs.' Br. 38-39. They point to Badii's own admissions in his deposition

that he was not invited to participate in the alleged conspiracy and that he was completely unaware of the alleged conspiracy until he discovered Castaneda admitting minors. Doc. 37-3, Badii Dep. Ex. C, at 225. Defendants argue that Badii essentially bases his *Sabine Pilot* claim on the fact that he engaged in a whistle-blowing activity, but that Texas law establishes that the *Sabine Pilot* exception does not extend to employees who are terminated for reporting illegal activities to upper management. *Id.* at 40-41. Defendants similarly maintain that even if Badii interpreted Stern's behavior and statements as direction to engage in unlawful acts, Badii's subjective interpretation fo Stern's statement is not evidence of being required to violate the law. Doc. 37, Defs.' Br. 39. Furthermore, Defendants note that there is no evidence of sexual performance by a minor in the club. *Id.*

To show that he was required to commit an illegal act, Badii presents deposition testimony that relates the conversation he had with Daniel Castaneda, the former XTC Cabaret employee who Badii says admitted to allowing minors into the club for a cover charge. Doc. 37-3, Badii Dep. Ex. C, at 215-16. Badii insists that Castaneda was acting in concert with Stern and other employees and that Stern reprimanded Badii after he terminated Castaneda. *Id.* at 217. He relates that Stern specifically stated, "you rang up that money? How dare you ring up that money. That's minor cover charges, you stupid n****r" and then told Badii that they needed to have a conversation because Badii did not operate the way Stern operated. *Id.* at 217-18. A week following this incident, Badii testifies that he was terminated. *Id.* at 215-22.

Badii maintains that this evidence is sufficient to support a *Sabine Pilot* claim because it shows that he refused to participate in a criminal conspiracy to admit minors under 18 into a sexually oriented business. Doc. 38, Pl.'s Resp. 10. He argues that, as a manager, he was an "operator" under

the Dallas City Code, and that knowledge was therefore presumed on his part because the club did not keep records of the minors entering the club. *Id.* at 11; Dallas City Code § 41A-20.1(b). According to Badii's theory, any time that Castaneda permitted a minor into the club, Badii would be presumed to have violated the statute. *Id.* When he terminated Castaneda and rang up the money, however, he refused to violate the law and participate in any future conspiracy, thus laying the foundation for his *Sabine Pilot* claim. *Id.* According to Badii, his actions constituted not only a refusal to participate in a conspiracy to admit minors into a sexually oriented business, but also a refusal enter into a conspiracy to commit sexual performance of a child. *Id.* at 10. He bases this latter argument on his theory that admitting minors into a club inherently involves sexual conduct as it is defined under the Texas Penal Code, and therefore constitutes sexual performance by a child. *Id.*

Badii's *Sabine Pilot* claims fail on both legal and factual grounds. As to the factual grounds for his claims, Badii fails to submit sufficient summary judgment evidence to raise a genuine issue of material fact as to whether he was required to commit an illegal act. As Badii himself admits, he did not know anything about the admission of minors into the club before the day Castaneda admitted to admitting minors. Doc. 37-3, Badii Dep. Ex. C, at 215-16. The only evidence he presents to show that he was required to participate in the conspiracy is that Stern and Robert Bonilla, another employee, tried to prevent him from interfering by threatening him and making aggressive comments. *Id.* at 217-18. Stern did order Badii to give the money back to Castaneda and did state that he needed to have a conversation with Badii because Badii's actions with regards to Castaneda were not in line with how Stern operated, *id.* at 218, but these statements are insufficient to create a fact issue as to whether Badii was required to commit an illegal act because Stern neither required Badii to participate in the alleged conspiracy, nor did he order Badii to participate in a conspiracy moving

forward. As one Texas court noted, an employer must generally request or order a plaintiff to engage in an illegal act in order for a plaintiff to maintain a *Sabine Pilot* claim. *Burt v. City of Burkburnett*, 800 S.W.2d 625, 627 (Tex. App.–Fort Worth 1990, no writ). By directing Badii to return the money, Stern did not order Badii to participate in the conspiracy, but instead was directing him not to interfere, effectively excluding Badii from the conspiracy.

This case parallels a recent case in which the Texas Supreme Court held that *Sabine Pilot* only "protects employees who are asked to commit a crime, not those who are asked not to report one." *Ed Rachal Foundation v. D'Unger*, 207 S.W.3d 330, 332 (Tex. 2006). The plaintiff in *Ed Rachal* suspected that his foreman was harassing migrants who crossed the ranch where he worked. *Id.* at 331. Even though his superior had told him "to drop it," the plaintiff became concerned that something illegal had happened after he found that the Border Patrol had no knowledge of three migrants whom the foreman had apprehended and had purportedly turned over to the authorities. *Id.* at 331. The plaintiff reported his concerns to the authorities, and when they proved to be unfounded, he was terminated. *Id.* The plaintiff later claimed that he could make out a *Sabine Pilot* claim because he was terminated for trying to find out what had happened to the migrants. *Id.* at 332. The court rejected the court of appeals' holding that the supervisor's instructions were an attempt to include the plaintiff in a conspiracy to cover up criminal conduct, holding instead that *Sabine Pilot* does not extend to employees who are asked not to report a crime. *Id.* Otherwise, the court reasoned, all whistleblowers would be able to make out *Sabine Pilot* claims. *Id.* The court concluded that "[c]riminal responsibility as a conspirator requires proof of culpable acts made with an intent to assist in the commission of a crime before it occurs," and that a plaintiff may not therefore maintain a *Sabine Pilot* claim without evidence that he was asked to participate in any

impending criminal acts or that he otherwise intended to do so. *Id.*

Here, Badii presents no evidence that he was asked to participate in any impending acts. Stern only directed him not to interfere, and did not require Badii to participate in the alleged criminal acts, either when they were occurring or at any point thereafter. Badii's novel argument that because he was an operator, knowledge was presumed on his part, and therefore his firing of Castaneda constitutes a refusal to participate in future violations, misreads the law. Section 41A-20.1(b) of the Texas Penal Code only presumes knowledge on the part of operators for employing or allowing a minor to perform adult cabaret entertainment in a sexually oriented business, not for simply admitting minors into such a business. Accordingly, Badii would not be automatically liable for the admission of minors into the club, even if he was an operator under the Code, and therefore his termination of Castaneda did not constitute an implicit refusal to take part in a conspiracy.[10]

Badii attempts to bolster his claims that a party can maintain a *Sabine Pilot* claim when he refuses to participate in a criminal conspiracy by relying on *Ebasco Constructors, Inc. v. Rex*, 923

---

[10]With regards to Badii's arguments that Stern and other employees had also engaged in a conspiracy to facilitate the sexual performance of a minor, the Court notes that Badii submits no evidence of sexual performance by a minor. He makes another novel argument that merely permitting a minor into a sexually oriented business equates to sexual performance of a minor because a minor must necessarily engage in sexual performance or sexual conduct, as those phrases are defined under the law, upon entering the club. Doc. 38, Pl.'s Resp. 10. This interpretation does not conform to the language of the law, however, which envisions a minor actually engaging in performance or conduct and not just being in the presence of sexual conduct or performance. Texas Penal Code § 43.25. Even if "sexual conduct" includes sexual contact, which in turn includes "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person," Tex. Penal Code § 43.01, Badii would have to submit evidence that Stern or other conspirators employed, authorized, or induced a minor to engage in the sexual conduct to raise a question as to sexual performance of a child. Texas Penal Code § 43.25(b). The evidence submitted only shows that Stern and others admitted minors into the club. In any event, the Court does not need to decide whether admitting minors into a sexually oriented business necessarily involves sexual performance of a child because it finds that there is insufficient evidence to raise a question of fact as to whether Badii was required to engage in a criminal conspiracy. This conclusion forecloses Badii's *Sabine Pilot* claim whether it is based on an alleged violation of Texas Penal Code § 43.25 or Dallas City Code § 41A-20.1.

S.W.2d 694 (Tex. App.–Corpus Christi 1996, no writ). This case is distinguishable from *Ebasco Constructors*, however, because in that case the plaintiff was asked to sign off on reports that he knew were falsified, and in doing so would have committed a criminal violation. 923 S.W.2d at 699. Here, by contrast, Badii was ordered to return money and told not to interfere, requiring him to do nothing beyond not report to others what he had seen. He was therefore not "forced to choose between risking criminal liability or being discharged from his livelihood" as required to make out a *Sabine Pilot* claim because he was not forced to join the conspiracy and because failing to report alleged violations under these circumstances did not carry any criminal penalties. *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 724 (Tex. 1990); *see also Ed Rachal*, 207 S.W.3d at 332 (finding that a plaintiff could not maintain a *Sabine Pilot* claim without pointing to a law that made failing to report the illegal activities of his employer a crime). Rather, he was directed not to report violations to higher management or the authorities, which Texas courts have held is not sufficient to support a *Sabine Pilot* claim. *Ed Rachal*, 207 S.W.3d at 331-32; *Winters*, 795 S.W.2d at 724; *Austin v. HealthTrust, Inc.*, 967 S.W.2d 400 (Tex. 1998).

Badii fails to raise a genuine issue of material fact regarding whether he was required to commit an illegal act, and thus he fails to raise a question as to one of the essential elements of his *Sabine Pilot* claim. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment as to Badii's *Sabine Pilot* claim. Because the Court decides that Badii was not required to commit an illegal act, it does not reach the parties' arguments concerning whether Badii voluntarily resigned or was terminated.

IV.

CONCLUSION

For the reasons provided above, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment. The Court **GRANTS** Defendants' Motion as to Badii's Title VII discrimination and retaliation claims as well as his *Sabine Pilot* claim. The Court **DENIES** Defendants' Motion as to Badii's hostile work environment claim.

SO ORDERED.

SIGNED: February 11, 2014.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE